Gregory S. Walston, State Bar No. 196776
Orestes Alexander Cross, State Bar No. 250471
WALSTON CROSS
222 Columbus Avenue, Suite 420
San Francisco, California 94133
Telephone: (415) 956-9200
Facsimile: (415) 956-9205
Email: gwalston@walstonlaw.com

ATTORNEYS FOR PLAINTIFF
MARKHAM ROBINSON

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARKHAM ROBINSON,<br><br>                          Plaintiff<br><br>        v.<br><br>SECRETARY OF STATE DEBRA<br>BOWEN, et al.<br><br>                          Defendants. | Case No. 08-CV-3836 JL<br><br>**PLAINTIFF'S *EX PARTE*<br>APPLICATION FOR AN ORDER<br>SHORTENING TIME ON<br>PLAINTIFF'S MOTION FOR<br>SUMMARY JUDGMENT**<br><br>**L-R 6-3** |

**INTRODUCTION**

Under Fed. R. Civ. P. 56(a), plaintiff cannot file a motion for summary judgment until 20 days after commencement of the action.  Under L-R 7-2, plaintiff must calendar the hearing on his prospective motion for summary judgment at least 35 days after it is filed.  Plaintiff asks the Court to shorten time to file and hear the motion under Local Rule 6-3, the Court's inherent power to control its calendar, and the power to control time to hear motions under Fed. R. Civ. P. 6(d) for the reasons set forth below.  For the Court's convenience, a copy of plaintiff's prospective motion for summary judgment is attached as Exhibit 1; the declaration in support is Exhibit 2.

This is an action by an Electoral College member and the chairman-elect of the American Independent Party, challenging Senator John McCain's eligibility to run for, and serve as, President of the United States.  Specifically, this action points out that Senator McCain is ineligible to run for, and serve as, President of the United States under Article II's "natural born"

WALSTON CROSS, ATTORNEYS
222 Columbus Avenue, Suite 420
San Francisco, California 94123
Telephone: (415) 956-9200
Facsimile: (415) 956-9205

WALSTON CROSS, ATTORNEYS
222 Columbus Avenue, Suite 420
San Francisco, California 94123
Telephone: (415) 956-9200
Facsimile: (415) 956-9205

1  citizen requirement because McCain was born in Panama.  *Accord,* Gabriel J. Chin, *Why Senator*

2  *John McCain Cannot Be President: Eleven Months and a Hundred Yards Short of Citizenship,*

3  Arizona Legal Studied Discussion Paper No. 08-14 (attached to plaintiff's motion for summary

4  judgment as Exhibit A.)

5      As set forth in plaintiff's motion for summary judgment, this issue is properly resolved

6  forthwith in order to avoid the chaos of resolving them after the election, and afford the non-

7  prevailing party meaningful appellate options with regard to this compelling issue.  Significantly,

8  this issue is a pure question of law that can be resolved without discovery, and defendants have

9  already briefed it in conjunction with a case that presented the same issue.  *See, Hollander v.*

10  *McCain*, 2008 DNH 129; 2008 U.S. Dist. LEXIS 56729 (D. N.H. 2008).[1]  It is now August 12,

11  2008.  The general election occurs on November 4, 2008.  Plaintiff respectfully urges the Court to

12  shorten time on this motion so that it is heard on Thursday, September 18, 2008 on this Court's

13  civil law and motion calendar.

14                          **ARGUMENT**

15                              **I.**

16              **THE COURT SHOULD SHORTEN TIME.**

17      The Court has authority to shorten time for good cause under Local Rule 6-3, the Court's

18  inherent power to control its calendar, and the power to control time to hear motions under Fed. R.

19  Civ. P. 6(d).

20      Good cause exists to shorten time on plaintiff's motion for summary judgment.  There is

21  increasing secondary authority raising serious questions concerning Senator McCain's eligibility.

22  See, e.g., Gabriel J. Chin, *Why Senator John McCain Cannot Be President: Eleven Months and a*

23  *Hundred Yards Short of Citizenship,* Arizona Legal Studied Discussion Paper No. 08-14; Opinion

24  of Lawrence Tribe and Theodore Olson re: Senator McCain's Eligibility to be President, dated

25  _____

26  [1] In Hollander, a "taxpayer" plaintiff was dismissed for lack of standing.  Nonetheless the
substantive issues were briefed by defendants.  Further, unlike Hollander, plaintiff in this case has

27  standing.  As both an elector and chairperson-elect of a rival Party on the same ballot, plaintiff has
"a personal stake in the outcome of the election" sufficient to establish his standing to challenge

28  the election.  *Miyazawa v. City of Cincinnati*, 45 F.3d 126, 128 (6th Cir. 1995); *see also*, *Erum v.
Cayetano,* 881 F.2d 689, 691 (9th Cir. 1989).

*Robinson v. Secretary of State, et al.*

WALSTON CROSS, ATTORNEYS
222 Columbus Avenue, Suite 420
San Francisco, California 94123
Telephone: (415) 956-9200
Facsimile: (415) 956-9205

1  March 19, 2008 (attached to Chin article as Appendix A); Adam Liptak, *A Hint of New Life to the*

2  *McCain Birth Issue*, N.Y. Times, July 11, 2008 (online at http://www.nytimes.com/2008/07/11

3  /us/politics/11mccain.html).

4       Yet with less than three months before the general election, Senator McCain is the

5  Republican Party's presumptive nominee.  Although at least two other cases have challenged

6  Senator McCain's candidacy, they have each been dismissed for lack of standing because the

7  plaintiffs in those cases were mere taxpayers.  *Hollander v. McCain,* 2008 DNH 129; 2008 U.S.

8  Dist. LEXIS 56729 (D. N.H. 2008).  This case, by contrast, is brought by a member of the

9  presidential electoral college of a competing political party that will be on the same presidential

10  ballot as John McCain and the Republicans, which is sufficient to establish standing.  *Erum v.*

11  *Cayetano*, 881 F.2d 689 (9th Cir. 1989)**;** *Miyazawa v. City of Cincinnati*, 45 F.3d 126, 128 (6th

12  Cir. 1995) (plaintiff has standing to challenge election when he has "a personal stake in the

13  outcome of the election").  Indeed, it is for this reason that plaintiff could not have brought this

14  action sooner.  Until recently, plaintiff had not been elected a presidential elector by the American

15  Independent Party presidential elector.

16       In short, this case will likely be the one to resolve the monumental issue of Senator

17  McCain's eligibility.  This issue has already divided the opinions of former solicitors general and

18  esteemed law professors, and will have a potentially nationwide impact.  Yet every day that passes

19  makes judicial resolution of the issue of Senator McCain's candidacy more difficult.  At the

20  outset, if Senator McCain wins the presidency, resolving the issue of his eligibility *after* the

21  election will simply inflict havoc on our system of democratic government: will McCain's running

22  mate assume the presidency or the candidate with the second-most electoral votes?  It is simply

23  irresponsible to put off resolution of these issues until after the election.

24       Further, the longer resolution of this issue is delayed, the more cumbersome it will be.  If

25  these issues are resolved shortly before the election, the state will have to reprint ballots, the

26  Republicans will have to nominate a new candidate, and public attitudes towards the legal and

27  political processes will be strained.  In short, there is simply no sense delaying this action beyond

28

*Robinson v. Secretary of State, et al.*

the very minimal amount of time necessary for it to be briefed by the parties and addressed by the Court.

Significantly, it is worth noting that the Republicans have already briefed this issue in *Hollander v. McCain*, 2008 DNH 129; 2008 U.S. Dist. LEXIS 56729 (D. N.H. 2008). They have obtained a joint opinion by Lawrence Tribe and Theodore Olson defending McCain's qualifications, which has been discussed by New York Times articles. *See, e.g.*, Adam Liptak, *A Hint of New Life to the McCain Birth Issue*, N.Y. Times, July 11, 2008 (online at http://www.nytimes.com/2008/07/11/us/politics/11mccain.html). Shortening time on this matter will therefore not prejudice defendants.

Plaintiff therefore respectfully requests an order shortening time.

### CONCLUSION

Because there is good cause to shorten time on this matter and because it will not prejudice defendants, plaintiff asks the Court to shorten time on plaintiff's motion for summary judgment and summary adjudication. Plaintiff proposes the following schedule:

Plaintiff's Motion for Summary Judgment filed forthwith;

Defendants' Opposition due September 12, 2008;

Plaintiff's Reply due September 15, 2008;

Motion argued September 18, 2008, 8:00 a.m. in Courtroom 9.

Dated: August 17, 2008              WALSTON CROSS

By: Gregory S. Walston

ATTORNEYS FOR PLAINTIFF

WALSTON CROSS, ATTORNEYS
222 Columbus Avenue, Suite 420
San Francisco, California 94123
Telephone: (415) 956-9200
Facsimile: (415) 956-9205

*Robinson v. Secretary of State, et al.*

WALSTON CROSS, ATTORNEYS
222 Columbus Avenue, Suite 420
San Francisco, California 94123
Telephone: (415) 956-9200
Facsimile: (415) 956-9205

## DECLARATION OF COUNSEL UNDER L-R 6-3

Gregory S. Walston, declare as follows:

1.      I am an attorney licensed to practice before all California state courts, the United States District Courts for the Northern and Eastern Districts of California, the United States Court of Appeals for the Ninth Circuit, and the Supreme Court of the United States. I am presently employed as a partner in the Law Firm of Walston Cross, and, in that capacity, I represent the plaintiff in this action.

2.      Plaintiff seeks summary judgment on the issue of Senator McCain's eligibility to run for, and serve as, President of the United States.

3.      All defendants have been served with the summons, complaint and plaintiff's pending motion for a preliminary injunction. Defendants are also receiving electronic copies of this motion and the exhibit. However, we have been unable to obtain a stipulation from opposing counsel as we have not yet been contacted by them.

4.      Plaintiff respectfully submits that allowing this matter a full briefing schedule will be prejudicial for the reasons set forth in the above argument.

5.      There have been no previous time modifications in this action, nor will this proposed modification affect the scheduling order.

6.      L-R 37-1 is inapplicable because this matter does not involve a discovery dispute. I declare under penalty of perjury that the foregoing is true and correct and based on my personal knowledge. Executed August 17, 2008 in San Francisco, California.

Gregory S. Walston

*Robinson v. Secretary of State, et al.*

# EXHIBIT 1

# PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Gregory S. Walston, State Bar No. 196776
Orestes Alexander Cross, State Bar No. 250471
WALSTON CROSS
222 Columbus Avenue, Suite 420
San Francisco, California 94133
Telephone: (415) 956-9200
Facsimile: (415) 956-9205
Email: gwalston@walstonlaw.com

ATTORNEYS FOR PLAINTIFF
MARKHAM ROBINSON

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MARKHAM ROBINSON,

               Plaintiff

    v.

SECRETARY OF STATE DEBRA
BOWEN, et al.

              Defendants.

Case No. CV-08-3836

**PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE FOR SUMMARY ADJUDICATION; SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**

WALSTON CROSS, ATTORNEYS
222 Columbus Avenue, Suite 420
San Francisco, California 94123
Telephone: (415) 956-9200
Facsimile: (415) 956-9205

*Robinson v. Secretary of State, et al.*

## TABLE OF CONTENTS

Notice ……………………………………………………………1

Memorandum of Points and Authorities …………………………… 3

Introduction ………………………………………………… 3

Statement of Facts ………………………………………… 4

Statement of the Issues ……………………………………………4

Relief Sought …………………………………………………… 4

Standard …………………………………………………… 5

Argument ………………………………………………………5

    I.    Plaintiff Has Standing ……………………………… 5

    II.    Senator McCain is Ineligible to Run For,
    and Serve as, President Under Article II's
    "Natural Born" Citizen Requirement…………………………9

        A.  The Canal Zone was not "the United States"
        in 1936 for Purposes of Article II's
        Citizenship Clause…………………………………... 10

        B.  Natives of Unincorporated Territories are
        Not Citizens …………………………………… 11

        C.  Citizenship as a Child of Citizens in not
        "Natural Born" Citizenship…………………………… 12

            1.   The Exclusive Naturalization Powers of
            Congress………………………………………... 13

            2.   Citizenship by Descent in 1936: "Birth in the
            Canal Zone Does Not Establish Citizenship…....14

    III.    Plaintiff's Requests for Injunctive Relief are Proper…...….17

    IV.    Prompt Resolution is in the Public Interest…………………18

Conclusion…………………………………………………… 19

WALSTON CROSS, ATTORNEYS
222 Columbus Avenue, Suite 420
San Francisco, California 94123
Telephone: (415) 956-9200
Facsimile: (415) 956-9205

i

1

## TABLE OF AUTHORITIES

Federal Cases

2

3

*Baker v. Carr*
     396 U.S. 186, 7 l. Ed. 2d 663, 82 S.Ct. 691 (1962)……………………………… 5

4

*Boumediene v. Bush*
     128 S. Ct. 2229, 2253-54 (2008)………………………………….. 12

5

6

*Bullock v. Carter*
     405 U.S. 134, 31 L. Ed. 2d 92, 92 S. Ct. 849 (1972)……………………………… 7

7

*Cardona v. Oakland Unified School Dist.*
     785 F. Supp. 837, 840 (N.D. Cal. 1982)……………………………… 18

8

9

*Celotex Corp. v. Catrett*
     477 U.S. 317 (1986)……………………………… 5

10

*Citizens for Legislative Choice v. Miller*
     993 F. Supp. 1041, 1044 (E.D. Mich. 1998)……………………………7

11

12

*City of Los Angeles v. Lyons*
     461 U.S. 95, 101 (1983)………………………………5

13

*Corona-Palomena v. INS*
     661 F.2d 814, 818 (9th Cir. 1981)……………………………… 12

14

15

*Downes v. Bidwell*
     182 U.S. 244, 251 (1901)………………………………10, 14

16

*Erum v. Cayetano*
     881 F.2d 689, 691 (9th Cir. 1989)……………………………… 6, 7

17

18

*Farrell v. United States*
     381 F.2d 368, 369 (9th Cir. 1967)……………………………… 12

19

*Federal Election Commission v. Akins*
     524 U.S. 11 (1998) ……………………………… 6

20

21

*Government of Canal Zone v. P. (Pinto)*
     590 F.2d 1344, 1351 (5th Cir.1979)……………………………… 11

22

*Hartman v. Summers*
     120 F.3d 157, 160 (9th Cir. 1997)……………………………… 6

23

24

*Henderson v. Ft. Worth Independent School District*
     526 F.2d 286 (5th Cir. 1976) ……………………………… 7

25

*Hollander v. McCain*
     2008 DNH 129; 2008 U.S. Dist. LEXIS 56729 (D. N.H. 2008)………………2, 4

26

27

*Hubbard v. EPA*
     949 F.2d 453 (D.C. Cir. 1991)……………………………… 17

28

WALSTON CROSS, ATTORNEYS
222 Columbus Avenue, Suite 420
San Francisco, California 94123
Telephone: (415) 956-9200
Facsimile: (415) 956-9205

*Robinson v. Secretary of State, et al.*

*Imperial v. Castruita*
   418 F. Supp. 2d 1174, 1178 (C.D. Cal. 2006) ........................................ 7

*L.A. Mem. Coliseum Comm'n v. Nat'l Football League*
   634 F.2d 1197, 1200 (9th Cir. 1980).................................................... 17

*Lujan v. Defenders of Wildlife*
   504 U.S. 555, 560 (1992)................................................................5

*In re Martiza Ellis A.K.A. Maritza M. Ellis*
   2006 WL 2008273 (BIA June 5, 2006) ................................................ 12

*Matter of S.*
   3 I & N Dec. 589, 593 (BIA Apr. 26, 1949) ......................................... 12

*Miller v. Albright*
   523 U.S. 420, 423-24 (1998) ........................................................... 13

*Miyazawa v. City of Cincinnati*
   45 F.3d 126, 128 (6th Cir. 1995) ................................................... 7, 8

*Montana v. Kennedy*
   366 U.S. 308 (1961) ......................................................................13

*No GWEN Alliance of Lane County, Inc. v. Aldridge*
   841 F.2d 946, 949 (9th Cir. 1988) ....................................................... 7

*Rabang v. Boyd*
   353 U.S. 427 (1957)...................................................................11, 12

*Rasul v. Bush*
   542 U.S. 466, 475 (2004) ............................................................ 15

*Rassmussen v. United States*
   197 U.S. 516, 521 (1905)................................................................10

*Regents of Univ. of Cal. v. Am. Broad. Cos.*
   747 F.2d 511, 519-20 (9th Cir. 1984)................................................... 17

*Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*
   944 F.2d 597, 603 (9th Cir. 1991) ....................................................... 17

*Rogers v. Bellei*
   401 U.S. 815 (1971)....................................................................... 13

*Sampson v. Murray*
   415 U.S. 61, 90, 94 S. Ct. 937, 39 L. Ed. 2d 166 (1974) ...........................17

*Schlesinger v. Reservists Committee to Stop the War*
   418 U.S. 208, 94 S. Ct. 2925, 41 L. Ed. 2d 706 (1974) ...........................6

*The Schooner Exchange v. McFaddon*
   11 U.S (7 Cranch) ..................................................................... 15

*United States v. Husband R. (Roach)*
   453 F.2d 1054, 1057 (5th Cir. 1971)............................................... 11

WALSTON CROSS, ATTORNEYS
222 Columbus Avenue, Suite 420
San Francisco, California 94123
Telephone: (415) 956-9200
Facsimile: (415) 956-9205

iii

*United States v. Wong Kim, Ark*
    169 U.S. 649, 702 (1898)………………………………………………13, 15

*Warth v Seldin*
    422 U.S. 490, 498, 45 L. Ed. 2d 343, 95 S. Ct. 2197 (1975) …………………..6

*Williams v. Florida*
    399 U.S. 78 (1970) ………………………………………………..   10

*Wilson v. Shaw*
    204 U.S. 24, 32-33 (1907) ………………………………………… 11

*Ex parte Young*
    209 U.S. 123, 152 (1908) …………………………………………17

*Zartarian v. Billings*
    204 U.S. 170, 173 (1907) …………………………………………9

Constitutional Provisions

U.S. Const., art. II, § 1, cl. 4 ……………………………………… 9

U.S. Const. Art. IV, § 3, cl. 2 ………………………………………10

U.S. Const., Amend. XIV ……………………………………………9

Federal Statutes

8 U.S.C. § 173 (1925) ……………………………………………… 11, 14

8 U.S.C. § 204(c) (1925) …………………………………………… 12

8 U.S.C. § 1403(a) ………………………………………………….. 10

8 U.S.C. § 1421(d) ………………………………………………… 13

Acts of Congress

33 Stat. 2234, art. 3 (1904) ………………………………………… 11

48 Stat. 797, ch. 344…………………………………………………   14

50 Stat 558, ch 563 …………………………………………………10

State Statutes

Cal. Bus. & Prof. Code § 17200 *et seq*…………………………………17

Cal. Bus. & Prof. Code § 17203 …………………………………….. 17

Other Authority

26 Op. U.S. Atty. Gen. 376 (Sept. 7, 1907)………………………….. 15-16

25 Op. U.S. Atty. Gen. 474 (June 5, 1905) …………………………….. 15-16

iv

1

30 Op. U.S. Atty. Gen. 271 (July 14, 1914) …………………………………… 16

2

38 Op. U.S. Atty. Gen. 10 (July 21, 1934) …………………………………... 14

3

John Major, *Prize Possession, the United States and the
   Panama Canal*, 1903-1979 (1993) ………………………………………… 10

4

5

José A. Cabranes, *Citizenship and the American Empire,*
   127 U. Pa. L. Rev. 391 (1978)………………………………………………11

6

Gerald L. Neuman, *Anomalous Zones*, 48 Stan L. Rev. 1197…………………….. 11

7

Gabriel J. Chin, *Why Senator John McCain Cannot Be President:
   Eleven Months and a Hundred Yards Short of Citizenship,*
   Arizona Legal Studied Discussion Paper No. 08-14, at 8-9 ………………….. passim

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**WALSTON CROSS, ATTORNEYS**
222 Columbus Avenue, Suite 420
San Francisco, California 94123
Telephone: (415) 956-9200
Facsimile: (415) 956-9205

*Robinson v. Secretary of State, et al.*

Gregory S. Walston, State Bar No. 196776
Orestes Alexander Cross, State Bar No. 250471
WALSTON CROSS
222 Columbus Avenue, Suite 420
San Francisco, California 94133
Telephone: (415) 956-9200
Facsimile: (415) 956-9205
Email: gwalston@walstonlaw.com

ATTORNEYS FOR PLAINTIFF
MARKHAM ROBINSON

WALSTON CROSS, ATTORNEYS
222 Columbus Avenue, Suite 420
San Francisco, California 94123
Telephone: (415) 956-9200
Facsimile: (415) 956-9205

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARKHAM ROBINSON,<br><br>　　　　　Plaintiff<br><br>　v.<br><br>SECRETARY OF STATE DEBRA BOWEN, et al.<br><br>　　　　　Defendants. | Case No. CV-08-3836<br><br>**PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE FOR PARTIAL SUMMARY JUDGMENT; SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

NOTICE IS GIVEN THAT, on the day, time and department designated by the Court by a separate order, plaintiff will ask the Court summary judgment or in the alternative for partial summary judgment against defendants under Fed. R. Civ. P. 56.

Plaintiff's requested relief is based on the position that Senator McCain is ineligible to serve as President of the United States under Article II's "natural born citizen" requirement. Plaintiff, who is the chairperson and presidential elector of another party on the ballot, is irreparably harmed by Senator McCain's illegal candidacy.

1    This motion is based on this notice, the supporting memorandum of points and authorities,

2    the complete records and files in this action, and all other matters the Court may properly consider.

3    Dated: August 17, 2008                    WALSTON CROSS

4

5                                              By: Gregory S. Walston

6                                              ATTORNEYS FOR PLAINTIFF

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

WALSTON CROSS, ATTORNEYS
222 Columbus Avenue, Suite 420
San Francisco, California 94123
Telephone: (415) 956-9200
Facsimile: (415) 956-9205

*Robinson v. Secretary of State, et al.*

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

This is an action asking the Court to resolve issues of Senator John McCain's eligibility to run for, and serve as, President of the United States, given that he was born in Panama and Article II of the Constitution requires that only "natural born" citizens may serve as President. This motion seeks summary judgment or partial summary judgment against defendants on grounds that there are no disputed issues of material fact precluding a finding that Senator McCain is not a "natural born" citizen eligible for the presidency under Article II.

The one way to become a "natural born" citizen is to be born in the United States. Being born in Panama – even in the Panama Canal Zone – is not being born in the United States for purposes of the Constitution. A series of early-20th-century decisions known as the Insular Cases ruled that unincorporated territories acquired by the United States were not part of the nation for constitutional purposes. Although the Insular Cases did not address the Panama Canal zone, they dispel any possibility that the zone could be considered part of the United States. The zone was considered an unincorporated territory before it was returned to Panama in 1999. Indeed, some people born in Panama when it was under American jurisdiction have been deported from the United States or convicted of being here illegally.

Senator McCain was not born in the United States and is not a "natural born" citizen under the plain language of Article II. In other words, he is ineligible to run for, and serve as, President of the United States. Yet he is running for President and is the presumptive nominee of the Republican Party.

This motion seeks summary judgment against defendants on grounds that there is no disputed material fact precluding plaintiff's injunctive and declaratory relief. Senator McCain's candidacy, which violates Article II on its face, is causing irreparable harm to all competitors on the same ballot, including the American Independent Party and its electors. There is no way to monetarily compensate a competing presidential elector for competing with an illegal candidacy.

This is a pure question of law that does not hinge on any question of fact, other than the fact that Senator McCain was born in Panama, which is undisputed. It can, and should, be

WALSTON CROSS, ATTORNEYS
222 Columbus Avenue, Suite 420
San Francisco, California 94123
Telephone: (415) 956-9200
Facsimile: (415) 956-9205

*Robinson v. Secretary of State, et al.*

1   addressed forthwith.  Indeed, allowing Senator McCain's candidacy to proceed gives rise to the

2   prospect that Senator McCain will win the Presidency and the courts will be forced to face the

3   chaotic process of resolving this issue then.

4                              **STATEMENT OF FACTS**

5       John McCain was born in the Panama Canal Zone in 1936.  (*Hollander v. McCain,* 2008

6   DNH 129; 2008 U.S. Dist. LEXIS 56729 (D. N.H. 2008); Walston Decl. ¶ 6).[1]

7                           **STATEMENT OF THE ISSUES**

8       1.      A plaintiff must present a "distinct and palpable injury" to have standing.  Plaintiff

9   wishes to challenge the legality of Senator McCain's candidacy.  Plaintiff is the chairperson and

10  presidential elector of a rival political party on the ballot, and plaintiff will be one of California's

11  fifty-five electors who will vote for President if plaintiff's party prevails.  Does a competitor's

12  illegal candidacy cause plaintiff a "distinct and palpable" injury?

13      2.      Article II requires a President to be a "natural born" citizen.  Senator McCain was

14  born in Panama.  Is Senator McCain eligible to be President?

15      3.      An injunction is proper when the plaintiff faces irreparable harm, i.e., harm that

16  cannot be calculated monetarily.  Here, plaintiff cannot be monetarily compensated for competing

17  with an illegal presidential campaign.  Should an injunction issue?

18                              **RELIEF SOUGHT**

19      Plaintiff asks for the following relief:

20      1.      For an injunction prohibiting Secretary Bowen from placing Senator McCain's

21              name on the California ballot as a candidate for president;

22      2.      For am injunction prohibiting the RNC and the CRP from representing Senator

23              McCain as a qualified candidate for President of the United States to the California

24              voters;

25  _____

26  [1] It is not clear whether Senator McCain was born in the Panama Canal Zone or the
    Commonwealth of Panama.  Senator McCain's eligibility for President would certainly be more
27  attenuated if he were born in the Commonwealth.  However, because Senator McCain asserts he
    was born in the Panama Canal Zone rather than the Commonwealth, this motion assumes that
28  Senator McCain was born in the Canal Zone in order to avoid disputed facts.

WALSTON CROSS, ATTORNEYS
222 Columbus Avenue, Suite 420
San Francisco, California 94123
Telephone: (415) 956-9200
Facsimile: (415) 956-9205

*Robinson v. Secretary of State, et al.*

WALSTON CROSS, ATTORNEYS
222 Columbus Avenue, Suite 420
San Francisco, California 94123
Telephone: (415) 956-9200
Facsimile: (415) 956-9205

3.    For an injunction prohibiting Senator McCain from representing himself as a qualified candidate for President of the United States to the California voters

4.    For an injunction prohibiting the RNC, CRP and Senator McCain from attempting to place Senator McCain's name on the California ballot for the upcoming 2008 presidential election;

5.    For an injunction prohibiting the California Republican Presidential electors from casting their electoral votes for Senator McCain;

6.    For a declaratory judgment that Senator McCain is ineligible to run for, and serve as, President of the United States.

## STANDARD

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper only where there is no genuine issue of material fact precluding judgment for the moving party. *See generally*, *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986).

## ARGUMENT

## I.

## PLAINTIFF HAS STANDING.

"Those who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Article III of the Constitution by alleging an actual case or controversy." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983). "[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "[T]he irreducible constitutional minimum of standing contains three elements." *Id*. "First, the plaintiff must have suffered an 'injury in fact' - an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical." *Id*. (internal citations and quotation marks omitted). "Second, there must be a causal connection between the injury and the conduct complained of . . . ." *Id*. "Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id*. (internal quotation marks omitted).

*Robinson v. Secretary of State, et al.*

1   Similarly, in *Hartman v. Summers*, 120 F.3d 157, 160 (9th Cir. 1997), the Court stated that to "the

2   threat of future injury must be credible rather than remote or hypothetical." *Id.*

3       In *Federal Election Commission v. Akins*, 524 U.S. 11 (1998) the Supreme Court extended

4   standing to a plaintiff claiming to be "aggrieved" under the federal election laws because of the

5   "failure to obtain relevant information" about a political action committee. *Id.* at 17.   The Ninth

6   Circuit has stated that plaintiff/voters possess "standing to challenge . . . ballot access restrictions

7   in [their] capacities as registered voter[s]. *Erum v. Cayetano*, 881 F.2d 689, 691 (9th Cir. 1989)

8   citing *Baker v. Carr*, 396 U.S. 186, 7 l. Ed. 2d 663, 82 S.Ct. 691 (1962).  In Baker, the Court

9   stated that "voters who allege facts showing disadvantage to themselves as individuals have

10  standing to sue."

11      However, a mere voter, or taxpayer, without more, apparently lacks standing to challenge

12  an illegal election.  The Supreme Court has "onsistently held that a plaintiff raising only a

13  generally available grievance about government – claiming only harm to his and every citizen's

14  interest in proper application of the Constitution and laws, and seeking relief that no more directly

15  and tangibly benefits him than it does the public at large--does not state an Article III case or

16  controversy." *Lujan,* 504 U.S. at 573-74.  These holdings include *Schlesinger v. Reservists*

17  *Committee to Stop the War,* 418 U.S. 208, 94 S. Ct. 2925, 41 L. Ed. 2d 706 (1974), where the

18  Court ruled that a group of citizens lacked standing to litigate the eligibility, under the

19  Incompatibility Clause, of members of Congress to serve simultaneously in the military reserves.

20      On the other hand, a plaintiff has standing to challenge a process when he or she has a

21  personal stake in that process.  The question of standing depends upon whether the party has

22  alleged such a "personal stake in the outcome of the controversy." *Baker v. Carr*, 369 U.S. 186,

23  204 (1962).  "The standing question is whether the plaintiff has alleged such a personal stake in

24  the outcome of the controversy as to warrant his invocation of federal court jurisdiction." *Warth v*

25  *Seldin*, 422 U.S. 490, 498, 45 L. Ed. 2d 343, 95 S. Ct. 2197 (1975).  Plaintiff "must instead

26  demonstrate a personal stake in the outcome of the controversy." *No GWEN Alliance of Lane*

27  *County, Inc. v. Aldridge*, 841 F.2d 946, 949 (9th Cir. 1988).

28

WALSTON CROSS, ATTORNEYS
222 Columbus Avenue, Suite 420
San Francisco, California 94123
Telephone: (415) 956-9200
Facsimile: (415) 956-9205

- 6 -

*Robinson v. Secretary of State, et al.*

WALSTON CROSS, ATTORNEYS
222 Columbus Avenue, Suite 420
San Francisco, California 94123
Telephone: (415) 956-9200
Facsimile: (415) 956-9205

A series of cases have recognized that a plaintiff has standing to challenge an election when he or she has a personal interest in the outcome of the election.  The Supreme Court in *Bullock v. Carter*, 405 U.S. 134, 31 L. Ed. 2d 92, 92 S. Ct. 849 (1972) allowed a suit by voters to challenge state ballot access requirements, where the voters/plaintiffs were persons who were seeking to become candidates but were barred under the subject statute.  In *Erum v. Cayetano*, 881 F.2d 689 (9th Cir. 1989), a voter was allowed to challenge a state ballot access requirement, where the plaintiff/voter was a non-partisan candidate who was seeking to become a candidate but was barred by the applicable statute.  In *Henderson v. Ft. Worth Independent School District*, 526 F.2d 286 (5th Cir. 1976), a voter wishing to support a particular potential candidate was found to have standing to challenge a state statute ballot requirements.  And as noted above, in *Baker*, 396 U.S. at 204 the Court held that "voters who allege facts showing disadvantage to themselves as individuals have standing to sue."

Significantly, the reported cases that have addressed the issue have held that plaintiff/voters who have standing are those who have a personal stake in the outcome of the election, while plaintiff/voters who lack standing are those who have no personal stake in the outcome.  In *Imperial v. Castruita*, 418 F. Supp. 2d 1174, 1178 (C.D. Cal. 2006), the Court held that plaintiffs had standing to challenge an election where they, as voters, "would be subject to an illegal election, in violation of federal and state elections law."  *See also*, *Miyazawa v. City of Cincinnati*, 45 F.3d 126, 128 (6th Cir. 1995) ("While the general language of the opinions in these cases seems to support Miyazawa's position, a careful review reveals that in each case, the plaintiff/voter had a personal stake in the outcome of the election"); *Citizens for Legislative Choice v. Miller*, 993 F. Supp. 1041, 1044 (E.D. Mich. 1998) ("The plaintiff's position in *Miyazawa* was distinguishable from cases in which the plaintiff/voter had a personal stake in the outcome of the election (i.e., the voter was a potential candidate, a supporter of the potential candidate, or was unable to vote for his specific candidate of choice due to the subject law").

Further, the only authority on who has standing to challenge a the eligibility of a presidential candidate holds that electors have such standing:

*Robinson v. Secretary of State, et al.*

WALSTON CROSS, ATTORNEYS
222 Columbus Avenue, Suite 420
San Francisco, California 94123
Telephone: (415) 956-9200
Facsimile: (415) 956-9205

1

> While some scholars contend that natural born citizenship questions might be justiciable, this conclusion is debatable, and it is particularly questionable whether anyone with standing would sue.  Of course, secretaries of states, _electors_, the President of the Senate, and perhaps the members of the House of Representatives make judgments about presidential eligibility.

2

3

4  Gabriel J. Chin, _Why Senator John McCain Cannot Be President: Eleven Months and a Hundred_

5  _Yards Short of Citizenship,_ Arizona Legal Studied Discussion Paper No. 08-14, at 5-6 (Attached

6  as Exhibit A) (emphasis added).

7      Here, the American Independent Party is recognized the California Secretary of State as a

8  "qualified political party," and specific sections of the California Elections Code apply to the

9  American Independent Party specifically.  (Walston Decl. at ¶¶ 2-5.)  Plaintiff Robinson is an

10  American Independent Party presidential elector.  (Robinson Decl. at ¶ 1.)  He is also the

11  chairperson-elect of the American Independent Party.  (Robinson Decl. at ¶ 1.)

12      As both an elector and chairperson-elect of the American Independent Party, plaintiff has a

13  personal interest in the outcome of the 2008 presidential election.  His party is on the same ballot

14  that Senator McCain is on.  His vote as a presidential elector is at state: if his party wins the

15  popular vote in California, he will have the opportunity of casting one of the 536 electoral votes

16  for President of the United States.

17      Short of being a candidate himself, it is difficult to conceive of a party with a greater

18  personal interest in a presidential election.  Indeed, it is unclear whether even a candidate would

19  have greater standing than an elector: unlike a presidential candidate, a presidential elector is

20  _directly_ elected from the general election.  _Cf._, Chin, _Why Senator John McCain Cannot Be_

21  _President: Eleven Months and a Hundred Yards Short of Citizenship,_ Arizona Legal Studied

22  Discussion Paper No. 08-14, at 5-6.  At any rate, there is little doubt that, as an elector and

23  chairman-elect of a rival political party that is competing with Senator McCain on the same ballot,

24  plaintiff has "a personal stake in the outcome of the election" sufficient to establish his standing to

25  challenge the election.  _Miyazawa v. City of Cincinnati_, 45 F.3d 126, 128 (6th Cir. 1995).

26  / / /

27  / / /

28  / / /

_Robinson v. Secretary of State, et al._

1

2

3

## II.

### SENATOR McCAIN IS INELIGIBLE TO RUN FOR, AND SERVE AS PRESIDENT UNDER ARTICLE II'S "NATURAL BORN" CITIZEN REQUIREMENT.[2]

4

The Constitution provides that "No person except a *natural born* Citizen, or a Citizen of

5

the United States, at the time of the Adoption of this Constitution, shall be eligible to the Office of

6

President." U.S. Const., art. II, § 1, cl. 4 (emphasis added).

7

According to the Supreme Court, there are only two ways to become a citizen: 1) birth in

8

the United States, thus becoming a citizen under the citizenship clause of the Fourteenth

9

Amendment (U.S. Const., Amend. XIV), or 2) satisfaction of every requirement of a statute

10

enacted by Congress granting citizenship to a class of people. (*E.g.*, *Zartarian v. Billings*, 204

11

U.S. 170, 173 (1907).) The second category includes naturalization of individuals, collective

12

naturalization of groups (such as when a new territory is acquired), and naturalization at birth of

13

certain classes of children born abroad to citizens.

14

Senator McCain's 1936 birth in the Panama Canal Zone conferred neither sort of

15

citizenship at the time.

16

17

18

19

20

In 1936, the Canal Zone fell in to a gap in the law, covered neither by the citizenship clause nor Revised Statutes § 1993, the only statute applicable to births to U.S. citizens outside the United States. As then-Representative John Sparkman explained in 1937: "the Canal Zone is not such foreign territory as to come under the law of 1855 [R.S. § 1993] and, on the other hand, it is not part of the United States which would bring it within the fourteenth amendment." The problem was well known; a 1934 American Bar Journal article explained, "we have no statutory provisions defining the nationality status of persons born in the Canal Zone.

21

Gabriel J. Chin, *Why Senator John McCain Cannot Be President: Eleven Months and a Hundred*

22

*Yards Short of Citizenship,* Arizona Legal Studied Discussion Paper No. 08-14, at 4-5 (Attached

23

as Exhibit A.)

24

Due to this problem, in 1937, Congress passed a statute conferring citizenship on "any

25

person born in the Canal Zone on or after February 26, 1904" who had at least on U.S. citizen

26

27

28

---

[2] Plaintiff's argument here rests on the recent law-review article, Gabriel J. Chin, *Why Senator John McCain Cannot Be President: Eleven Months and a Hundred Yards Short of Citizenship,* Arizona Legal Studied Discussion Paper No. 08-14 (Attached as Exhibit A). The substance of plaintiff's argument follows professor Chin's article.

*Robinson v. Secretary of State, et al.*

WALSTON CROSS, ATTORNEYS
222 Columbus Avenue, Suite 420
San Francisco, California 94133
Telephone: (415) 956-9200
Facsimile: (415) 956-9205

WALSTON CROSS, ATTORNEYS
222 Columbus Avenue, Suite 420
San Francisco, California 94123
Telephone: (415) 956-9200
Facsimile: (415) 956-9205

parent.  (Act of Aug. 4, 1937, § 1, 50 Stat 558, ch 563, codified at 8 U.S.C. § 1403(a).  This Act made Senator McCain a citizen.  But again, to be a "natural born" citizen, one must be a citizen at birth.  *Chin, supra*, at n. 14.  Since Senator McCain became a citizen in his eleventh month of life, he does not satisfy this requirement.  He is not a "natural born" citizen, and thus is not eligible to run for, or serve as, President of the United States.  *Id.*

A.      **The Canal Zone was not "the United States" in 1936 for Purposes of Article II's Citizenship Clause.**

The first sentence of Section 1 of the Fourteenth Amendment provides that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States."  By this sentence, the People of the United States overruled *Dred Scott*'s holding that persons of African descent born in the United States were not citizens.  But the provision does not define the "United States."  Surely it applies to the States, but it does not say what else, if anything, it covers.

Although the Canal Zone was under the exclusive control of the United States at the time of Senator McCain's birth (See generally, John Major, *Prize Possession, the United States and the Panama Canal, 1903-1979* (1993)), the constitutional status of places like the Canal Zone has been resolved in the so-called *Insular Cases*.  The *Insular Cases* held that the Constitution does not apply in full to places like the Canal Zone.

The *Insular Cases* arose after the United States acquired overseas possessions following the Spanish American War.  The nation had the power to acquire territories.  U.S. Const. Art. IV, § 3, cl. 2.  The Constitution's application turned on whether a particular territory "has been incorporated into the United States as a part thereof, or simply held . . . under the sovereignty of the United States as a possession or dependency."  *Rassmussen v. United States*, 197 U.S. 516, 521 (1905), *overruled on other grounds*, *Williams v. Florida*, 399 U.S. 78 (1970).  If incorporated, the full Constitution applied, but an unincorporated territory was "not a part of the United States" for constitutional purposes.  *Downes v. Bidwell*, 182 U.S. 244, 287 (1901).  Thus, only a limited set of fundamental rights restricted congressional authority.  Therefore, the Sixth Amendment right to trial by jury in criminal cases did not apply to the Philippines; though governed by the

*Robinson v. Secretary of State, et al.*

1   United States, the Philippines was not part of the United States.  *Rassmussen,* 197 U.S. at 520-21

2   (*citing Dorr v. United States*, 195 U.S. 138, 149 (1904)).  However, Congress incorporated Alaska

3   into the United States, so the Sixth Amendment applied.  *Id*. at 522-25.

4        Congress ultimately granted citizenship to the residents of many territories, including

5   Alaska, Hawaii and Puerto Rico.  In other territories, however, Congress made residents non-

6   citizen "nationals" who owed allegiance to the United States, but were not vested with

7   indefeasible citizenship. Inhabitants of the Philippines, for example, were nationals, but with

8   independence lost that status and all connection with the United States.  *Rabang v. Boyd*, 353 U.S.

9   427 (1957).  If not naturalized, they became aliens.  *Id*. at 430-31.

10       The Canal Zone was an unincorporated territory like the Philippines, rather than an

11  incorporated territory like Alaska.  José A. Cabranes, *Citizenship and the American Empire,* 127

12  U. Pa. L. Rev. 391 (1978).  One piece of evidence, of course, is that the Canal Zone was returned

13  to Panama, consistent with the understanding that the United States did not obtain ownership of

14  the territory.  *Wilson v. Shaw*, 204 U.S. 24, 32-33 (1907) (Panama grants rights to United States

15  "which the United States would possess and exercise if it were the sovereign") (quoting 33 Stat.

16  2234, art. 3 (1904)).  In addition, Title 8 of the United States Code, "Aliens and Citizenship",

17  excluded the Canal Zone from the definition of the United States.  8 U.S.C. § 173 (1925).

18  Although the Supreme Court never faced the question, federal courts held that during the period of

19  United States jurisdiction "[t]he Canal Zone is an unincorporated territory of the United States."

20  *United States v. Husband R.* (*Roach*), 453 F.2d 1054, 1057 (5th Cir. 1971); *see also* Gerald L.

21  Neuman, *Anomalous Zones*, 48 Stan L. Rev. 1197, 1228 n.186 (1996) (*citing, e.g*., *Government of*

22  *Canal Zone v. P.* (*Pinto*), 590 F.2d 1344, 1351 (5th Cir.1979) ("the provisions of the Constitution

23  do not apply of their own force")).

24       **B.      Natives of Unincorporated Territories are Not Citizens**

25       The *Insular Cases* remain good law.  *United States v. Husband R.* (*Roach*), 453 F.2d 1054,

26  1057 (5th Cir. 1971).  Accordingly, persons born in the Canal Zone are not citizens under the

27  citizenship clause of the Fourteenth Amendment because they were not born in the "United

28  States."  *Boumediene v. Bush*, 128 S. Ct. 2229, 2253-54 (2008).  As the Board of Immigration

*Robinson v. Secretary of State, et al.*

WALSTON CROSS, ATTORNEYS
222 Columbus Avenue, Suite 420
San Francisco, California 94123
Telephone: (415) 956-9200
Facsimile: (415) 956-9205

Appeals in the U.S. Department of Justice explained in 1949, "[t]he principle of *jus soli*—the law of the place of one's birth—does not obtain in the outlying possessions of the United States . . . presumably because the Constitution does not extend to outlying possessions." Matter of S., 3 I & N Dec. 589, 593 (BIA Apr. 26, 1949). Congress also legislated on the understanding that Canal Zone natives were not automatically birthright citizens, although it gave them special status as "non-quota" immigrants, exempt from numerical limitation. 8 U.S.C. § 204(c) (1925) (person born in the Canal Zone is a "non-quota immigrant" entitled to advantageous treatment, but, under § 203, an immigrant is an "alien").

Most cases about citizenship by birth in an unincorporated territory address the Philippines. Drawing on the *Insular Cases*, the Second, Third and Ninth Circuits held that "birth in the Philippines during the territorial period does not constitute birth 'in the United States' under the Citizenship Clause of the Fourteenth Amendment, and thus does not give rise to United States citizenship." *Rabang v. INS*, 35 F.3d 1449, 1452 (9th Cir. 1994). Significantly, individuals born in the Canal Zone under United States jurisdiction have been deported (*see In re Martiza Ellis A.K.A. Maritza M. Ellis*, 2006 WL 2008273 (BIA June 5, 2006) (person did not gain U.S. nationality by birth in Canal Zone)) or convicted of unlawful presence (*Farrell v. United States*, 381 F.2d 368, 369 (9th Cir. 1967) (*per curiam*)) in the United States. Thus, Senator McCain's birth in the Canal Zone, by itself, cannot make him a natural born citizen; it did not make him a citizen at all.

**C.      Citizenship as a Child of Citizens in not "Natural Born" Citizenship.**

If Senator McCain was not born in the United States for purposes of the Fourteenth Amendment, under the traditional view, if he is to be a citizen it is necessary to find a statute making him one. The blunt rule applied by courts and the executive in this context is that "[e]vidence of foreign birth gives rise to a presumption that the person so born is an alien." *Corona-Palomena v. INS*, 661 F.2d 814, 818 (9th Cir. 1981). Persons born in the Canal Zone are presumptively aliens. *See In re Martiza Ellis A.K.A. Maritza M. Ellis*, 2006 WL 2008273 (BIA June 5, 2006). In 1936, no statute granted citizenship to children of U.S. citizens born in the Canal Zone.

WALSTON CROSS, ATTORNEYS
222 Columbus Avenue, Suite 420
San Francisco, California 94123
Telephone: (415) 956-9200
Facsimile: (415) 956-9205

*Robinson v. Secretary of State, et al.*

### 1. The Exclusive Naturalization Powers of Congress.

According to the Supreme Court, the Constitution "contemplates two sources of citizenship, and two only: birth and naturalization." *United States v. Wong Kim, Ark*, 169 U.S. 649, 702 (1898). Unless born in the United States, a person "can only become a citizen by being naturalized . . . by authority of Congress, exercised either by declaring certain classes of persons to be citizens, as in the enactments conferring citizenship upon foreign-born children of citizens, or by enabling foreigners individually to become citizens." *Id. Accord Miller v. Albright*, 523 U.S. 420, 423-24 (1998).

The citizenship statutes are exclusive; there is no residual common-law or natural-law citizenship. 8 U.S.C. § 1421(d). The Court has held that citizens have no constitutional right to transmit their citizenship to children. In *Rogers v. Bellei*, 401 U.S. 815 (1971), the Supreme Court upheld a statute requiring children born overseas to citizen parents to reside in the United States to retain their citizenship. The Court explained that Congress had no power to remove "Fourteenth-Amendment-first-sentence" citizenship, but the citizenship clause "obviously did not apply to any acquisition of citizenship by being born abroad of American parents. That type, and any other not covered by the Fourteenth Amendment, was necessarily left to proper congressional action." *Id.* at 827-830. Indeed, "Congress may withhold citizenship from persons" born overseas to citizen parents. *Id.* at 831. Since, with respect to a foreign-born child of a United States citizen, Congress could "deny him citizenship outright," it could impose the lesser burden of requiring United States residence to retain citizenship. *Id.* at 835.

Congressional power to withhold citizenship from children of U.S. citizens is not hypothetical, it is law. The 7th Congress, which included Framers Gouverneur Morris and Abraham Baldwin, among others, did precisely that. In *Montana v. Kennedy*, 366 U.S. 308 (1961), the Supreme Court construed an 1802 statute to mean that "[f]oreign-born children of persons who became American citizens between April 14, 1802 and 1854 were aliens." *Id*. at 311. Thus, children of members of the armed forces serving overseas, and diplomats and civil servants in foreign posts were not only not "natural born citizens", ineligible to be President, they were not citizens at all. *Id.*

WALSTON CROSS, ATTORNEYS
222 Columbus Avenue, Suite 420
San Francisco, California 94123
Telephone: (415) 956-9200
Facsimile: (415) 956-9205

*Robinson v. Secretary of State, et al.*

### 2. Citizenship by Descent in 1936: "Birth in the Canal Zone Does Not Establish Citizenship.

In 1936, when Senator McCain was born, Revised Statutes § 1993 governed citizenship of children born overseas to U.S. citizen parents. It did not grant citizenship to those born in the Canal Zone.

Although the original version of § 1993 dated to 1855 (passed to reverse the policy described in *Montana v. Kennedy*), the version in force in 1936 granted citizenship to "[a]ny child hereafter born out of the limits and jurisdiction of the United States, whose father or mother or both at the time of the birth of such child is a citizen of the United States." Act of May 24, 1934, § 1, 48 Stat. 797, ch. 344. The statute had two other qualifications. It provided that "citizenship shall not descend to any such child unless the citizen [parent] has resided in the United States previous to the birth of such child." *Id.* This prevented the creation of overseas enclaves of citizens with no connection to the United States; the foreign-born child of a citizen who had lived in the United States was a citizen, but the grandchild would be only if the condition were satisfied. In addition, if one parent was not a citizen, citizenship would terminate (38 Op. U.S. Atty. Gen. 10 (July 21, 1934)) "unless the child comes to the United States and resides therein for at least five years continuously immediately previous to his eighteenth birthday," and took an oath. Act of May 24, 1934, § 1, 48 Stat. 797, ch. 344.

By its terms, § 1993 applied if the Canal Zone is "out of the limits and jurisdiction of the United States." By the rule of the *Insular Cases*, the Canal Zone was not the "United States," so the first criterion is satisfied. However, by statute (8 U.S.C. § 173 (1925)) and given exclusive United States control of the Canal Zone, it was not out of the "jurisdiction" of the United States.

The Constitution's text itself demonstrates that United States "jurisdiction" and the "United States" in a territorial sense are distinct concepts. "The 13th Amendment to the Constitution, prohibiting slavery and involuntary servitude 'within the United States, or in any place subject to their jurisdiction,' . . . show[s] that there may be places within the jurisdiction of the United States that are no part of the Union." *Downes v. Bidwell*, 182 U.S. 244, 251 (1901) (opinion of Brown J.). *See also, e.g., Rasul v. Bush*, 542 U.S. 466, 475 (2004) (United States has "plenary and exclusive jurisdiction" over Guantanamo, but not "ultimate sovereignty").

WALSTON CROSS, ATTORNEYS
222 Columbus Avenue, Suite 420
San Francisco, California 94123
Telephone: (415) 956-9200
Facsimile: (415) 956-9205

*Robinson v. Secretary of State, et al.*

WALSTON CROSS, ATTORNEYS
222 Columbus Avenue, Suite 420
San Francisco, California 94123
Telephone: (415) 956-9200
Facsimile: (415) 956-9205

1    In *United States v. Wong Kim Ark*, 169 U.S. 649 (1898), the Court construed a passage of

2    the 1855 version of what became § 1993; that language remained unchanged in the 1934 revision.

3    The Court held that the phrases "in the United States and subject to the jurisdiction thereof" in the

4    citizenship clause of the Fourteenth Amendment "must be presumed to have been understood and

5    intended by [Congress and the States as] the converse of the words 'out of the limits and

6    jurisdiction of the United States' as habitually used in the naturalization acts." *Id.* at 687.  That is,

7    "jurisdiction" in § 1993 means the same thing as it does in the Fourteenth Amendment.  *Id.*

8    *Wong Kim Ark* held that natives and citizens of China living in the United States were

9    subject to the "jurisdiction" of the United States because they "are entitled to the protection of and

10   owe allegiance to the United States, so long as they are permitted by the United States to reside

11   here, and are 'subject to the jurisdiction thereof' in the same sense as all other aliens residing in

12   the United States." *Id.* at 694.   Based on *The Schooner Exchange v. McFaddon*, 11 U.S (7

13   Cranch) 116 (1812), *Wong Kim Ark* found persons not subject to the jurisdiction of the United

14   States to include "children of foreign sovereigns or their ministers, or born on foreign public ships,

15   or of enemies within and during a hostile occupation of part of our territory."  *Wong Kim Ark,* 169

16   U.S. at 693.  Accordingly, individuals are within a country's "jurisdiction" if they are in a place

17   that obligates them to that nation.  *Id.  Wong Kim Ark* thus recognizes four categories. A person

18   can be: 1) both in the United States and subject to its jurisdiction, like a Chinese immigrant in

19   California; 2) neither in the United States nor subject to its jurisdiction, like a Brazilian citizen in

20   São Paulo; 3) in the United States but not subject to its jurisdiction, like a British soldier

21   occupying Washington, D.C. during the War of 1812; or 4) out of the United States but subject to

22   its jurisdiction, like a sailor on a United States ship in foreign waters.  Only persons born in the

23   first category are citizens by birth under the Fourteenth Amendment; only those born in the second

24   category to U.S. citizens are covered by §1993.  *Id.*

25   The Canal Zone is in the fourth category.  Under doctrine of the *Insular Cases*, the House

26   Committee on Immigration and Naturalization's conclusion that "Children of American parents in

27   the Canal Zone are not outside the jurisdiction of the United States, neither are they within the

28   limits of the United States" is inescapable.  As an unincorporated territory, the Canal Zone is not

*Robinson v. Secretary of State, et al.*

the "United States."  Attorney General Charles Bonaparte applied this view to the Canal Zone,

opining in 1907 that "[t]he words 'sovereign rights' 'within the Zone' mean, among other things,

the right to the allegiance of the Zone's people" and imposed the corresponding duty to protect

them.  26 Op. U.S. Atty. Gen. 376 (Sept. 7, 1907).  In addition, many statutes and Attorney

General Opinions recognized that the Canal Zone was under United States "jurisdiction."  30 Op.

U.S. Atty. Gen. 271 (July 14, 1914) ("That the Canal Zone is 'territory under the control or

jurisdiction' of the United States has been held in a long line of opinions by the Attorneys

General."); 25 Op. U.S. Atty. Gen. 474 (June 5, 1905) (by treaty "the Canal Zone became subject

to the jurisdiction of the United States"; accordingly, Thirteenth Amendment applied).

In short, John McCain is not a "natural born" citizen under the plain language of Article II.

Many commentators and others have minimized Senator's McCain's ineligibility as a technicality

that should be overlooked in light of McCain's service to his country.  While Senator McCain's

service to his country should not be minimized, however, neither should the text of the

Constitution:

> Of course, McCain's lack of citizenship at birth is a technicality *ne plus ultra*. Presidential candidates who obtained their citizenship after birth are no more likely to be disloyal than those born citizens, and the People of the United States should be allowed to elect whomever they choose.24 Therefore, as a policy matter, Senator McCain should be eligible to the Office of President. Yet, the text of the Constitution forbids it. The rule of law would be mortally wounded if courts, Congress or the executive could legitimately ignore provisions of law they deemed obsolete under the circumstances. It would be a grim moment in history if the very oath to "preserve, protect and defend the Constitution" that made a person President was also a falsehood that defied the document.

Gabriel J. Chin, *Why Senator John McCain Cannot Be President: Eleven Months and a Hundred Yards Short of Citizenship,* Arizona Legal Studied Discussion Paper No. 08-14, at 8-9 (Attached as Exhibit A).

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

WALSTON CROSS, ATTORNEYS
222 Columbus Avenue, Suite 420
San Francisco, California 94123
Telephone: (415) 956-9200
Facsimile: (415) 956-9205

*Robinson v. Secretary of State, et al.*

WALSTON CROSS, ATTORNEYS
222 Columbus Avenue, Suite 420
San Francisco, California 94123
Telephone: (415) 956-9200
Facsimile: (415) 956-9205

**III.**

**PLAINTIFF'S REQUESTS FOR INJUNCTIVE RELIEF ARE PROPER.**

Federal courts have authority to enjoin unconstitutional acts.  *See, e.g., Ex parte Young,* 209 U.S. 123, 152 (1908): "The general doctrine [that the] Courts of the United States will restrain a state officer from executing an unconstitutional statute of the State, when to execute it would violate rights and privileges of the complainant which had been guaranteed by the [U.S.] Constitution, and would work irreparable damage and injury to him, has never been departed from."  "The court's power to enjoin unconstitutional acts by the government is inherent in the Constitution itself."  *Hubbard v. EPA,* 949 F.2d 453, n. 15 (D.C. Cir. 1991), *affirmed in part and reversed in part on other grounds*, 949 F.2d 453.  Further, section 17200 *et seq*. of the California Business and Professions Code (which is set forth in the complaint against all parties except the Secretary of State) provides further authority to enjoin defendants' actions.  Section 17203 specifies that "[a]ny person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction.

The question is whether the Court's exercise of its equitable power is proper in this case, *i.e.*, whether plaintiff will suffer irreparable hard.  As recognized by the Ninth Circuit, "tangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm." *Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.,* 944 F.2d 597, 603 (9th Cir. 1991), *citing Regents of Univ. of Cal. v. Am. Broad. Cos.,* 747 F.2d 511, 519-20 (9th Cir. 1984). Harm that can be calculated monetarily, on the other hand, is not irreparable harm.  *Rent-A-Center, Inc.,* 944 F.2d at 603 (*citing Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League,* 634 F.2d 1197, 1201 (9th Cir. 1980)); *see also Sampson v. Murray,* 415 U.S. 61, 90, 94 S. Ct. 937, 39 L. Ed. 2d 166 (1974) ("Mere injuries, however substantial, in terms of money, time and energy necessarily expended are not enough" to constitute irreparable injury) (quotation omitted).

This case involved plaintiff's fundamental right to vote and participate in our democratic system.  As noted by the Court in *Imperial v. Castruita*, 418 F. Supp. 2d 1174, 1178 (C.D. Cal. 2006), there is no way to monetarily compensate a party for being subject to the infringement on

*Robinson v. Secretary of State, et al.*

WALSTON CROSS, ATTORNEYS
222 Columbus Avenue, Suite 420
San Francisco, California 94123
Telephone: (415) 956-9200
Facsimile: (415) 956-9205

1   this right inherent in an illegal election.  "Abridgement or dilution of a right so fundamental as the

2   right to vote constitutes irreparable injury."  *Cardona v. Oakland Unified School Dist.*, 785 F.

3   Supp. 837, 840 (N.D. Cal. 1982).  Here, there is no way to monetarily compensate plaintiff for

4   facing the prospect of losing his electoral vote to an illegal campaign, and he faces an irreparable

5   injury.  Since plaintiff's prospective harm is impossible to calculate in monetary terms, this

6   Court's equitable powers are the only meaningful remedies plaintiff has.  An injunction is proper.

7                                              **IV.**

8                    **PROMPT RESOLUTION IS IN THE PUBLIC INTEREST.**

9           The importance of expeditious resolution of these issues should be emphasized.  If Senator

10  McCain is ineligible to be President, then preventing his candidacy has no consequence except

11  preventing the chaos of dealing with the issue after the fact.  The injunctive termination of Senator

12  McCain's candidacy does him no harm if he is ineligible to be President in the first instance.  On

13  the other hand, refusing to injunctively terminate Senator McCain's candidacy, despite his

14  ineligibility, imposes substantial harm on plaintiff because there is only one election.  Once the

15  election happens, there is no mechanism to repeat a general election to vindicate plaintiff's

16  interests in competing against legitimate campaigns (nor, in the interests of domestic stability,

17  should there be such a mechanism).  In short, to delay plaintiff's remedy here is to deny it.

18  Finally, it is patently in the public interest to resolve this issue now.  Senator McCain is the

19  presumptive nominee of one of the two major parties in this country, and it suffices to say there is

20  a distinct possibility he may win the presidency.  There is no sense in subjecting the public to the

21  chaos and uncertainty of dealing with the question of whether Senator McCain can be president

22  *after* the election.  Given that McCain's eligibility is a pure question of law that can be resolved

23  now, it would be irresponsible to delay resolution of this issue.

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CONCLUSION**

Plaintiff acknowledges the issue of Senator McCain's eligibility to be President is novel. Nonetheless, given the fact that it is a pure question of law with no disputed facts that can be resolved now, plaintiff has met his burden of establishing his entitlement to a summary judgment. Accordingly, plaintiff respectfully asks the Court to enter the requested injunctions and declaratory judgment forthwith.

Dated: August 17, 2008                    WALSTON CROSS

By: Gregory S. Walston

ATTORNEYS FOR PLAINTIFF

WALSTON CROSS, ATTORNEYS
222 Columbus Avenue, Suite 420
San Francisco, California 94123
Telephone: (415) 956-9200
Facsimile: (415) 956-9205

- 19 -

*Robinson v. Secretary of State, et al.*

# Exhibit A





# *Arizona Legal Studies*
## Discussion Paper No. 08-14

## Why Senator John McCain Cannot Be President: Eleven Months and a Hundred Yards Short of Citizenship

Gabriel J. Chin
The University of Arizona
James E. Rogers College of Law

July 2008

COMMENT DRAFT.  SUBJECT TO REVISION AND CORRECTION.

# WHY SENATOR JOHN MCCAIN CANNOT BE PRESIDENT: ELEVEN MONTHS AND A HUNDRED YARDS SHORT OF CITIZENSHIP

Gabriel J. Chin[*]

## Abstract

*Because Senator John McCain was not a citizen at birth, he is not a "natural born Citizen" and thus is not "eligible to the Office of President" under the Constitution. Senator McCain was born in 1936 in the Canal Zone to U.S. citizen parents.  As requested by Senator McCain's campaign, distinguished constitutional lawyers Laurence Tribe and Theodore Olson examined the law and issued a detailed opinion offering two reasons that Senator McCain was a natural born citizen.  Neither is sound under current law.  The Tribe-Olson Opinion suggests that the Canal Zone, then under exclusive U.S. jurisdiction, may have been covered by the Fourteenth Amendment's grant of citizenship to "all persons born . . . in the United States."  However, in the* Insular Cases*, the Supreme Court held that "unincorporated territories" were not part of the United States for constitutional purposes.  Accordingly, many decisions hold that persons born in unincorporated territories are not Fourteenth Amendment citizens.  The Tribe-Olson Opinion also suggests that Senator McCain obtained citizenship by statute.  However, the only statute in effect in 1936 did not cover the Canal Zone.  Recognizing the gap, in 1937, Congress passed a citizenship law applicable only to the Canal Zone, granting Senator McCain citizenship, but eleven months too late for him to be a citizen at birth.  This essay concludes by exploring how changes in constitutional law implied by the Tribe-Olson Opinion, such as limiting the* Insular Cases *and expanding judicial review of immigration and nationality laws passed by Congress, could make Senator McCain a citizen at birth and thus a natural born citizen.*

---

[*] Chester H. Smith Professor of Law, Professor of Public Administration and Policy, University of Arizona. Website: www.jackchin.org.  I am grateful for helpful comments from David Adelman, Deborah Beaumont, Reid Fontaine, Steve Legomsky, Earl Maltz, David Marcus, Toni Massaro, Robert McWhirter, Howard Miller, Marc Miller, Gerry Neuman, Barak Orbach, Vic Romero, Carol Rose, Ted Ruthizer, Roy Spece, Suja Thomas and Frank Wu. The views expressed herein are solely mine.

1

*Table of Contents*

Introduction ................................................................................................................... 3

I. Was the Canal Zone "the United States" for Purposes of the Citizenship Clause?....... 10

    A. The Canal Zone and Other Unincorporated Territories are not "the United
        States" ................................................................................................. 11
    B.  Natives of Unincorporated Territories are Not Citizens ...................................... 14

II. Citizenship as a Child of Citizens ............................................................................... 15

    A. The Exclusive Naturalization Powers of Congress.............................................. 16
    B.  Citizenship by Descent in 1936: "The Canal Zone is a 'no man's land'" ........... 18
    C.  Should § 1993 be Re-Drafted to Fix Congressional Error? ................................ 24
    D. The Politics of Canal Zone Citizenship .............................................................. 28

III. Senator McCain's Paths to Natural Born Citizenship................................................ 38

    A. Restricting Congressional Power by Overruling the Insular Cases. .................... 41
    B. Restricting Congressional Power by Recognizing Common Law Citizenship..... 44
    C. Restricting Congressional Power by Overruling the Plenary Power Doctrine ..... 46

IV. Conclusion ............................................................................................................... 51

    Appendix A.  Opinion of Laurence H. Tribe and Theodore B. Olson............................. 53

## Introduction

The Constitution provides that "No Person except a natural born Citizen . . . . shall be eligible to the office of President."[1]  A person must be a citizen at birth to be a natural born citizen.[2]  The presumptive 2008 Republican presidential nominee, Senator John McCain, was born in the Canal Zone in 1936.  Although he is now a United States citizen, the law in effect in 1936 did not grant him citizenship when he was born.[3]  Because he was not born a citizen, he is not eligible to the Office of President.

The citizenship of those born in the Canal Zone in 1936 is a legal question, not a question about one's views of Senator McCain's candidacy.  United States citizenship

---

[1] U.S. CONST. art. II, § 1, cl. 5.

[2] *See* Sarah Helene Duggin & Mary Beth Collins, *'Natural Born' in the USA: The Striking Unfairness and Dangerous Ambiguity of the Constitution's Presidential Qualifications Clause and Why We Need to Fix It*, 85 B.U. L. REV. 53, 56 n.11 (2005) ("The Supreme Court has repeatedly said that the natural born citizenship provisio precludes naturalized citizens from serving as President.") (citing, inter alia, Schneider v. Rusk, 377 U.S. 163, 165 (1964) ("[T]he rights of citizenship of the native born and of the naturalized person are . . . coextensive. The only difference . . . is that only the 'natural born' citizen is eligible to be President. Art. II, § 1"); Baumgartner v. United States, 322 U.S. 665, 673 (1944) ("Under our Constitution, a naturalized citizen stands on an equal footing with the native citizen in all respects save that of eligibility to the Presidency.") (quoting Luria v. United States, 231 U.S. 9, 22 (1913)).

[3] This essay does not examine whether a person obtaining citizenship at birth to U.S. citizen parents overseas is a natural born citizen; the answer is almost certainly yes, and has been thoroughly explored. *See* J. Rebekka S. Bonner, *Who May be President? Constitutional Interpretation of Article II's "Natural Born" Presidential Eligibility Clause* (unnumbered manuscript) ("any person who holds the right to United States citizenship by virtue of the Constitution, treaties, or statutes in effect at the time of his or her birth . . . qualifies as 'natural born' under Article II"); Duggin & Collins, *supra* note 2, at 83 ("those espousing the view that persons who become citizens at birth are 'natural born' have the better argument"); Charles A. Gordon, *Who can be President of the United States: The Unresolved Enigma*, 28 MD. L. REV. 1, 31 (1968) ('[I]t seems likely that the natural-born qualification was intended  only to exclude those who were not born American citizens"); Jill A. Pryor, *The Natural-Born Citizen Clause and Presidential Eligibility: An Approach for Resolving Two Hundred Years of Uncertainty*, 97 YALE L.J. 881, 896 (1988) ("Under the naturalized born approach,  . . .a 'natural born citizen' may be  . . . a naturalized-born citizen designated under Congress's power to confer citizenship at birth on any category of persons."); *cf.* Kevin Tripp, *Law Professor: McCain Birthplace Question is Bizarre* (Feb. 29, 2008) (quoting Gabriel J. Chin: "He was a U.S. citizen at birth, and therefore, I think 999 out of a thousand judges are going to say he's eligible to be president.  I would be totally shocked . . . if this turned into a serious question, because the guy's a natural born citizen") (http://www.ktar.com/?nid=6&sid=748713).  *But see* Lawrence Friedman, *An Idea Whose Time has Come--The Cuirous History, Uncertain Effect, and Need for Amendment of the "Natural Born Citizen" Requirement for the Presidency*, 52 ST. LOUIS U. L.J. 137, 143 (2007) (eligibility of foreign-born U.S. citizen at birth "is an open question.").

law is not simple or intuitive.[4]  As the child of two U.S. citizens, and because his father was on active duty in the U.S. Navy, it might seem obvious and logical that he must have been a citizen at birth.  However, neither in 1936 nor at any other time did Congress confer citizenship based on these facts without more.[5]

According to the Supreme Court,[6] there are only two ways to become a citizen: 1) birth in the United States, thus becoming a citizen under the citizenship clause of the Fourteenth Amendment;[7] or 2) satisfaction of every requirement of a statute enacted by Congress granting citizenship to a class of people.[8]  The second category includes naturalization of individual adults or children already born, collective naturalization of groups, such as residents of territory acquired by the United States, and naturalization at birth of certain classes of children born abroad to citizens.

In 1936, the Canal Zone fell in to a gap in the law, covered neither by the citizenship clause nor Revised Statutes § 1993, the only statute applicable to births to U.S. citizens outside the United States.  As then-Representative John Sparkman[9] explained in 1937: "the Canal Zone is not such foreign territory as to come under the law

---

[4] Thus the existence of tools like ROBERT MCWHIRTER, THE CITIZENSHIP FLOWCHART (2007), which the ABA website advertises as "An easy-to-understand flowchart that provides ultimate answer as to citizenship status by taking user through the complex and sometimes conflicting steps and questions linked to a century of legislation and regulation." (http://www.abanet.org/abastore/index.cfm?section=main&fm=Product.AddToCart&pid=5090108). *See also* Jonathan C. Drimmer, *The Nephews of Uncle Sam: The History, Evolution, and Application of Birthright Citizenship in the United States*, 9 GEO. IMMIGR. L.J. 667 (1995).

[5] For example, under current law and historically, a child of two citizens born overseas is not a citizen if neither parent resided in the United States prior to the child's birth. 8 U.S.C. § 1401(c).  Non-citizens may serve in the military, so birth to a parent in the U.S. armed forces *per se* has never been a basis for citizenship by descent, but military service can help a non-citizen naturalize. *E.g.*, 8 U.S.C. § 1439.

[6] *See* notes 69-72, *infra*, and accompanying text.

[7] U.S. CONST. amend. xiv ("All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside.")

[8] *See* note 70, *infra*, and accompanying text. Some divide the second category into two, distinguishing between naturalization of individuals or groups, and citizenship by descent from a U.S. citizen.  Peter H. Schuck, *The Re-Evaluation of American Citizenship*, 12 GEO. IMMIGR. L.J. 1, 10-11 (1997).   In any event, if not obtained under the Constitution, citizenship can only be obtained by statute.

[9] The future Senator and 1952 Democratic nominee for Vice President.

of 1855 [R.S. § 1993] and, on the other hand, it is not part of the United States which would bring it within the fourteenth amendment."[10]  The problem was well known; a 1934 *American Bar Association Journal* article explained "we have no statutory provisions defining the nationality status of persons born in the Canal Zone."[11]

Because the Canal Zone was a "no man's land,"[12] in 1937 Congress passed a statute granting citizenship to "any person born in the Canal Zone on or after February 26, 1904" who had at least one U.S. citizen parent.[13]  This Act made Senator McCain a United States citizen before his first birthday.  But again, to be a natural born citizen, one must be a citizen at birth.[14]  Since Senator McCain became a citizen in his eleventh month of life, he does not satisfy this criterion, is not a natural born citizen, and thus is not "eligible to the Office of President."

While some scholars contend that natural born citizenship questions might be justiciable,[15] this conclusion is debatable, and it is particularly questionable whether

---

[10] 81 CONG. REC. 7764 (1937).

[11] Richard W. Flournoy, *Proposed Codification of Our Chaotic Nationality Laws*, 20 ABA J. 780, 783 (1934).  *See also*  81 CONG. REC. 6353 (1937) (Remarks of Sen. Clark)  ("The citizenship status of persons born in the Canal Zone has never been decided, either by constitution, treaty, or congressional enactment," quoting a "letter from the Secretary of War").

[12] 81 CONG. REC. 7769 (1937) (Remarks of Rep. Sparkman).

[13] Act of Aug. 4, 1937, § 1, 50 Stat. 558, ch. 563, *codified at* 8 U.S.C. § 1403(a).

[14] There is no Supreme Court decision specifically holding that Congress cannot retroactively make a person not born a citizen a "natural born Citizen."  However, to leave open the possibility that every person in the world could be a natural born citizen would construe the provision away.  Further, it would be odd for the Framers to use a flat prohibition--"No Person except a natural born Citizen . . .  shall be eligible to the Office of President"-- to express the idea that Congress has control over the area.

  Another possibility is that "natural born" could include individuals who become citizens based on the circumstances of their birth, as opposed to being individually naturalized.  Under that principle, however, many people born aliens would be "natural born", including some minor aliens whose parents are naturalized, 8 U.S.C. § 1431(a), and many adult citizens of foreign countries in territory acquired by the United States.  *E.g.*, 8 U.S.C. § 1406(a)(2) (natives of Virgin Islands); 8 U.S.C. § 1407(a)(2) (natives of Guam).

[15] Bonner, *supra* note 3, pt. II; Duggin & Collins, *supra* note 2, at 111-126; Gordon, *supra* note 3, at 28-31 (judicial decision conceivable, but by no means certain).

anyone with standing would sue.[16]  Of course, secretaries of state, electors, the President

of the Senate, and perhaps the members of the House of Representatives make judgments

about presidential eligibility.  But for all of these theoretical possibilities, Senator

McCain could probably be elected and assume office even if not eligible.

Yet, the issue is, has been made, significant.  When major papers including *The*

*New York Times*[17] and the *Washington Post,*[18] and legal commentators[19] began exploring

the question, the McCain campaign could have dismissed the issue.  "Senator McCain is

a natural born citizen, period", they could have said, leaving it to others to establish both

the merits of the question, and why it might be important.

Instead of eliding the issue, the McCain campaign emphasized it.  They requested

Harvard Law Professor Laurence H. Tribe and former Solicitor General Theodore B.

Olson to offer an opinion about Senator McCain's citizenship.[20]  These distinguished

constitutional lawyers issued a detailed legal analysis of why Senator McCain was a

natural born citizen.[21]  This opinion was publicly released and made part of the

*Congressional Record*.  At least in partial reliance on the opinion, the Senate resolved

---

[16] A vice president-elect, for example, might have standing because he or she would obtain the office if the President were removed.  Yet, a vice president, having been selected by the President and being a member of the President's party, would ordinarily be reluctant to sue.

[17] Carl Hulse, *McCain's Canal Zone Birth Prompts Queries About Whether That Rules Him Out*, N.Y. TIMES, Feb. 28, 2008 (http://www.nytimes.com/2008/02/28/us/politics/28mccain.html).

[18] Michael Dobbs, *McCain's Birth Abroad Stirs Legal Debate*, WASH. POST, May 2, 2008,  at A06 (http://www.washingtonpost.com/wp-dyn/content/article/2008/05/01/AR2008050103224_pf.html)

[19] *See, e.g.*, Jonathan Turley, *The Supreme Court Redux: Is John McCain Ineligible to be President?*, (http://jonathanturley.org/2008/03/06/the-supreme-redux-is-john-mccain-ineligible-to-be-president/); Eugene Volokh, *Natural Born Citizen*, on The Volokh Conspiracy, (http://volokh.com/posts/1204246912.shtml); Jim Lindgren, *The Meaning of Natural Born*, on the Volokh Conspiracy (http://volokh.com/posts/1204265246.shtml); Larry Solum, *McCain, Natural Born Citizens, and Originalism*, on Legal Theory Blog (http://lsolum.typepad.com/legaltheory/2008/02/mccain-natural born.html); Michael Dorf, *Originalism Versus Straight Talk* on Dorf on Law, (http://michaeldorf.org/2008/02/originalism-versus-straight-talk.html); J. Rebekka Bonner, *Why John McCain Needs the Living Constitution*, on Balkinization (http://balkin.blogspot.com/2008/05/why-john-mccain-needs-living.html).

[20] *See* Dobbs, *supra* note 18; Hulse, *supra* note 17.

[21] Letter dated March 19, 2008 from Laurence H. Tribe & Theodore B. Olson, *reprinted in* 154 CONG. REC. S3645-46 (Apr. 30, 2008) ("Tribe-Olson Opinion") (attached to this essay as Appendix A).

that Senator McCain was a natural born citizen.[22]  Senator McCain apparently adopted the opinion's reasoning, by having his lawyers use the arguments in court in response to a lawsuit challenging his eligibility.[23]

The McCain campaign, two major constitutional figures, the United States Senate, and Senator McCain's own lawyers determined that the issue should not be ignored, offering reasons supporting Senator McCain's eligibility.  It is now too late to say Senator McCain's citizenship at birth is irrelevant.  This essay contends that the Tribe-Olson Opinion is not correct under current law; Senator McCain was not a natural born citizen because he was not a citizen at birth.  After the crisis of the 2000 election, to inaugerate a President in January, 2009 in open violation of the Constitution's terms risks a national trauma.

Of course, McCain's lack of citizenship at birth is a technicality *ne plus ultra*. Presidential candidates who obtained their citizenship after birth are no more likely to be disloyal than those born citizens, and the People of the United States should be allowed to elect whomever they choose.[24]  Therefore, as a policy matter, Senator McCain should be eligible to the Office of President.  Yet, the text of the Constitution forbids it.  The rule of law would be mortally wounded if courts, Congress or the executive could legitimately

---

[22] S. Res. 110-511 (Apr. 30, 2008).  Of course, a resolution of a single house of Congress does not have the force of law.  INS v. Chadha, 462 U.S. 919 (1983).

[23] *See* Memorandum of Law in Support of Defendant's Motion to Dismiss First Amended Complaint at 2-4 (Apr. 30, 2008), in Fred Hollander v. Senator John McCain and Republican National Committee, Civ, No. 1:08-cv-00099JL (D.N.H.) (hereinafter "McCain Brief").  Lawyers from Gibson Dunn & Crutcher, Mr. Olson's firm, represent Senator McCain, and the brief's arguments are the same as those in the opinion, sometimes in the same language.  A similar suit was filed in the Central District of California, Inland Empire Voters v. United States of America, 5:08-cv-00304-SGL-OP (C.D. Cal.), but voluntarily dismissed without substantive filings.

[24] *See, e.g.*, Duggin & Collins, *supra* note 2, Part IV; Robert Post, *What is the Constitution's Worst Provision?*, 12 CONST. COMMENT. 191, 193 (1995) (Professor Post's answer is the natural born citizen clause; "[i]t is a vestigial excrescence on the face of our Constitution"). The ideal solution would be an immediate, bi-partisan effort to amend the Constitution to make any person who is a citizen of the United States eligible to the Office of President, perhaps changing the "fourteen Years a resident within the United States" requirement to require fourteen years of citizenship and residency.

ignore provisions of law they deemed obsolete under the circumstances. It would be a grim moment in history if the very oath to "preserve, protect and defend the Constitution" that made a person President was also a falsehood that defied the document.

This essay responds to the Tribe-Olson Opinion. Part I explores the Tribe-Olson Opinion's suggestion that Senator McCain was a natural born citizen because he was born in the Canal Zone when it was under United States jurisdiction, and thus is covered by the citizenship clause of the Fourteenth Amendment.[25] The opinion argues that if the United States were "sovereign" over the Canal Zone, "that fact alone would make him a 'natural born' citizen under the well established principle that 'natural born' citizenship includes birth within the territory and allegiance of the United States."[26]

This reasoning is not consistent with current law. Part I explains that in the *Insular Cases*, the Supreme Court said "unincorporated territories" like the Canal Zone were not part of the United States for constitutional purposes, and therefore the Constitution did not apply in full.[27] Accordingly, the Department of Justice,[28] the United States Code,[29] and all courts considering the issue,[30] including the Supreme Court,[31] albeit in dicta, hold that persons born in unincorporated territories are not for that reason United States citizens. Individuals born in the Canal Zone under United States

---

[25] *See infra* notes 39-66 and accompanying text.

[26] Tribe-Olson Opinion, *supra* note 21, at 1; *id.* ("The Fourteenth Amendment expressly enshrines this connection between birthplace and citizenship in the text of the Constitution"); *see also* McCain Brief, *supra* note 23, at 3-4 ("Thus, although Senator McCain was not born within a State, he was nevertheless born within the sovereign territory of the United States, which—even apart from his birth to U.S. citizen parents—provides an additional basis for his status as a 'natural born Citizen.'")

[27] *See infra* notes 43-58 and accompanying text.

[28] *See infra* note 61 and accompanying text.

[29] *See infra* note 62 and accompanying text.

[30] *See infra* note 63 and accompanying text.

[31] *See infra* note 64 and accompanying text.

8

jurisdiction have been deported from the United States, even one claiming to be a birthright citizen under the Fourteenth Amendment.[32]

Part II examines the Tribe-Olson Opinion's argument that Senator McCain was a citizen by birth under an Act of Congress.[33]  Because the citizenship laws are complex and exclusive, it is quite significant that the opinion quotes no statutory language demonstrating that children of U.S. citizens born in the Canal Zone are citizens at birth. By its text, Revised Statutes § 1993, cited by the Tribe-Olson Opinion and the only such statute in effect in 1936, did not apply to the Canal Zone, which was outside the "limits" of the United States as an unincorporated territory, but within the "jurisdiction" of the United States as land over which the nation exercised permanent exclusive control.[34] Accordingly, in 1937, Congress legislated for the Canal Zone specifically, granting citizenship to children born there.[35]  This was too late to make children already born citizens at birth.

Part II also explains that federal authorities recognized the gap in the statute no later than 1932.[36]  Thus, if Congress so desired, children born in the Canal Zone in 1936 could have been made citizens at birth by statute.  However, Congress moved deliberately, in part because during the Depression years, many opposed more people coming to the United States making any immigration legislation difficult to pass.[37]

---

[32] *See infra* notes 65-66 and accompanying text.

[33] Tribe-Olson Opinion, *supra* note 21, at 1 ("Congress has recognized in successive federal statutes since the Nation's Founding that children born abroad to U.S. citizens are themselves U.S. citizens. 8 U.S.C. § 1401(c); *see also* Act of May 24, 1934, Pub. L. No. 73-350, § 1, 48 Stat. 797, 797."); McCain Brief, *supra* note 23, at 2 ("Congress has recognized in successive federal statutes since the Nation's Founding that children born abroad to U.S. citizens are themselves U.S. citizens.  8 U.S.C. § 1401(c); *see also* Pub. L. No. 73-350, § 1, 48 Stat. 797, 797 (1934).").

[34] *See infra* notes 83-111 and accompanying text.

[35] *See infra* notes 91-100 and accompanying text.

[36] *See infra* notes122-133 and accompanying text.

[37] *See infra* notes 134-169 and accompanying text.

Should Senator McCain be elected, he could respond to his ineligibility in one of several ways. First, he could decline the office out of respect for the Constitution, making his campaign pointless and depriving the People of the United States of their choice of leader. Second, he could take office in defiance of the Constitution. Third, Senator McCain could assert that current law set out by the Supreme Court is wrong, and that he is a natural born citizen under a correct reading of the Constitution. As Part III explains, the Tribe-Olson Opinion suggests possibilities for restructuring harsh doctrines of the contemporary constitutional law of immigration, naturalization and citizenship, in ways making Senator McCain eligible to the Office of President.[38]

However, in a government of laws, constitutional principles apply to all, not just particular individuals. If President McCain believed that the Constitution, correctly interpreted, made him a citizen at birth, he would have the power to implement some of these views by executive order and regulation, and urge Congress to adopt others into statutory law. Part III explains how the legal changes necessary to make a person born in the Canal Zone in 1936 a citizen at birth would grant citizenship to thousands or millions of people now legally aliens.

## I. Was the Canal Zone "the United States" for Purposes of the Citizenship Clause?

The first sentence of Section 1 of the Fourteenth Amendment provides that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States."[39] By this sentence, the People of the United States overruled *Dred Scott*'s holding that persons of African descent born in the United States

---

[38] *See infra* notes 176-225 and accompanying text.
[39] U.S. Const. amend. XIV, § 1.

were not citizens.[40]  But the provision does not define the "United States."  Surely it

applies to the States, but it does not say what else, if anything, it covers.

The Tribe-Olson Opinion suggests that the Canal Zone was part of the United

States for constitutional purposes, and therefore that the citizenship clause of the

Fourteenth Amendment applied of its own force.[41]  If the question were original, that

approach would be compelling, because the Canal Zone was under the exclusive control

of the United States.[42]  However, the constitutional status of places like the Canal Zone

has been extensively explored, in a body of decisions called the *Insular Cases*.[43] The

*Insular Cases* held that the Constitution did not apply in full to places like the Canal

Zone.

A.      *The Canal Zone and Other Unincorporated Territories*
        *are not "the United States"*

The *Insular Cases* arose after the United States acquired overseas possessions

following the Spanish American War.  The nation had the power to acquire territories.[44]

But did "the Constitution follow the flag," did constitutional provisions restricting federal

power and protecting individual rights in the United States apply to Hawaii, Puerto Rico,

the Philippines, Guantanamo Bay, and a few years later, the Canal Zone?  The

Constitution's application turned on whether a particular territory "has been incorporated

into the United States as a part thereof, or simply held . . .  under the sovereignty of the

---

[40] *See generally* EARL M. MALTZ, DRED SCOTT AND THE POLITICS OF SLAVERY (2007).

[41] Tribe-Olson Opinion, *supra* note 21, at 2

[42] *See* notes 180-187, *infra* and accompanying text.  *See generally* JOHN MAJOR, PRIZE POSSESSION: THE UNITED STATES AND THE PANAMA CANAL, 1903-1979 (1993).

[43] *See generally* BARTHOLOMEW H. SPARROW, THE INSULAR CASES AND THE EMERGENCE OF AMERICAN EMPIRE (2006); Efrén Rivera Ramos, *The Legal Construction of American Colonialism: The* Insular Cases *(1901-1922)*, 65 REV. JUR. U.P.R. 225 (1996).

[44] U.S. CONST. art. IV, § 3, cl. 2 ("The Congress shall have the Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States.").

United States as a possession or dependency."[45]  If incorporated, the full Constitution

applied.  But an unincorporated territory was "not a part of the United States" for

constitutional purposes,[46] so only a limited set of fundamental rights restricted

congressional authority.  Thus, the Sixth Amendment right to trial by jury in criminal

cases did not apply to the Philippines; though governed by the United States, the

Philippines was not part of the United States.[47]  However, Congress incorporated Alaska

into the United States, so the Sixth Amendment applied.[48]

      The law is summarized in the remarkable amicus brief in *Boumediene v. Bush*

authored by Gerald Neuman, Harold Hongju Koh, Sarah Cleveland and Margaret L.

Sannner, and joined by other major constitutional scholars including Professor Tribe.[49]

The brief explained that under the *Insular Cases*,

> only "fundamental" constitutional rights extended by their
> own force to "unincorporated" territories. . . . The *Insular
> Cases* struck a compromise between the forces of
> constitutionalism and the forces of empire by guaranteeing
> that the Constitution's most fundamental rights would be
> honored wherever the United States possesses governing
> authority.[50]

*Downes v. Bidwell*, the first *Insular Case*, explained that the lesser privileges permissibly

denied in unincorporated territories include "the rights to citizenship, to suffrage (*Minor*

---

[45] Rassmussen v. United States, 197 U.S. 516, 521 (1905), *overruled on other grounds*, Williams v. Florida, 399 U.S. 78 (1970).

[46] Downes v. Bidwell, 182 U.S. 244, 287 (1901).

[47] 197 U.S. at 520-21 (citing Dorr v. United States, 195 U.S. 138, 149 (1904)).

[48] *Id.* at 522-25.

[49] Brief of Professors of Constitutional Law and Federal Jurisdiction as Amici Curiae in Support of Petitioners (http://www.mayerbrown.com/public_docs/probono_Brief_Professors_Constitutional.pdf), Boumediene v. Bush, 553 U.S. ____ (2008) (Nos. 06-1195 & 06-1196).

[50] *Id.* at 16.  *See also* Hooven & Allison Co. v. Evatt, 324 U.S. 652, 673-74 (1945) ("That our dependencies . . . are territories belonging to, but not a part of, the Union of states under the Constitution, was long since established by [the *Insular Cases*.] . . . [when legislating with regard to them] Congress is not subject to the same constitutional limitations, as it is when legislating for the United States."), *overruled on other grounds*, Limbach v. Hooven & Allison Co., 466 U.S. 353 (1984).

v. Happersett, 21 Wall. 162, 22 L. ed. 627), and to the particular methods of procedure pointed out in the Constitution, which are peculiar to Anglo-Saxon jurisprudence."[51]

Congress ultimately granted citizenship to the residents of many territories, including Alaska, Hawaii and Puerto Rico.[52]  In other territories, however, Congress made residents non-citizen "nationals" who owed allegiance to the United States, but were not vested with indefeasible citizenship.  Inhabitants of the Philippines, for example, were nationals, but with independence lost that status and all connection with the United States.[53]  If not naturalized, they became aliens.[54]

The Canal Zone was an unincorporated territory like the Philippines, rather than an incorporated territory like Alaska.[55]  One piece of evidence, of course, is that the Canal Zone was returned to Panama, consistent with the understanding that the United States did not obtain ownership of the territory.[56]  In addition, Title 8 of the United States Code, "Aliens and Citizenship", excluded the Canal Zone from the definition of the United States.[57]  Although the Supreme Court never faced the question, federal courts

---

[51] 182 U.S. at 283 (Brown J.); *id* at 306 (White J.) (United States need not provide for "immediate bestowal of citizenship on those absolutely unfit to receive it.").  *See also* Rabang v. Boyd, 353 U.S. 427, 432 (1957) (Congress can dictate "status" of inhabitants of territories) (quoting *Downes*, 182 U.S. at 279)).

[52] José A. Cabranes, *Citizenship and the American Empire,* 127 U. PA. L. REV. 391 (1978).

[53] Rabang v. Boyd, 353 U.S. 427 (1957).

[54] *Id.* at 430-31.

[55] Because Arizona was an incorporated territory, there is no serious question that Senator Barry Goldwater, born in Arizona Territory before statehood, was nevertheless a Fourteenth Amendment citizen and thus eligible to the office of President. *Cf.* Cabranes, *supra* note 52, at 434 (noting that Arizona was incorporated territory, represented by a delegate in Congress).

[56] Wilson v. Shaw, 204 U.S. 24, 32-33 (1907) (Panama grants rights to United States "which the United States would possess and exercise if it were the sovereign") (quoting 33 Stat. 2234, art. 3 (1904)).

[57] 8 U.S.C. § 173 (1925)  ("The term 'United States" shall be construed to mean the United States, and any waters, territory, or other place subject to the jurisdiction thereof, except the Isthmian Canal Zone."). *See also* 16 Op. U.S. Comptroller Gen. 515 (Nov. 23, 1936) (listing various statutes and regulations treating the Canal Zone variously as part of the United States, or as foreign territory).

held that during the period of United States jurisdiction "[t]he Canal Zone is an unincorporated territory of the United States."[58]

## B.    Natives of Unincorporated Territories are Not Citizens

The *Insular Cases* remain good law.[59]  Accordingly, persons born in the Canal Zone are not citizens under the citizenship clause of the Fourteenth Amendment because they were not born in the "United States."[60]  As the Board of Immigration Appeals in the U.S. Department of Justice explained in 1949, "[t]he principle of *jus soli*—the law of the place of one's birth—does not obtain in the outlying possessions of the United States . . . presumably because the Constitution does not extend to outlying possessions."[61] Congress also legislated on the understanding that Canal Zone natives were not automatically birthright citizens, although it gave them special status as "non-quota" immigrants, exempt from numerical limitation.[62]

Most cases about citizenship by birth in an unincorporated territory address the Philippines.  Drawing on the *Insular Cases*, the Second, Third and Ninth Circuits held that "birth in the Philippines during the territorial period does not constitute birth 'in the United States' under the Citizenship Clause of the Fourteenth Amendment, and thus does

---

[58] United States v. Husband R. (Roach), 453 F.2d 1054, 1057 (5th Cir. 1971); *see also* Gerald L. Neuman, *Anomalous Zones,* 48 STAN. L. REV. 1197, 1228 n.186 (1996) (citing, e.g., Government of Canal Zone v. P. (Pinto), 590 F.2d 1344, 1351 (5th Cir.1979) ("the provisions of the Constitution do not apply of their own force")).

[59] *See* Boumediene v. Bush, 128 S. Ct. 2229, 2253-54 (2008); United States v. Verdugo-Urquidez, 494 U.S. 259, 268 (1990) (Rehnquist, C.J., joined by White, O'Connor, Scalia and Kennedy, JJ.) ("The global view . . . of the application of the Constitution is also contrary to this Court's decisions in the *Insular Cases,* which held that not every constitutional provision applies to governmental activity even where the United States has sovereign power."); Rayphand v. Sablan, 95 F.Supp.2d 1133 (D.N. Mariana Islands 1999) (three judge court) (one person, one vote inapplicable in unincorporated territories), *aff'd mem sub nom.* Torres v. Sablan, 528 U.S. 1110 (2000).

[60] *Cf.* Friend v. Reno, 172 F.3d 638, 640-42 (9th Cir. 1999) (residence in Philippines not "United States" for purposes of transmitting citizenship); *In re:* Juan Carlos Smith, 2004 WL 2952288 (BIA Nov. 29, 2004) (Canal Zone not "United States").

[61] Matter of S---, 3 I & N  Dec. 589, 593 (BIA Apr. 26, 1949).

[62] 8 U.S.C. § 204(c) (1925) (person born in the Canal Zone is a "non-quota immigrant" entitled to advantageous treatment, but, under § 203, an immigrant is an "alien").

not give rise to United States citizenship."[63]  These courts relied on Supreme Court cases from the 1950s assuming that persons born in the Philippines were not citizens.[64]

Accordingly, persons born in the Canal Zone are citizens only if some law other than the Fourteenth Amendment makes them citizens.  Thus, individuals born in the Canal Zone under United States jurisdiction have been deported[65] or convicted of unlawful presence[66] in the United States.  Contrary to the Tribe-Olson Opinion, under existing Supreme Court decisions, Senator McCain's birth in the Canal Zone, by itself, cannot make him a natural born citizen; it did not make him a citizen at all.

## II.    Citizenship as a Child of Citizens

If Senator McCain was not born in the United States for purposes of the Fourteenth Amendment, under the traditional view, if he is to be a citizen it is necessary to find a statute making him one.  The blunt rule applied by courts and the executive in this context is that "[e]vidence of foreign birth gives rise to a presumption that the person

---

[63] Rabang v. INS, 35 F.3d 1449, 1452 (9th Cir. 1994); *see also* Lacap v. INS, 138 F.3d 518, 519 (3d Cir. 1998) (per curiam); Valmonte v. INS, 136 F.3d 914, 920 (2d Cir. 1998).

[64] *Valmonte*, 136 F. 3d at 919 (citing "Barber v. Gonzales, 347 U.S. 637, 639 n. 1 (1954) (stating that although the inhabitants of the Philippines during the territorial period were 'nationals' of the United States, they were not 'United States citizens'); Rabang v. Boyd, 353 U.S. 427, 432 n. 12 (1957) ( 'The inhabitants of the Islands acquired by the United States during the late war with Spain, not being citizens of the United States, do not possess right of free entry into the United States.' (emphasis added) (citation and internal quotation marks omitted))").

[65] *See In re* Martiza Ellis A.K.A. Maritza M. Ellis, 2006 WL 2008273 (BIA June 5, 2006) (person did not gain U.S. nationality by birth in Canal Zone); *In re* Arturo Brazier-Gooding, 2006 WL 2008323 (BIA June 2, 2006) ("While he was born in the Canal Zone in 1959, when it was under the jurisdiction of the United States, he was neither born nor naturalized in the United States"); *In re* Francisco Corpas-Arrocha A.K.A. Franklin Williams A.K.A. Francisco Corpas A.K.A. William R. Kennedy, 2005 WL 3952690 (BIA Aug. 30, 2005) (individual not a citizen based on birth in Canal Zone unless parents were citizens).

[66] Farrell v. United States, 381 F.2d 368, 369 (9th Cir. 1967) (per curiam) ("[A] person born in the Canal Zone is a citizen only if his father or mother or both were . . . citizens of the United States. 8 U.S.C. §1403.")

so born is an alien;"[67] persons born in the Canal Zone are presumptively aliens.[68]  In

1936, no statute granted citizenship to children of U.S. citizens born in the Canal Zone.

A.    *The Exclusive Naturalization Powers of Congress*

According to the Supreme Court, the Constitution "contemplates two sources of

citizenship, and two only: birth and naturalization."[69]  Unless born in the United States, a

person "can only become a citizen by being naturalized . . . by authority of Congress,

exercised either by declaring certain classes of persons to be citizens, as in the

enactments conferring citizenship upon foreign-born children of citizens, or by enabling

foreigners individually to become citizens."[70]  A person granted citizenship by birth

outside the United States to citizen parents is naturalized at birth; he or she is both a

citizen by birth, and a naturalized citizen.[71]

The citizenship statutes are exclusive;[72] there is no residual common-law or

natural-law citizenship.  The Court has held that citizens have no constitutional right to

---

[67] Corona-Palomena v. INS, 661 F.2d 814, 818 (9th Cir. 1981) (citing, *inter alia*, United States *ex rel.* Barilla v. Uhl, 27 F. Supp. 746 (S.D.N.Y. 1939), *affd per curiam on opinion below*, 108 F.2d 1021 (2d Cir. 1940).

[68] *See In re* Martiza Ellis A.K.A. Maritza M. Ellis, 2006 WL 2008273 (BIA June 5, 2006) ("The respondent claims that she is a national of the United States by birth in the Canal Zone . . . While the burden to establish alienage in a removal proceeding is upon the Government, a person born abroad is presumed to be an alien and must go forward with the evidence to establish any claim to United States citizenship."); *In re* Francisco Corpas-Arrocha A.K.A. Franklin Williams A.K.A. Francisco Corpas A.K.A. William R. Kennedy, 2005 WL 3952690 (BIA Aug. 30, 2005) ("The respondent concedes that he was born in the Panama Canal Zone and therefore the DHS has satisfied its threshold burden of proving the respondent's foreign birth. Accordingly, the respondent has the burden of demonstrating by a preponderance of the evidence that he is in fact a United States citizen.").

[69] *Id.* United States v. Wong Kim, Ark, 169 U.S. 649, 702 (1898).

[70] *Id.  Accord* Miller v. Albright, 523 U.S. 420, 423-24 (1998) (Stevens, J.); *id.* at 453 (Scalia J., concurring in the judgment);  Zartarian v. Billings, 204 U.S. 170, 173 (1907) ("As Mariam was born abroad, a native of Turkey, she has not become a citizen of the United States, except upon compliance with the terms of the act of Congress, for, wanting native birth, she cannot otherwise become a citizen of the United States.").

[71] Pryor, *supra* note 3, at 893-94.

[72] 8 U.S.C. § 1421(d) ("A person may only be naturalized as a citizen of the United States in the manner and under the conditions prescribed in this subchapter and not otherwise."); Boyd v. Nebraska, 143 U.S. 135, 160 (1892) ("The constitution has conferred on congress the right to establish a uniform rule of naturalization, and this right is evidently exclusive, and has always been held by this court to be so.").

transmit their citizenship to children. In *Rogers v. Bellei*,[73] the Supreme Court upheld a statute requiring children born overseas to citizen parents to reside in the United States to retain their citizenship. The Court explained that Congress had no power to remove "Fourteenth-Amendment-first-sentence"[74] citizenship, but the citizenship clause "obviously did not apply to any acquisition of citizenship by being born abroad of American parents. That type, and any other not covered by the Fourteenth Amendment, was necessarily left to proper congressional action."[75] Indeed, "Congress may withhold citizenship from persons" born overseas to citizen parents.[76] Since, with respect to a foreign-born child of a United States citizen, Congress could "deny him citizenship outright,"[77] it could impose the lesser burden of requiring United States residence to retain citizenship.

Congressional power to withhold citizenship from children of U.S. citizens is not hypothetical; for decades, it was law, and to some extent still is. The Tribe-Olson Opinion proposes that "[i]t goes without saying that the Framers did not intend to exclude a person from the office of the President simply because he or she was born to U.S. citizens serving in the U.S. military outside of the continental United States."[78] However, the 7th Congress, which included Framers Gouverneur Morris and Abraham Baldwin, among others, did precisely that. In *Montana v. Kennedy*,[79] the Supreme Court construed

---

[73] 401 U.S. 815 (1971).
[74] *Id.* at 827.
[75] *Id.* at 830.
[76] *Id.* at 831.
[77] *Id.* at 835. The Court's cases make it much more difficult to expatriate a "Fourteenth-Amendment-first-sentence" citizen. T. Alexander Aleinikoff, *Theories of Loss of Citizenship*, 84 MICH. L. REV. 1471 (1986).
[78] Tribe-Olson Opinion, *supra* note 21, at 2. *See also* McCain Brief, *supra* note 23, at 4 ("It is inconceivable that the Framers intended to exclude a child born of two U.S. citizens from holding the Office of President simply because of the historical accident that he or she happened to be born in a place that was not a State of the Union.").
[79] 366 U.S. 308 (1961).

an 1802 statute to mean that "[f]oreign-born children of persons who became American citizens between April 14, 1802 and 1854 were aliens."[80]  Thus, children of members of the armed forces serving overseas, and diplomats and civil servants in foreign posts were not only not "natural born citizens", ineligible to be President, they were not citizens at all.

This decision was less of a hardship than it would be now, because until the late nineteenth century, there was little federal immigration law.  There were no general federal restrictions on who could enter the country, no provisions for deportation of residents who became undesirable, and there was no immigration agency to deport them.[81]  Of course, these children could become citizens by individual naturalization.  But even if the child suffered based on lack of citizenship, "[a]s this subject is entirely within congressional control, the matter must rest there; it is only for the courts to apply the law as they find it."[82]

B.    *Citizenship by Descent in 1936: "The Canal Zone is a 'no man's land'"*

In 1936, when Senator McCain was born, Revised Statutes § 1993 governed citizenship of children born overseas to U.S. citizen parents.  It did not grant citizenship to those born in the Canal Zone.

Although the original version of § 1993 dated to 1855 (passed to reverse the policy described in *Montana v. Kennedy*), the version in force in 1936 became law in 1934.[83]  It granted citizenship to "[a]ny child hereafter born out of the limits and

---

[80] *Id.* at 311 (construing Act of April 14, 1802, 2 Stat. 155, *codified at* R.S. § 2172).
[81] There was state regulation, however.  *See* Gerald L. Neuman, *The Lost Century of American Immigration Law (1776-1875)*, 93 COLUM. L. REV. 1833 (1993).
[82] Zartarian v. Billings, 204 U.S. 170, 175-76 (1907).
[83] Act of May 24, 1934, § 1, 48 Stat. 797, ch. 344.  The major change to this part of the statute allowed female as well as male citizens to transmit citizenship to their children born abroad.

jurisdiction of the United States, whose father or mother or both at the time of the birth of

such child is a citizen of the United States."[84]  The statute had two other qualifications.  It

provided that "citizenship shall not descend to any such child unless the citizen [parent]

has resided in the United States previous to the birth of such child."[85]  This prevented the

creation of overseas enclaves of citizens with no connection to the United States; the

foreign-born child of a citizen who had lived in the United States was a citizen, but the

grandchild would be only if the condition were satisfied.  In addition, if one parent was

not a citizen, citizenship would terminate[86] "unless the child comes to the United States

and resides therein for at least five years continuously immediately previous to his

eighteenth birthday", and took an oath.[87]

By its terms, § 1993 applied if the Canal Zone is "out of the limits and jurisdiction

of the United States."  By the rule of the *Insular Cases*, the Canal Zone was not the

"United States," so the first criterion is satisfied.[88]  However, by statute[89] and given

exclusive United States control of the Canal Zone, it was not out of the "jurisdiction" of

the United States.  Under its plain meaning, § 1993 does not include the Zone.  For

example, the 2007 amicus brief of constitutional law professors, joined by Professor

Tribe, refers to "territory outside U.S. territorial borders and sovereignty, but still under

---

[84] *Id.*

[85] *Id.*

[86] *See* 38 Op. U.S. Atty. Gen. 10 (July 21, 1934) (finding these conditions subsequent, not conditions precedent).

[87] Act of May 24, 1934, § 1, 48 Stat. 797, ch. 344.

[88] *See also, e.g.,* 8 C.F.R. § 3.11(c) & (d) (1938) (visa required for admission to "the United States" unless returning from short visit to "nearby countries" including "Panama Canal Zone").

[89] 8 U.S.C. § 173 (1925) ("The term 'United States' shall be construed to mean the United States, and any waters, territory or other place subject to the jurisdiction thereof, except the Isthmian Canal Zone."). Many laws still in the U.S. Code also make the point.  *See, e.g.,* 10 U.S.C. § 776 ("This chapter applies in – (1) the United States; (2) the territories, commonwealths, and possessions of the United States; and (3) all other places subject to the jurisdiction of the United States"); 15 U.S.C. § 1231(h) (definition applicable to "Canal Zone . . . . or any other place under the jurisdiction of the United States"); 22 U.S.C. § 611 (United States includes "Canal Zone . . . and all other places now or hereafter subject to the civil or military jurisdiction of the United States.").

the complete jurisdiction and control of the United States, most prominently, the Canal

Zone in Panama."[90]

Because the Canal Zone was neither the United States nor foreign, Congress

recognized a problem with the citizenship of Zone-born children. In 1937, Congress

passed a specific statute granting citizenship to children of U.S. citizens born in the Canal

Zone. Still in force, it provides:

> [A]ny person born in the Canal Zone on or after February
> 26, 1904, and whether before or after the effective date of
> this Act, whose father or mother or both at the time of the
> birth of such person was or is a citizen of the United States,
> is declared to be a citizen of the United States.[91]

The legislative history explains the basis for the law. In 1937, the Immigration

and Naturalization Service was part of the Department of Labor.[92] Labor Secretary

Frances Perkins explained that children born to U.S. citizens in the Canal Zone "are

citizens in every sense except as a matter of law."[93] Because "the Canal Zone is not an

incorporated territory of the United States, hence not 'a part of' or 'in' the United States,

there is doubt that any of the persons described in the bill are citizens of the United States

under the Constitution or any existing statutes even though the Canal Zone is under the

jurisdiction of the United States."[94]

The House Report observed that "the citizenship of persons born in the Canal

Zone of American parents, has never been defined either by the Constitution, treaty or

---

[90] Brief of Professors of Constitutional Law, *supra* note 49, at 15.
[91] Act of August 4, 1937, § 1, 50 Stat. 558 ch. 563, *codified at* 8 U.S.C. § 1403(a).
[92] Exec. Ord. 6166 § 14 (June 10, 1933).
[93] Letter from Frances Perkins, Mar. 2, 1937, *in* S. Comm. on Interoceanic Canals, *Citizenship of Certain Classes of Persons born in the Canal Zone or the Republic of Panama*, S. REP. NO. 75-678, at 3 (1937).
[94] *Id.*

congressional enactment."[95]  Canal Zone-born children are not covered by the "statutes

on citizenship" because they "are not outside the jurisdiction of the United States, neither

are they within the limits of the United States."[96] Thus, "[e]ven children born within the

limits of the Zone which is under the jurisdiction of the United States are not citizens."[97]

In the brief Senate debate on the bill, Senator Bennett Champ Clark said that

"existing law is changed" in that citizenship would be granted to children of U.S. citizens

born in the Canal Zone.[98]  In the House, John Sparkman explained:

> It has been held that the Canal Zone is not such foreign
> territory as to come under the law of 1855 [R.S. § 1993]
> and, on the other hand, it is not part of the United States
> which would bring it within the fourteenth amendment;
> consequently there has been great doubt about the
> citizenship status of children born in the Canal Zone.[99]

Sparkman concluded: "The Canal Zone is a 'no man's land.'  Every place in the world

except the Canal Zone has been covered either by the law of 1855, which applies to

foreign countries, or by the fourteenth amendment, which applies to the United States and

its possessions."[100]

Of course, doubts about applicability of § 1993 might be mistaken.  If Senator

McCain was born a citizen in 1936 by virtue of § 1993, Congress in 1937 cannot reverse

that, even by legislation.  Conceivably, the 1937 statute was somehow redundant of

§1993, just as part of the citizenship clause of the Fourteenth Amendment is now

repeated verbatim in 8 U.S.C. § 1401(a).  However, the concern of Congress was

---

[95] H. Comm. on Immigr. and Naturalization, *Citizenship of Certain Classes of Persons born in the Canal Zone or Republic of Panama*, H.R. REP. NO. 75-1303, at 1 (1937).
[96] *Id.* at 2.
[97] *Id.* at 1.
[98] 81 CONG. REC. 6353 (1937).
[99] *Id.* at 7764.
[100] *Id.* at 7769.

justified, because persons born in the Canal Zone were not covered by the Supreme

Court's interpretation of the text of § 1993, or its original public meaning.

The Constitution's text itself demonstrates that United States "jurisdiction" and

the "United States" in a territorial sense are distinct concepts.[101]  "The 13th Amendment

to the Constitution, prohibiting slavery and involuntary servitude 'within the United

States, or in any place subject to their jurisdiction,' . . . show[s] that there may be places

within the jurisdiction of the United States that are no part of the Union."[102]

In *United States v. Wong Kim Ark*,[103] the Court construed a passage of the 1855

version of what became § 1993; that language remained unchanged in the 1934 revision.

The Court held that the phrases "in the United States and subject to the jurisdiction

thereof" in the citizenship clause of the Fourteenth Amendment "must be presumed to

have been understood and intended by [Congress and the States as] the converse of the

words 'out of the limits and jurisdiction of the United States' as habitually used in the

naturalization acts."[104]  That is, "jurisdiction" in § 1993 means the same thing as it does

in the Fourteenth Amendment.

*Wong Kim Ark* held that natives and citizens of China living in the United States

were subject to the "jurisdiction" of the United States because they "are entitled to the

---

[101] For a contemporary example, compare 18 U.S.C. § 5 (defining "United States") with 18 U.S.C. § 7 (defining "special maritime and territorial jurisdiction of the United States", which covers land and water beyond the "United States"). "Jurisdiction" also refers to the nation's power to regulate its citizens anywhere in the world. *See* Cook v. Tait, 265 U.S. 47 (1924) (upholding worldwide taxation of citizens); Christopher L. Blakesley & Dan E. Stigall, *The Myopia of* U.S. v. Martinelli*: Extraterritorial Jurisdiction in the 21st Century*, 39 GEO. WASH. INT'L L. REV. 1, 18-21 (2007) (discussing criminal jurisdiction based on nationality). *Wong Kim Ark* was surely right that the naturalization laws did not use "jurisdiction" in this sense, because citizens are never outside the authority of the United States to regulate them.  If § 1993 applied only when parents were outside this sort of jurisdiction, it would never apply.

[102] Downes v. Bidwell, 182 U.S. 244, 251 (1901) (opinion of Brown J.). *See also, e.g.,* Rasul v. Bush, 542 U.S. 466, 475 (2004) (United States has "plenary and exclusive jurisdiction" over Guantanamo, but not "ultimate sovereignty").

[103] 169 U.S. 649 (1898).

[104] *Id.* at 687.

protection of and owe allegiance to the United States, so long as they are permitted by the United States to reside here, and are 'subject to the jurisdiction thereof' in the same sense as all other aliens residing in the United States."[105]  Based on *The Schooner Exchange v. McFaddon*,[106] an 1812 decision by Chief Justice Marshall, *Wong Kim Ark* found persons not subject to the jurisdiction of the United States to include "children of foreign sovereigns or their ministers, or born on foreign public ships, or of enemies within and during a hostile occupation of part of our territory."[107]  Accordingly, individuals are within a country's "jurisdiction" if they are in a place that obligates them to that nation.

*Wong Kim Ark* thus recognizes four categories.  A person can be: 1) both in the United States and subject to its jurisdiction, like a Chinese immigrant in California; 2) neither in the United States nor subject to its jurisdiction, like a Brazilian citizen in São Paulo; 3) in the United States but not subject to its jurisdiction, like a British soldier occupying Washington, D.C. during the War of 1812; or 4) out of the United States but subject to its jurisdiction, like a sailor on a United States warship in Tripoli.  Only persons born in the first category are citizens by birth under the Fourteenth Amendment; only those born in the second category to U.S. citizens are covered by §1993.

The Canal Zone is in the fourth category.  Under doctrine of the *Insular Cases*, the House Committee on Immigration and Naturalization's conclusion that "Children of American parents in the Canal Zone are not outside the jurisdiction of the United States, neither are they within the limits of the United States"[108] is inescapable.  As an unincorporated territory, the Canal Zone is not the "United States."  At the same time, if

---

[105] *Id.* at 694.
[106] 11 U.S (7 Cranch) 116 (1812).
[107] 169 U.S. at 693.
[108] H.R. REP. NO. 75-1303, *supra* note 95, at 2.

Chinese living in the United States owed at least temporary allegiance and were entitled

to protection, children of U.S. citizens born in the Canal Zone also could be expected to

receive the protection of law, and not to violate its laws.

Attorney General Charles Bonaparte applied this view to the Canal Zone, opining

in 1907 that "[t]he words 'sovereign rights' 'within the Zone' mean, among other things,

the right to the allegiance of the Zone's people" and imposed the corresponding duty to

protect them.[109]  In addition, many statutes[110] and Attorney General Opinions recognized

that the Canal Zone was under United States "jurisdiction."[111]

C.    *Should § 1993 be Re-Drafted to Fix Congressional Error?*

Like the natural born citizen clause itself, the language of § 1993 was not

intended to correlate with the citizenship clause of the Fourteenth Amendment; the

Fourteenth Amendment had not yet been imagined when the earlier provisions became

law.  On the other hand, under a broad theory of statutory construction, a court or person

parsing § 1993 might conclude that the "and jurisdiction" requirement was introduced

and maintained in the law as a mistake or surplusage.   Alternatively, perhaps Congress

meant to grant citizenship when the parents were outside the "limits *or* jurisdiction," of

the United States not, as they wrote, "limits *and* jurisdiction."  If so perhaps, the apparent

statutory requirement that the birth be outside United States "jurisdiction" should be

---

[109] 26 Op. U.S. Atty. Gen. 376 (Sept. 7, 1907). Congress also recognized that there were non-citizens in
outlying territories who owed allegiance to the United States, and granted them special naturalization
privileges if they moved to the United States proper.  8 U.S.C. § 360 (1925) (special rules for naturalization
of those not citizens, but who owed permanent allegiance to the United States, if they became "residents of
any State or organized territory of the United States.").

[110] *See supra* note 89.

[111] 30 Op. U.S. Atty. Gen. 271 (July 14, 1914) ("That the Canal Zone is 'territory under the control or
jurisdiction' of the United States has been held in a long line of opinions by the Attorneys General."); 25
Op. U.S. Atty. Gen. 474 (June 5, 1905) (by treaty "the Canal Zone became subject to the jurisdiction of the
United States"; accordingly, Thirteenth Amendment applied).

ignored.  Indeed, there was testimony at the House hearing on the 1937 Act that the State

Department held that view, and thus regarded children of U.S. citizens born in outlying

possessions as citizens.[112]  Reading "and jurisdiction" out of § 1993 would mean persons

born in the Canal Zone in 1936 are citizens at birth because the meet the requirements of

the statute as revised.

This argument is doubtful for several reasons.  Ambiguous citizenship statutes are

construed against the grant of citizenship.  The courts and the executive agree that

"Citizenship is a high privilege, and when doubts exist concerning a grant of it, generally

at least, they should be resolved in favor of the United States and against the claimant."[113]

In addition, if Congress erred, perhaps failing to realize that it left a gap in the law, or to

appreciate the potential implications of the structure it created, it is for Congress to fix

that error.  "If Congress enacted into law something different from what it intended, then

it should amend the statute to conform it to its intent. 'It is beyond our province to rescue

Congress from its drafting errors, and to provide for what we might think ... is the

preferred result.'"[114]

---

[112] *Hearing on S. 2416 relating to the Citizenship of Certain Classes of Persons born in the Canal Zone or the Republic of Panama, before the H. Comm. on Immigr. and Naturalization,* 75th Cong. (July 21, 1937) ("July 21, 1937 Hearing") (unnumbered pages) (view of Department is "that it is complementary to the provision in the fourteenth amendment concerning children born within the United States and subject to the jurisdiction of the United States") (statement of Richard W. Flournoy, Assistant to the Legal Advisor, Department of State).  *But see Hearing on S. 2416 relating to the Citizenship of Certain Classes of Persons born in the Canal Zone or the Republic of Panama before the H. Comm. on Immigr. and Naturalization* at 16 (July 14, 1937) ("July 14, 1937 Hearing") (Statement of Henry B. Hazard, Assistant to the Commissioner of Immigration) ("children born there were presumably not citizens, because they were not born out of the limits and jurisdiction of the United States, . . .  nor were they citizens because they were not born in the United States under the 14th Amendment.").

[113] 38 Op. U.S. Atty. Gen. 217 (June 17, 1935) (quoting United States v. Manzi, 276 U.S. 463, 467 (1928)); Ashton v. Gonzalez, 431 F.3d 95, 99 (2d Cir. 2005) (citing *Manzi*); Bagot v. Ashcroft, 398 F.3d 252, 256-57 (3d Cir. 2005).  *See also* Montana v. Kennedy, 366 U.S. 308, 314 (1961) (statute granted citizenship to children if U.S. citizen mother lost citizenship and regained it, but not if she remained a citizen; "Paradoxical though this may be, we have no power to 'construe' away the unambiguous statutory requirement").

[114] Lamie v. U.S. Trustee, 540 U.S. 526, 542 (2004) (Kennedy J., joined by Rehnquist, C.J., and O'Connor, Souter, Thomas, Ginsburg, Breyer, JJ., and Scalia J. as to this part) (quoting United States v. Granderson,

Fundamentally, the statute is not ambiguous. Requiring that citizen parents be beyond both United States territory and jurisdiction cannot be ascribed to congressional scrivener's error.[115] To this day, Congress declines to grant automatic citizenship to some children of U.S. citizens born overseas, so it is not necessarily evidence of mistake that some children of citizens are left to the general immigration and naturalization laws. Here, it is perfectly sensible that Congress would treat those outside the country but within the jurisdiction differently from those outside both the territory and the jurisdiction.

In 1855, when § 1993 first became law, there were few places outside the territory but within the jurisdiction, and none were considered fit for women and children. Territory temporarily occupied by United States forces by permission of a foreign sovereign and United States warships in foreign ports would be out of the United States and within its jurisdiction.[116] Given the sex discrimination in the U.S. armed forces at the time, Congress certainly would have thought that, say, births in foreign ports on all-male U.S. Navy ships, would be sufficiently irregular and unusual as to warrant the individual inquiry afforded by naturalization under the statute, rather than granting blanket birthright

---

511 U.S. 39, 68 (1994) (concurring opinion)); *see also* United States *ex rel.* Totten v. Bombardier Corp., 380 F.3d 488, 494 (D.C. Cir. 2004) (Roberts J.) (citing related passage of *Lamie*).

[115] The 1934 law amending § 1993, in addition to requiring that the birth be outside the "limits and jurisdiction" of the United States, required that the "father or mother" be a U.S. citizen. Act of May 24, 1934, § 1, 48 Stat. 797 ch. 4. In addition, § 2 of the law addressed the citizenship of a "child born without the United States of alien parents" who later naturalized. *Id.* at § 2. Thus, the Act itself shows that Congress knew how to establish requirements in the alternative by using the word "or," and knew how to describe all of the world outside of the United States proper, whether in U.S. jurisdiction, or not. That Congress did not do so at least implies that its drafting was intentional; use of different language in different parts of a statute suggests a different meaning. *E.g.,* Bates v. United States, 522 U.S. 23, 29-30 (1997).

[116] *See, e.g.,* The Schooner Exchange v. McFaddon, 11 U.S. (7 Cranch) 116, 140 (1812) ("The grant of a free passage . . . implies a waver of all jurisdiction over the [foreign] troops during their passage, and permits the foreign general to use that discipline, and to inflict those punishments which the government of his army may require.")

citizenship.[117]  There are perfectly good reasons for treating these special circumstances differently than foreign births generally.

In 1934, when Congress revised § 1993 to allow U.S. citizen mothers to transmit citizenship to their children on the same basis as U.S. citizen fathers, more places were outside of the United States but subject to its jurisdiction, including Puerto Rico, Guam and the Canal Zone.  By then, a new set of considerations justified treating people born there differently from those born either in the United States or in a foreign land.  Notably, when Congress addressed the problem in 1937, it did not eliminate the differential treatment of unincorporated territories; it codified it.  It remains in modified form in the current U.S. Code.

If Congress considered birth in the Canal Zone to be equivalent to birth in London or Mexico City, it could have included the Canal Zone in § 1993 by striking the words "and jurisdiction," or by defining the Canal Zone as "out of the limits and jurisdiction of the United States" for purposes of § 1993.  Instead, Congress left § 1993 untouched, and legislated different treatment for Zonians than those abroad.  The 1937 Act omits § 1993's requirement that a person with one alien parent return to the United States for five years and take an oath to retain citizenship.  Congress treated the Zone as an American enclave, allowing Zone-born citizens to live their entire lives there and maintain their citizenship.  For the same reason, a Zone-born child of a U.S. citizen who never resided

---

[117] This is particularly so given later interpretations of the statute making it applicable only to births in wedlock or later legitimated. 32 Op. U.S. Atty. Gen. 162 (Apr. 7, 1920).  If this opinion correctly discerned congressional intent, then the actions of Congress are even more understandable.

in the United States is made a citizen, while under § 1993, the foreign-born child of a U.S. citizen who never resided in the United States is an alien.[118]

Congress to this day has chosen to maintain differential treatment of those born outside the United States but in an unincorporated territory. The current version of the Immigration and Nationality Act has distinct rules for citizenship by descent for those born in the United States,[119] outside of both the United States and its outlying possessions,[120] and outside the United States but in its in outlying possessions.[121] That is, the law still treats U.S. jurisdiction and territory as distinct and meaningful concepts.

The plain language, prior judicial construction, the actions of Congress, and use of the words in official contexts all point in the same direction. Because persons born in unincorporated territories such as the Canal Zone are out of the United States but within its jurisdiction, § 1993 did not apply. Since there was no other law in 1936, children of citizens born there were not citizens at birth.

D.      *The Politics of Canal Zone Citizenship*

The Canal Zone citizenship problem had not been overlooked. It was no secret that nationality law was in disarray. A State Department official wrote in 1934 that "[p]robably no branch of the law in this country is more open to criticism upon the

---

[118] Canal Zone authorities justified preferential treatment: "The Canal Zone is under the jurisdiction of the United States with nothing but United States laws and customs and hence is not foreign territory." Memorandum Submitted by the Governor of the Canal Zone, *in* H.R. REP. NO. 75-1303, *supra* note 97, at 3.
[119] 8 U.S.C. § 1401(a) & (b).
[120] 8 U.S.C. §1401(c) , (d) & (g).
[121] 8 U.S.C. § 1401(e).

grounds of instability, inconsistency and ambiguity than that governing nationality, or citizenship."[122]  However, for a variety of reasons Congress legislated slowly.

Congress was informed about the gap in the law with regard to the unincorporated territories no later than 1932.  Commissioner of Naturalization Raymond F. Crist testified before the House Committee on Immigration and Naturalization on a bill proposing to make foreign-born children of U.S. citizen mothers citizens instead of aliens.[123] His testimony reflected both the precise nature of the problem, and the tradition of government inertia delaying its resolution.

Commissioner Crist explained that he "had nearly 25 years experience in executive councils in attempting to get a uniform rule of naturalization out of the existing naturalization statute."[124]  He insisted that "[t]here are cases left out which should be included in this bill",[125] specifically "children born of American parents who are not citizens by section 1992 [covering birth in the United States], children born in the Philippine Islands, as to whom neither the Constitution nor any statute affirmatively declares that they are citizens of the United States."[126]  The problem was that "those born

---

[122] Flournoy, *supra* note 11, at 780.  A modern analyst proposes that "[c]urrent U.S. citizenship-by-descent law is full of complications that act more as traps for the unwary than reasonable ways of accomplishing legitimate policy goals." David A. Isaacson, *Correcting Anomalies in United States Law of Citizenship by Descent*, 47 ARIZ. L. REV. 313, 316 (2005). The same observations have been made about immigration law generally. *See, e.g.,* Ira J. Kurzban, *A More Critical Analysis of Immigration Law*, 99 HARV. L. REV. 1681, 1681 (1986) ("In attempting to unravel the complex statutes, regulations, operations instructions, court decisions, executive orders, and treaties that govern the actions of INS officials, one may find, as did the Second Circuit in *Lok v. INS*, that a 'striking resemblance' exists between 'King Minos's Labyrinth in ancient Crete . . . and the Immigration and Nationality Acts.'").

[123] *Hearings on H.R. 5489 Relating to Naturalization and Citizenship Status of Certain Children of Mothers who are Citizens of the United States, and Relating to the Removal of Certain Distinctions in Matters of Nationality, , before the H. Comm. on Immigr. and Naturalization,* 72d Cong. (Jan. 7, 1932) . The transcript is dated "January 7, 1931."  However, some of the internal documents in the transcript are dated 1932, *id.* at 19, and in January, 1931, the 71st Congress still sat.  Accordingly, this hearing probably took place in 1932.

[124] *Id.* at 27.

[125] *Id.*

[126] *Id.* at 28.

within the jurisdiction of the United States are not declared citizens of the United States."[127]   The gap was "not limited to the Philippines; any place under the jurisdiction of the United States.  I gave the Philippines as an illustration only."[128]

This testimony did not persuade the 72d Congress to act with respect to either children born in the unincorporated territories or to U.S. citizen mothers; both groups were left aliens.  However, in April, 1933, President Roosevelt issued an Executive Order directing the Departments of State, Labor and Justice to prepare a report on the nationality laws of the United States, and recommend revisions to Congress.[129]

Commenting in March 1933 on the bill pending in the 73d Congress that became § 1993, Secretary of State Cordell Hull reminded the House Committee on Immigration and Naturalization that, "[a]s has been suggested by this Department on several occasions, its experience persuades it to believe that it would be advisable to give careful consideration to the matter of making a general revision of the nationality laws of the United States." [130]   Secretary Hull recommended that Congress wait until completion of a study, and then enact "a complete code of law on the subjects of citizenship of the United States and its insular possessions"; in his view the "piecemeal enactment of legislation concerning these matters [makes them] difficult of solution and often not without embarrassment."[131]

But in case Congress would not wait, Secretary Hull submitted a draft statute. Remarkably similar to what would become the Nationality Act of 1940, the State

---

[127] *Id.*
[128] *Id.*
[129] Exec. Order 6115 (Apr. 25, 1933).
[130] *Hearings Relating to Naturalization and Citizenship Status of Children whose Mothers are Citizens of the United States, and Relating to the Removal of Certain Inequalities in Matters of Nationality before the H. Comm. on Immigr. and Naturalization*, 73rd Cong. at 8 (Mar. 28, 1933).
[131] *Id.*

Department proposed separate nationality provisions for those born in the United States, born out of the United States and its outlying possessions, and born in the outlying possessions, fixing the gap in § 1993 that Commissioner Crist identified.[132]  As one witness explained, it made citizens of "a child not born abroad, but born in a place subject to the jurisdiction of the United States, but not in the United States proper" if at least one parent was a U.S. citizen.[133]

Once again, Congress was advised of the problem and a solution.  However, Congress did not act.  Mere equalization of the rights of male and female U.S. citizens to give their children citizenship generated substantial political opposition; the anti-immigrant tenor of this era is suggested by the fact that Congress and executive agencies would not loosen immigration restrictions even to save refugees from the Nazi regime.[134]  Regarding an unsuccessful 1939 bill to admit 20,000 refugee children from Europe, the wife of the Commissioner of Immigration observed that the "20,000 children would all too soon grow up into 20,000 ugly adults."[135]

Similar sentiments affected the mother's bill.  While women's groups were the driving force behind reform, other important constituencies opposed the law.  The State Department noted that allowing U.S. citizen mothers to have citizen children "would make it possible for large numbers of persons who are . . . alien in all respects except in

---

[132] *Id.* at 8-9, 53.

[133] *Id.* at 56 (statement of Mrs. Burnita S. Matthews, representing National Women's Party).

[134] *See, e.g.,* HENRY L. FEINGOLD, THE POLITICS OF RESCUE: THE ROOSEVELT ADMINISTRATION AND THE HOLOCAUST, 1938-1945, at 14 (1970) ("[A] Jewish-sponsored move to liberalize the law, such as the steps suggested by Congressman Samuel Dickstein during the Seventy-fifth and Seventy-sixth Congresses [i.e., January 1937 to January 1941], had a tendency to elicit more restrictive measures whose antirefugee character was only thinly disguised."); SAUL S. FRIEDMAN, NO HAVEN FOR THE OPPRESSED: UNITED STATES POLICY TOWARD JEWISH REFUGEES, 1938-1945, at 31 (1973) (according to 1938-39 Roper Poll, while 95% of Americans disapproved of German regime, if in Congress, 83% would oppose additional refugee admission to the United States, "despite the public's increased knowledge of persecutions against German Jews that winter").

[135] FEINGOLD, *supra* note 134, at 150.

name to enter the United States free from the restrictions of the immigration laws."[136]  Lt. Col. U.S. Grant III, representing the American Coalition of Patriotic Societies, opposed equalization, as it "would tend to establish an endless chain of admissible relatives and materially increase immigration;"[137] "with the large problem of unemployment . . . it is certainly very undesirable to let down the bars at all."[138]  The American Federation of Labor opposed the bill, arguing that "the real and proper way to equalize the status of men and women . . . would be to amend the bill by denying automatic citizenship to any children born in foreign countries, unless both the father and the mother are citizens . . . ."[139]

Because passage of the bill at all was precarious, Congress resolved only discrimination against mothers.  On the floor of the House, Representative McFadden argued that "[t]he entire question is so intricate and technical that it deserves long and patient study . . . in the face of this and the study that is being made under the instructions of the President, what is the great haste in putting this resolution through at this time?"[140]  However, Representative Jenckes' view prevailed: "leaving further changes in the laws themselves until the commission now studying them has presented its report in some future year—would throw the question of equal nationality into what would be bound to be a bitter fight on new nationality and naturalization laws—a situation women have sought to avoid." [141]  Similarly, in the Senate it was proposed, unsuccessfully, that the bill

---

[136] *Hearings, supra* note 130, at 9 (letter from Assistant Secretary of State Carr for the Secretary of State dated February 10, 1933).
[137] *Id.* at 18.
[138] *Id.* at 20.
[139] *Id.* at 47.
[140] 78 CONG. REC. 7346 (1934).
[141] *Id.* at 7345.

be put over; "[i]t is too complicated to be considered at this time."[142]  The bill became law; Congress fixed this problem piecemeal, knowing that many others were left unrepaired for the moment.

The inter-Department Committee President Roosevelt directed to review the nationality laws in 1933 took just over five years, issuing its three volume report in 1938.[143]  The report was the basis for the comprehensive Nationality Act of 1940.[144]  It is not surprising that Congress waited for completion of an expert study, but those born in limbo or without citizenship had reason to complain that Congress should have acted sooner.

Yet, children born in outlying possessions left aliens under the 1934 law were in good company.  All foreign-born children were aliens if born between 1802 and 1855 and their parents became citizens after 1802, as were all children of U.S. citizen mothers and alien fathers until 1934.  Foreign-born adopted children of naturalized citizens were made citizens by statute,[145] but such adopted children of "native born" U.S. citizens were aliens until 2001.[146]  Children of U.S. citizen fathers born out of wedlock are not automatically

---

[142] *Id.* at 8471. Those who objected to haste were right; after the bill passed both houses and was sent to the president, it was recalled to fix minor drafting errors, and then re-passed and signed into law. *Id.* at 9245 (1934) (Senate passage of S. Con. Res. 19); *id.* at 9309 (House passage); *id.* at 9406 (Message from the President returning the bill).

[143] NATIONALITY LAWS OF THE UNITED STATES: MESSAGE FROM THE PRESIDENT OF THE UNITED STATES TRANSMITTING A REPORT PROPOSING A REVISION AND CODIFICATION OF THE NATIONALITY LAWS OF THE UNITED STATES, PREPARED AT THE REQUEST OF THE PRESIDENT OF THE UNITED STATES, BY THE SECRETARY OF STATE, THE ATTORNEY GENERAL, AND THE SECRETARY OF LABOR (June 13, 1938) (Comm. Print 76th Cong. 1939).

[144] Nationality Act of 1940, Pub. L. 76-853, ch. 2, 54 Stat. 1137, 1138-40, now codified as amended at 8 U.S.C. § 1401 et seq.  Again, there were separate rules for the United States, for the outlying possessions, and for the world outside of the United States and the outlying possessions.  For the current version, see *supra* notes 119-121.

[145] 8 U.S.C. § 1431(a).

[146] The Child Citizenship Act of 2000, Pub. L. 106-395, tit. I, § 101(a), 114 Stat. 1631, 1631-32, codified at 8 U.S.C. § 1431(b), granted citizenship to some children adopted overseas by U.S. citizens.  This prevented the tragedy of people adopted as infants who lived in the United States for their entire lives being deported to countries with which they had no connection.  But the law was not retroactive, so people who would have been citizens if current law had been in effect when they were adopted were not made citizens. Drakes

citizens under current law.[147]  An apologist for the piecemeal legislative tradition of the past two centuries could say that none of these classes of alien children of U.S. citizen parents were exiled or outlawed.  Certainly, it hardly unheard of for complex statutory regimes to fail to solve all related problems at once, or to offer incomplete, contradictory and inconsistent coverage, and yet accurately reflect what Congress was able to agree to enact into law.  If particular children did not want to be U.S. citizens, no harm was done by failing to grant that status automatically.  If they did, they might well be able to become citizens through individual application under general naturalization statutes or other law.

The demographics of the Canal Zone presented an additional political complication.  From 1790 to 1965, federal law restricted immigration and naturalization of non-whites.  A few examples: The immigration of Africans[148] and Asians was prohibited or discouraged until 1965;[149] from 1790 until 1952, Congress restricted naturalization by race, limiting it first to "free white persons";[150] for a period, female citizens who married Asian aliens were automatically expatriated.[151]  Although little known now, informed policymakers were aware of the centrality of racial restriction in

---

v. Ashcroft, 323 F.3d 189, 190 (2d Cir. 2003) (per curiam).  *See also* Colaianni v. INS, 490 F.3d 185, 188-89 (2d Cir. 2007) (per curiam) (rejecting equal protection challenge to automatic grant of citizenship under 8 U.S.C. § 1431(a) to adopted children of aliens who naturalize while denying it, prior to the Child Citizenship Act, to children adopted by citizens).

[147] 8 U.S.C. §1409(a).

[148] Bill Ong Hing, *Immigration Policies: Messages of Exclusion to African Americans*, 37 How. L.J. 237 (1994).

[149] BILL ONG HING, MAKING AND REMAKING ASIAN AMERICA THROUGH IMMIGRATION POLICY, 1850-1990 (1993); Gabriel J. Chin, *Segregation's Last Stronghold: Race Discrimination and the Constitutional Law of Immigration*, 46 UCLA L REV. 1, 13-14 (1998) (http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1121119)

[150] IAN HANEY LOPEZ, WHITE BY LAW: THE LEGAL CONSTRUCTION OF RACE (1997); Gabriel J. Chin, *The Civil Rights Revolution Comes to Immigration Law: A New Look at the Immigration and Nationality Act of 1965*, 75 N.C. L. REV. 273, 281 (1996) (http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1121504);

[151] Leti Volpp, *Divesting Citizenship: On Asian American History and the Loss of Citizenship Through Marriage*, 53 UCLA L. REV. 405 (2005).

34

the era of Senator McCain's birth; a unanimous 1922 Supreme Court decision, for example, holding Japanese persons racially ineligible to naturalize, called the racial bar a "rule in force from the beginning of the government, a part of our history as well as our law, welded into the structure of our national polity by a century of legislative and administrative acts and judicial decisions."[152]

Because of the paramount concern of some in Congress about the immigrant stream's racial composition, it legislated cautiously with respect to the Canal Zone, as it had with the 1934 revision of §1993.[153]  Representatives grilled witnesses on racial risks at the 1937 hearing on the Canal Zone citizenship bill before the House Committee on Immigration and Naturalization.  Witnesses reassured legislators that the bill offered no benefits to ethnic Panamanians or "Negroes";[154] it "is no attempt to bring in half-breeds or anyone else like that."[155]

Representative Charles Kramer of California observed: "Now, you are going to run into a situation where American men come down there and marry one of those

---

[152] Ozawa v. United States, 260 U.S. 178, 194 (1922).

[153] Admitting more whites was a prominent argument in favor of the 1934 revision.   Representative Samuel Dickstein, chair of the House Committee on Immigration explained:

> To illustrate the inequality of the present law, let us consider on the one hand the case of children born out of the United States to a couple, the man being of Chinese ancestry but a native-born American citizen and the woman ineligible to citizenship, and on the other hand the case of children born out of the United States of the union between a native-born white woman and a Britisher.  . . .  In the case of the Chinaman, the children arriving at the port of entry . . . are admitted as American citizens, whereas the white child of the native born American woman married to the Britisher is held back and is called an "alien."  Because of the inequality of the present law, that child derives the citizenship of the alien father, even though the mother is a native-born white American citizen.

78 CONG. REC. 7329 (1934).  This story was borrowed from the testimony of Miss Ruth Taunton, representing the Business Women's Legislative Council of California.  *Hearings*, *supra* note 130, at 50.

[154] *July 21, 1937 Hearing*, *supra* note 112 (Statement of H.A.A. Smith, Chief of General Purchasing Office, Panama Canal Zone).

[155] *Id.*

Koreans, Japanese, or Chinese, and perhaps after a short time abandon the wife[156] and there will be a child born, and you are going to bring these children in as American citizens."[157]  Panama Canal official H.A.A. Smith,[158] assured the Committee that "they would not come under this bill at all."[159]

The Committee apparently wished to avoid granting citizenship to the children of African-Americans.  Illinois Representative Noah Mason observed that "there are very few colored American citizens down there."  After Chairman Samuel Dickstein agreed that "[p]ractically 90 per cent or more of those affected would be of white American stock," Representative Mason concluded that he did "not see that there is very much to fear from the passage of this bill in that respect."[160]  When Representative William Poage of Texas noted that "[y]ou are going to make these children born of Negro and Indian women with American fathers, going to make American citizens out of every one of them," Representative John Lesinki, Sr. of Michigan asked: "Why not make this bill apply only to the white race?"[161]

There was no need to limit the bill to whites in text, because it would be limited in effect.  H.A.A. Smith assured the committee that the bill had been carefully drafted to

---

[156] Representative Kramer had concern about Asian wives immigrating, because the Asian Exclusion Laws prohibited the immigration of Asians even if married to U.S. citizens.  8 U.S.C. § 213(c) (1925) (excluding aliens ineligible to citizenship); 8 U.S.C. § 359 (1925) (naturalization available to "free white persons, and to aliens of African nativity and to persons of African descent").

[157] *July 14, 1937 Hearing*, *supra* note 112, at 11.

[158] Smith was "controller of the canal" and "chief of the canal office in Washington which is the clearing house for canal business at the capital and in the United States generally." *C.T. Lindsay is Head of Panama Railroad*, N.Y. TIMES, Aug. 31, 1936.

[159] *July 14, 1937 Hearing, supra* note 112, at 11.

[160] *Id.* at 11-12.

[161] *Id.* at 12. The racial obsession was evident even in lighter moments; even witticisms were about race. After Frederick Sill, the Canal's Director of Admeasurement, testified that laborers earned 20 cents per hour, Representative Poage noted that "there is hardly a negro in my district that makes 20 cents an hour, and there are probably 100,000 of them in my district.  Of that, probably 99,000 would be glad to go to Panama and be glad to work for 20 cents an hour."  Chairman Dickstein asked "Do you want them shipped out of your district?" Poage replied, "Yes, I would be happy to have them shipped out." *Id.* at 27-28.

avoid unfortunate racial consequences.  After Representative Poage noted that "You have got about 22,000 Negroes employed there," Smith explained that as non-U.S. citizens, "they are not covered by this bill. . . .  we do not want to give them by this bill any rights whatever as American citizens.  That is why we have drafted this in this way."[162]

Surprisingly, Smith testified that racial considerations led the Canal to oppose an earlier proposal that would have made citizens of all children born in the Canal Zone, including, of course, blacks and browns.  "We do not want to bring in all the children that are born in the Canal Zone," Smith explained.  "Two or three years ago we had up the proposition that was advanced to make all children born in the Canal Zone American citizens.  We have fought that consistently, the Canal has."[163]  The Canal Zone authorities thought that it was more important to exclude children of native Panamanians and other alien workers than to ensure that the children of U.S. citizens were birthright citizens.  This makes perfect sense, in a way; sooner or later white children were likely to be made citizens.  But a hastily drafted bill benefitting Panamanians or "Negroes" would have irreversible consequences.

The careful drafting succeeded.  The House Report assured Members of Congress that the bill is:

> entirely different from legislation that would confer citizenship on residents of territories of the United States of different blood.  The bill . . . would not confer citizenship on any alien employee or the children of such alien employee, even though such alien children were born within the limits of the Canal Zone.[164]

---

[162] *July 21, 1937 Hearing, supra* note 112.

[163] *Id.*  The legislative history confirms the Canal Zone authorities' claim of credit for the text of the bill; the Secretary of War's letter to the Senate Committee stated "[t]he draft of the bill attached was prepared under the direction of the Governor of the Panama Canal after extensive studies . . . of the subject matter." 81 CONG. REC. 6353 (1937).

[164] H.R. REP. NO. 75-1303, *supra* note 95, at 2. The other territory referred to was probably Guam. Congress considered a Guam citizenship bill in 1937, but it did not pass.  *See Citizenship for Residents of*

Not every Representative was persuaded; one well-travelled member objected that "there are more nationalities and more cross-breeds of all kinds in the Isthmus of Panama than any other place in the world."[165]  The vote reflected the anti-immigration sentiment of many in Congress.  After several Representatives on both sides switched their votes, the final tally was 146 aye, to 144 nay;[166] a single vote prevented failure through a tie.  Even for a bill benefitting the children of "our men in the Army in the Canal Zone,"[167] the House nearly decided to leave them in a "no man's land."  The support most Americans now believe members of the armed forces deserve should not be imagined a consistent feature of our law or culture.[168]  Just short of half voted to leave such children without U.S. citizenship, at least until they made individual application.[169]

## III.    Senator McCain's Paths to Natural Born Citizenship

In a government of laws, not of people, rules apply equally to all.  Senator John McCain demonstrated his loyalty to this principle in the most compelling way possible: choosing torture instead of a preferential release from a North Vietnamese POW camp

---

*Guam: Hearings on S. 1450, A Bill to Confer United States Citizenship upon Certain Inhabitants of the Island of Guam and to Extend the Naturalization Laws Thereto, before a Subcomm. of the S. Comm. on Territories and Insular Affairs*, 75th Cong. (Apr. & June 1937).

[165] 81 CONG. REC. 7767 (1937) (Remarks of Rep. Jenkins of Ohio).

[166] *Id.* at 7771-72.

[167] *Id.* at 7768 (Remarks of Rep. Jenkins of Ohio).

[168] *Cf.*  18 U.S.C. § 244 ("Whoever . . .  causes any person wearing the uniform of any of the armed forces of the United States to be discriminated against because of that uniform, shall be fined under this title.")

[169] 81 CONG. REC. 7765 (1937) (Remarks of Rep. Tarver) (citizenship should be predicated on "some form of application").

based on his father's status as a senior Admiral.[170]  His legal philosophy also demands
that judges should not make legal decisions simply to achieve outcomes they prefer.[171]

In addition, no legitimate system of laws can dispose of this question by saying it
does not matter whether Senator McCain is a natural born citizen; inconvenient laws
cannot be ignored simply because one expects to get away with it.  It cannot be that
because he is a major party's nominee, he is, therefore, a citizen at birth.  Senator McCain
must find a sound legal basis to be a natural born citizen.  The implications of that legal
principle must be equally available to every person similarly situated.

Senator McCain's conservative jurisprudence leaves him little room to criticize
the discrimination that affected him; his view is that the courts should not change
congressional decisions whether well founded or otherwise.  "When applying the law,"
he believes, "the role of judges is not to impose their own view as to the best policy
choices for society but to faithfully and accurately determine the policy choices already
made by the people and embodied in the law."[172]  Since Congress determined that only
children outside both the limits and jurisdiction of the United States would be citizens,
under Senator McCain's approach, the question is closed.

While some may think that Congress should have granted citizenship to children
of U.S. citizen military personnel in the Canal Zone earlier, Senator McCain's view is
that § 1993 cannot be judicially improved; judges should "faithfully apply the law as
written, not impose their opinions through judicial fiat."[173]  Whether Congress kept

---

[170] JOHN G. HUBBELL, P.O.W.: A DEFINITIVE HISTORY OF THE AMERICAN PRISONER-OF-WAR EXPERIENCE
IN VIETNAM, 1964–1973, at 450-54 (1976).
[171] Senator McCain's legal philosophy appears on his website. *Strict Constructionist Philosophy*,
http://www.johnmccain.com/Informing/Issues/b8529d0e-381e-4a29-9c39-6a57c7e182c9.htm (visited June
5, 2008).
[172] *Id.*
[173] *Id.*

Senator McCain from being a citizen at birth because it was sloppy and slow, or merely careful and deliberate, judicial intervention is not justified; judges should "respect the lawmaking powers of Congress."[174]

However, several more rights-protective theories about the Constitution make him a citizen by birth. Those theories, implied in the analysis of the Tribe-Olson Opinion, represent the dreams of liberal jurists, lawyers and scholars, who believe the courts have given Congress too much power over unincorporated territories and immigration and citizenship. For Senator McCain to be a natural born citizen, the law must abandon a century of restrictive doctrines developed by conservative justices.

A President McCain would have substantial power to address the issue through regulations and executive orders. It is questionable whether he could issue an executive order directing the Departments to, in effect, disregard Supreme Court decisions, particularly those based on the Constitution. However, at a minimum, the President has clear power to direct the law enforcement priorities of the agencies, and a President McCain could instruct the immigration authorities not to deport any alien who, under President McCain's view of the Constitution, should be a citizen.[175] President McCain could also ask the Congress to enact laws reflecting his view of the Constitution by granting citizenship to people not now citizens who would be to the extent that the arguments in the Tribe-Olson Opinion were accepted.

---

[174] *Id.*

[175] Immigration authorities have used "deferred action" status to allow otherwise deportable individuals to remain in the country. 2 AUSTIN T. FRAGOMEN, JR., ALFRED J. DEL REY, JR., & SAM BERNSEN, IMMIGR. LAW & BUSINESS § 6:98 (2008) ("The deferred action program is an administrative form of relief from removal. The program is premised on the view that, in certain cases, the benefits of enforcing the immigration laws may be outweighed by humanitarian factors which militate against imposing the harsh penalty of removal. Accordingly, the DHS may decline to initiate removal proceedings, terminate on-going proceedings, or decline to execute a removal order in appropriate cases.").

A.    *Restricting Congressional Power by Overruling the Insular Cases.*

Senator McCain is a citizen at birth if the *Insular Cases* are overruled or limited, to the extent that all persons born in United States sovereign territory are citizens.  There are good reasons to rethink the area.  The Court's determination that Congress can withhold the full protections of the Constitution to those in the territories rested on racial notions.[176]  As Justice Brown explained: "in the annexation of outlying and distant possessions grave questions will arise from differences of race, habits, laws, and customs of the people . . .  which may require action on the part of Congress that would be quite unnecessary in the annexation of contiguous territory inhabited only by people of the same race".[177]  The problem was that some races were not suited to constitutional democracy.  Because the territories

> are inhabited by alien races, differing from us in religion, customs, laws, methods of taxation and modes of thought, the administration of government and justice, according to Anglo-Saxon principles, may for a time be impossible; and the question at once arises whether large concessions ought not to be made for a time, that, ultimately, our own theories may be carried out, and the blessings of a free government under the Constitution extended to them. We decline to hold that there is anything in the Constitution to forbid such action.[178]

As was his wont, Justice Harlan disagreed, asserting that constitutional protections "are for the benefit of all, of whatever race or nativity, in the states composing the Union, or in

---

[176] Sanford Levinson, *Why the Canon should be Expanded to include the* Insular Cases *and the Saga of American Expansionism*, 17 CONST. COMMENT. 241, 257 (2000) ("No one can read *Downes* without realizing the extent to which the 'unAmericanness' of the people in the new American territories is fundamental to the outcome."); s*ee also* Sarah H. Cleveland, *Powers Inherent in Sovereignty: Indians, Aliens, Territories, and the Nineteenth Century Origins of Plenary Power over Foreign Affairs*, 81 TEX. L. REV. 1 (2002).
[177] Downes v. Bidwell, 182 U.S. 244, 282 (1901).
[178] *Id.* at 287.

any territory, . . . over the inhabitants of which the government of the United States may exercise the powers conferred upon it by the Constitution."[179]

If Justice Harlan's view prevailed, the Canal Zone would have been the "United States" subject to the citizenship clause of the Fourteenth Amendment. The Zone was as American as apple pie. By treaty, the United States obtained "in perpetuity" all "rights, power and authority" it "would possess and exercise if it were the sovereign . . . to the entire exclusion of the exercise by the Republic of Panama of any such sovereign rights, power or authority."[180] Congress drafted the Canal Zone's Civil and Criminal Codes[181] and a list of "Personal and Civil Rights" much like the Bill of Rights.[182] The President controlled the Zone,[183] through a civilian governor[184] or, in time of war, a U.S. Army officer.[185] The trial court of general jurisdiction was the U.S. District Court for the District of the Canal Zone, whose judgments were appealable to the U.S. Court of Appeals for the Fifth Circuit.[186] Neither Panama nor any other country had any more political or military authority over the Canal Zone than they did over Minnesota or Texas. During the period of United States jurisdiction, the Canal Zone can have been nothing

---

[179] Dorr v. United States, 195 U.S. 138, 154 (1904). *See generally* Eric Schepard, *The Great Dissenter's Greatest Dissents: The First Justice Harlan, The "Color-Blind" Constitution and the Meaning of his Dissents in the Insular Cases for the War on Terror*, 48 AM. J. LEGAL HIST. 119 (2006).
[180] Wilson v. Shaw, 204 U.S. 24, 33 (1907). For a compendium of laws, treaties and regulations governing the Canal Zone see CANAL ZONE CODE: AN ACT OF THE CONGRESS OF THE UNITED STATES OF AMERICA TO ESTABLISH A CODE OF LAWS FOR THE CANAL ZONE APPROVED JUNE 19, 1934, TOGETHER WITH AN APPENDIX CONTAINING CERTAIN TREATIES AND GENERAL LAWS OF THE UNITED STATES APPLICABLE IN OR RELATING TO THE CANAL ZONE OR THE PANAMA CANAL (1934).
[181] Act of June 19, 1934, 48 Stat. 1122, Ch. 667, promulgating CANAL ZONE CODE (1934).
[182] C.Z. CODE tit. 1, § 1 (1934).
[183] C.Z. CODE tit. 2, § 5 (1934).
[184] C.Z. CODE tit. 2, § 7 (1934).
[185] C.Z. CODE tit. 2, § 8 (1934).
[186] C.Z. CODE tit. 7, §§ 21, 61 (1934).

else but part of the United States.  Apart from the *Insular Cases*, the argument that the Canal Zone was the United States is overwhelming.[187]

Although rejecting the *Insular Cases* at least for purposes of the citizenship clause would mean that the United States cannot permanently acquire territory without making it a part of the United States, that might be consistent with the Framer's design.  The national government has limited powers; Jefferson believed that a constitutional amendment was necessary to execute the Louisiana Purchase.[188]  The Constitution provides that "[n]ew States may be admitted by the Congress into this Union,"[189] and Congress can establish a seat of government and purchase other property for forts, arsenals and buildings,[190] but there is no textual authority to acquire non-State, federal territory where large numbers of civilians will live.  The clause said to authorize establishing an empire speaks only of the power to "dispose of . . . Territory or other property,"[191] not to acquire it.  To acquire territory for the United States and declare the Constitution inapplicable to it is very distant from any power granted to Congress by words in the text of the document.

Overruling the *Insular Cases* would vindicate Justice Harlan's dissents, and scholars who support individual rights, such as Judge Juan Torruella of the U.S. Court of Appeals for the First Circuit, a long-time student of this topic.[192]  Overruling or limiting

---

[187] So said Rep. John Sparkman: "[t]he Canal Zone is in every sense of the word United States territory and should be covered by the Fourteenth Amendment."  81 CONG. REC. 7770 (1937).

[188] Levinson, *supra* note 176, at 254.

[189] U.S. CONST. art. IV, § 3, cl. 1.

[190] U.S. CONST. art. I, § 8, cl. 17.

[191] U.S. CONST. art. IV, § 3, cl. 2.

[192] Torres v. Mathews, 426 F. Supp. 1106 (D.P.R. 1977) (three judge court) (Torruella, J) (exclusion of Puerto Rico from participation in SSI program unconstitutional under circumstances), *rev'd per curiam sub nom*. Califano v. Torres, 435 U.S. 1 (1978); Juan R. Torruella, *The* Insular Cases*: The Establishment of a Regime of Political Apartheid*, 29 U. PA. J. INT'L L. 283 (2007); Juan R. Torruella, *Hacia Dónde Vas Puerto Rico?*, 107 YALE L.J. 1503 (1998).

the *Insular Cases* makes Senator McCain is a citizen under Section 1 of the Fourteenth Amendment, as a person born in the United States and subject to the jurisdiction thereof.

However, if Senator McCain is citizen at birth because of the *Insular Cases'* invalidity, so too are millions of others born in unincorporated territories under United States jurisdiction. All persons born in the Philippines between 1898 and 1946[193] and all persons born in the Canal Zone between 1904 and 1979 would apparently be Fourteenth Amendment birthright citizens. By statute, most of their children[194] and some of their grandchildren[195] would be also be citizens.

B.    *Restricting Congressional Power by Recognizing Common Law Citizenship*

The Tribe-Olson Opinion alludes to principles of citizenship extant at the Founding.[196] This argument implies a potentially profound basis to reform United States nationality law. The very existence of the natural born citizen clause demonstrates that some people are citizens by birth in the United States. Yet, before the Fourteenth Amendment no statute or constitutional provision granted or recognized citizenship by birth in the United States. Accordingly, the Constitution necessarily recognized citizenship based on law other than federal statute or constitutional provision.[197] A logical source is the common law in effect when the Constitution was drafted and

---

[193] The question of Pilipino citizenship has been contentious over the years. *See, e.g.,* INS v. Pangilinan, 486 U.S. 875 (1988) (due process challenge to administration of special naturalization benefits available to Pilipinos who served in U.S. armed forces); Avelino J. Halagao, Jr., *Citizens Denied: A Critical Examination of the* Rabang *Decision Rejecting United States Citizenship Claims by Persons Born in the Philippines During the Territorial Period,* 5 ASIAN PAC. AM. L.J. 77 (1998).

[194] 8 U.S.C. § 1401(c) (granting citizenship at birth to children born out of the U.S. and its outlying possessions to two U.S. citizen parents, so long as one of them had a residence in the United States.); 8 U.S.C. § 1401(g) (one citizen and one non-citizen parent).

[195] If the citizen parent had a prior residence in the United States. *Id.*

[196] Tribe-Olson Opinion, *supra* note 21, at 1; McCain Brief, *supra* note 23, at 2-3.

[197] This point is discussed in 10 Op. U.S. Atty. Gen. 382, 389-90 (Nov. 29, 1862), and common law citizenship is recognized in *Ludlam v. Ludlam,* 26 N.Y. 356 (1860). [*Cf.* Peter Spiro, *An Emerging International Law of Citizenship?*, 101 AM. SOC'Y INT'L L. PROC. ___ (forthcoming)].

ratified.  Perhaps Congress's naturalization authority allows it to grant citizenship to those who do not obtain it under common law, but does not permit Congress to deny it to those entitled to it under the original Constitution.  While the First Congress passed a statute granting citizenship to children born abroad,[198] perhaps the statute was declaratory of the common law, not a determination that the common law of citizenship had been supplanted.

Senate Resolution 511, finding Senator McCain to be a natural born citizen, notes that "there is no evidence of the intention of the Framers . . . to limit the constitutional rights of children born to Americans serving in the military or to prevent those children from serving as their country's President."[199]  Senate Judiciary Committee Chair Patrick Leahy stated that Secretary of Homeland Security Michael Chertoff "agreed with me that anyone born to American citizens is a 'natural born Citizen' and satisfies the purposes of Article II of the Constitution."[200]  No statute was mentioned; the conclusion that children of Americans should be Americans, admittedly logical and reasonable, flows from some other source.  Perhaps the Senate is open to the idea that there is a constitutional interest in being a natural born citizen, independent of statute, based solely on birth to a U.S. citizen parent.

If the Constitution preserves citizenship under common law, Senator McCain may be a birthright citizen.  Of course, this would open up a world of challenges to current nationality laws.  There would be in effect two constitutional citizenship clauses: the first sentence of the Fourteenth Amendment, and the natural born citizen clause, to be

---

[198] Act of March 26, 1790, ch. 3, 1 Stat. 103, *repealed*, Act of Jan. 29, 1795, 1 Stat. 414.
[199] 154 CONG. REC. S3646 (Apr. 30, 2008).
[200] Statement of Senator Patrick Leahy, Chairman, Senate Judiciary Committee, Opening Statement, Executive Business Meeting, Apr. 24, 2008 (http://leahy.senate.gov/press/200804/042408c html).

elaborated by the courts.  If "the British tradition . . . necessarily informed the Framers' understanding of the Natural Born Citizenship Clause,"[201] perhaps the future will be exemplified by overruling *Rogers v. Bellei*,[202] where the Court held that a foreign-born U.S. citizen lost that status for failure to live in the United States, vindicating the dissents of Justices Black, Douglas, Marshall[203] and Brennan[204] asserting that Congress has no power to take it away from those having it at birth.  Since there was apparently no retention requirement at common law, the implication of the Tribe-Olson Opinion and the McCain Brief may be that Bellei, and thousands of others, including Panamanian children of U.S. citizens treated as aliens,[205] are citizens under a provision of the Constitution that Congress cannot change without invoking the amendment procedure of Article V.

C.    *Restricting Congressional Power by Overruling the Plenary Power Doctrine*

Senator McCain could be a citizen if courts applied equal protection review to the law in effect in 1936.  At least as to the children of citizens, there are strong arguments that citizenship by descent is worthy of protection, perhaps in the way that voting rights are.  While "the Court has specifically recognized the power of Congress not to grant a United States citizen the right to transmit citizenship by descent,"[206] once Congress acts, the right to live in the same country as one's family should not be withheld for insubstantial reasons.  Senator McCain's mother could have, as many Americans did,

---

[201] McCain Brief, *supra* note 23, at 3; *see also* Tribe-Olson Opinion, *supra* note 21, at 1.
[202] 401 U.S. 815 (1971).
[203] *Id.* at 836 (Black J., dissenting).
[204] *Id.* at 845 (Brennan J., dissenting).
[205] *See* Icaza v. Schultz, 656 F. Supp. 819 (D.D.C. 1987) (former U.S. citizen born in Panama lost citizenship for failure to reside in the United States for five years.); *see also* United States v. Connolly, 2006 WL 1084693 (E.D.N.Y. Apr. 25, 2006) (Panamanian-born child of U.S. citizen not citizen; properly convicted of reentry after deportation).
[206] Rogers v. Bellei, 401 U.S. 815, 830 (1971).

delivered in Colon Hospital in Colon,[207] a facility built, owned, and located in a town

owned by the Panama Railroad, a U.S. company, but under Panamanian sovereignty. He

would have been a citizen at birth under R.S. § 1993, because born out of both the

territory and jurisdiction of the United States. It is irrational that he should be denied

citizenship based on that geographic triviality.

However, under a principle called the "plenary power doctrine," judicial

challenges to immigration and citizenship policies are strictly limited.[208] The reverse of

strict scrutiny, plenary power review is deferential in theory, virtually non-existent in

fact. To this day, no person denied immigration or citizenship based on race,[209] political

belief,[210] sex and out-of-wedlock birth[211] or sexual orientation[212] has persuaded the

Supreme Court that such discrimination is unconstitutional. Because exclusion of

undesirables might well be "essential . . . . to the preservation of our civilization,"[213] the

Court holds that "'over no conceivable subject is the legislative power of Congress more

complete than it is over' the admission of aliens"[214] and that it is unobjectionable that "in

---

[207] *July 14, 1937 Hearing*, *supra* note 112, at 4.

[208] A number of articles discuss plenary power. *See, e.g.,* T. Alexander Aleinikoff, *Detaining Plenary Power: The Meaning and Impact of* Zadvydas v. Davis, 16 GEO. IMMIGR. L.J. 365 (2002); Kif Augustine-Adams, *The Plenary Power Doctrine After September 11*, 38 U.C. DAVIS L. REV. 701 (2005); Chin, *supra* note 149; Hiroshi Motomura, *Immigration Law After a Century of Plenary Power: Phantom Constitutional Norms and Statutory Interpretation,* 100 YALE L.J. 545 (1990); Victor C. Romero, *On Elián and Aliens: A Political Solution to the Plenary Power Problem*, 4 N.Y.U. J. LEGIS. & PUB. POL'Y 343 (2000-01); Natsu Taylor Saito, *Beyond the Citizen/Alien Dichotomy: Liberty, Security, and the Exercise of Plenary Power*, 14 TEMP. POL. & CIV. RTS. L. REV. 389 (2005); Peter J. Spiro, *Explaining the End of Plenary Power*, 16 GEO. IMMIGR. L.J. 339 (2002).

[209] Fong Yue Ting v. United States, 149 U.S. 698 (1893).

[210] Kleindienst v. Mandel, 408 U.S. 753 (1972); Galvan v. Press, 347 U.S. 522 (1954).

[211] Nguyen v. INS, 533 U.S. 53 (2001); Miller v. Albright, 523 U.S. 420 (1998); Fiallo v. Bell, 430 U.S. 787 (1977).

[212] Boutilier v. INS, 387 U.S. 118 (1967).

[213] Chae Chan Ping v. United States, 130 U.S. 581, 594 (1889).

[214] Fiallo v. Bell, 430 U.S. 787, 792 (1977) (quoting Oceanic Nav. Co. v. Stranahan, 214 U.S. 320, 339 (1909)).

the exercise of its broad power over immigration and naturalization, 'Congress regularly makes rules that would be unacceptable if applied to citizens.'"[215]

The Tribe-Olson Opinion's claim that the Framers cannot have intended a child born to U.S. citizens to be a non-citizen was a claim about the common law and the meaning of the Constitution, but it also sounds in equal protection. Other foreign-born children of U.S. citizens were made U.S. citizens, as Senator McCain would have been had his mother elected to deliver a hundred yards over the border in the Republic of Panama. Birth in the Canal Zone is justifiably treated differently from birth in other parts of the world, but those differences warrant more favorable treatment, not less, as Congress determined in the 1937 Act. Arguably, a well-functioning Congress would not have left those born in the Canal Zone in limbo for years after the problem became clear in 1932.

However, for the Supreme Court to grant relief would be groundbreaking. Again, the Court has never held that a substantive immigration or citizenship decision of Congress was so ill-reasoned that it was unconstitutional. Second, even if the Court found a violation of the Fifth Amendment, the Court has never held that it has the power to grant citizenship in the absence of compliance with an Act of Congress.

Particularly in the face of laws discriminating based on sex, lower courts are beginning to push the boundaries. Older cases found such discrimination untroubling. In the 1961 decision of *Montana v. Kennedy*,[216] Mauro Montana would have been a citizen if his U.S. citizen parent had been his father instead of his mother; this discrimination was not challenged, presumably because it had no chance of success. Montana also

---

[215] *Id.* (quoting Matthews v. Diaz, 426 U.S. 67, 80 (1976)).
[216] 366 U.S. 308 (1961).

would have been a citizen if his mother had lost her citizenship based on marriage to an alien but regained it under provisions of law; however, she had never lost her citizenship. The Court recognized the "obvious paradox of giving preferred treatment to the children of a woman who has lost her citizenship over that afforded to the children of a woman who has never lost her citizenship" but concluded they had "no power" to "'construe' away the unambiguous statutory requirement"[217]

However, the Third[218] and Ninth Circuits,[219] and a distinguished U.S. District Judge in Illinois,[220] held in recent years that Congress violated equal protection when it granted citizenship only to children of U.S. citizen fathers in the version of § 1993 in effect from 1855 to 1934.  These courts determined that otherwise eligible children of U.S. citizen mothers (like Mauro Montana) were citizens at birth.[221]  The Supreme Court has left open the possibility that it would invalidate invidious sex discrimination.[222] However, because the Court rejected the claims on the merits, the Court did not address either "the implications of statements in our earlier cases regarding the wide deference afforded to Congress in the exercise of its immigration and naturalization power"[223] or the views of Justices Thomas and Scalia that "the Court lacks the power to provide relief

---

[217] *Id.* at 313-14.
[218] Breyer v. Meissner, 214 F.3d 416, 423-26 (3d Cir. 2000), *adhered to*, Breyer v. Ashcroft, 350 F.3d 327, 332 n.5 (3d Cir. 2003).  For a discussion of *Breyer*, see Michael M. Pavlovich, Note, *A Nazi War Criminal as a Standard Bearer for Gender Equality? – The Strange Saga of Johann Breyer*, 10 WM. & MARY J. WOMEN & L. 319 (2004).
[219] Wauchope v. U.S. Dept. of State, 985 F.2d 1407, 1415-16 (9th Cir. 1993).
[220] Aguayo v. Christopher, 865 F. Supp. 479 (N.D. Ill. 1994) (Grady J.).
[221] Other lower courts disagree. *See, e.g.*, Aguilar Mortega v. Department of Defense, 520 F. Supp.2d 1, 5 n.4 (D.D.C. 2007) (citing Tranter v. Secretary of State, 1994 WL 289358 (D.D.C. 1994)).
[222] *See* Nguyen v. INS, 533 U.S. 53 (2001); Miller v. Albright, 523 U.S. 420 (1998).
[223] 533 U.S. at 72-73.

of the sort requested in this suit—namely, conferral of citizenship on a basis other than that prescribed by Congress."[224]

Senator McCain's equal protection challenge would be stronger in some ways than the challenges that succeeded.  Senator McCain was actually made a citizen in 1937, so unlike the other cases, granting him citizenship as of 1936 would not be contrary to congressional will.  On the other hand, unlike the people denied citizenship based on a parent's sex, there was no discrimination against a suspect or semi-suspect class.  Instead, Congress did not act earlier because of the complexity of the problem and a legislative decision to deal with other issues first.  If Senator McCain was not the subject of unconstitutional discrimination, then a conclusion that he was nevertheless unconstitutionally denied citizenship would be very close to holding that he has a right to it, or that his parents have a right to transmit it.

In sum, a determination that Senator McCain was born a citizen because others with less claim to it received it would be pathbreaking both procedurally and substantively.  Procedurally, it would be a rejection of the principle that only Congress can make citizens.  And it would hold up a legal regime historically full of contradictions, ironies and lacunae[225] to standards of logic, consistency and fairness, going back in time as well as forward.  Although the full consequences of those changes are unknown, they would be large.

---

[224] *Id.* at 73-74 (Scalia J., concurring) (citing 523 U.S. at 452 (Scalia J., concurring in the judgment)).
[225] *See supra* note 122.

50

## IV.    Conclusion

From Mark Twain's *Pudd'nhead Wilson*[226] to Gregory Howard Williams' *Life on the Color Line*,[227] American letters are filled with stories of people whose identity rested on the idea that they were one thing, but were shocked to find that they were another. Undoubtedly, Senator John McCain has always believed that he was a citizen from the moment he was born.  Under the law as it existed in 1936, he was not.  To learn that one was not a citizen when born might well be as stunning as learning that one was adopted.

For a number of reasons, it is a bitter irony that John McCain should find himself in this legal gap.   He has a reputation for advocating moderate policies with regard to immigration.  In addition, it is preposterous that in 2008, a presidential candidate, a Caucasian no less, should be caught up in antique technicalities of the legal regulation of race.

In the 2000 Republican primary, leading in the polls, Senator McCain was subject to a smear.  Senator McCain and his wife had adopted a daughter with dark skin. According to his campaign manager, before the South Carolina primary, "Anonymous opponents used 'push polling' to suggest that McCain's Bangladeshi-born daughter was his own illegitimate black child."[228] Senator McCain was defeated; George Bush became the Republican nominee and President.  Race-baiting may well have cost Senator McCain the presidency in 2000.

And now, it appears, three other times, racial considerations frustrated his legal ability to be President by keeping him from being a citizen at birth.  The doctrines of the

---

[226] MARK TWAIN, THE TRAGEDY OF PUDD'NHEAD WILSON (1894)
(http://www.cs.cofc.edu/~manaris/books/Mark-Twain-The-Tragedy-of-Puddnhead-Wilson.txt).
[227] GREGORY HOWARD WILLIAMS, LIFE ON THE COLOR LINE: THE TRUE STORY OF A WHITE BOY WHO DISCOVERED HE WAS BLACK (1996).
[228] Richard H. Davis, *The Anatomy of a Smear Campaign*, BOST. GLOBE, Mar. 21, 2004.

*Insular Cases*, predicated on race, kept the Canal Zone from being part of the United States for purposes of the citizenship clause of the Fourteenth Amendment.  The plenary power doctrine, predicated on race, now precludes successful challenge to irrational citizenship laws.  Finally, Congress and the Canal Zone authorities delayed legislation for years, the former because of government inertia and anti-immigrant sentiment, the latter until they could ensure the law would not benefit non-whites.  These decisions left Senator McCain a non-citizen at birth.

The legacy that led to his lack of citizenship at birth, however, may give him an avenue that would make him eligible to the Office of President and be faithful to his strict constructionism.  Some Caucasian families would not adopt a dark-skinned child; that the McCains do not have that attitude suggests the absence of strong racial antipathies. Senator McCain's sensitivity to race is also suggested by his April, 2008 speech in Selma honoring the 43rd anniversary of the Selma to Montgomery march where he praised Democratic Representative John Lewis, whose skull was fractured there.[229]  For all that appears, Senator McCain is not only not a race-baiter but disapproves of race discrimination.  Of course, that choices made by the people and their representatives and embodied in law are motivated by discrimination has justified judicial intervention even among judges regarded as conservative.  Thus, perhaps unreasonable immigration and citizenship policies should not be protected by old doctrines rooted in racism, even if in other areas courts should carefully defer to the legislature.

---

[229] *Remarks by John McCain on Day One of the Time For Action Tour* (Apr. 21, 2008) (www.johnmccain.com/informing/News/PressReleases/40b630f5-06b5-41ff-ba95-3f5d262eaf5a htm).

**Appendix A**

**Opinion of Laurence H. Tribe and Theodore B. Olson**

**Dated March 19, 2008**

March 19, 2008

We have analyzed whether Senator John McCain is eligible for the U.S. Presidency, in light of the requirement under Article II of the U.S. Constitution that only "natural born Citizen[s] . . . shall be eligible to the Office of President." U.S. Const. art. II, § 1, cl. 5. We conclude that Senator McCain is a "natural born Citizen" by virtue of his birth in 1936 to U.S. citizen parents who were serving their country on a U.S. military base in the Panama Canal Zone. The circumstances of Senator McCain's birth satisfy the original meaning and intent of the Natural Born Citizen Clause, as confirmed by subsequent legal precedent and historical practice.

The Constitution does not define the meaning of "natural born Citizen." The U.S. Supreme Court gives meaning to terms that are not expressly defined in the Constitution by looking to the context in which those terms are used; to statutes enacted by the First Congress, *Marsh v. Chambers*, 463 U.S. 783, 790-91 (1983); and to the common law at the time of the Founding. *United States v. Wong Kim Ark*, 169 U.S. 649, 655 (1898). These sources all confirm that the phrase "natural born" includes both birth abroad to parents who were citizens, and birth within a nation's territory and allegiance. Thus, regardless of the sovereign status of the Panama Canal Zone at the time of Senator McCain's birth, he is a "natural born" citizen because he was born to parents who were U.S. citizens.

Congress has recognized in successive federal statutes since the Nation's Founding that children born abroad to U.S. citizens are themselves U.S. citizens. 8 U.S.C. § 1401(c); *see also* Act of May 24, 1934, Pub. L. No. 73-250, § 1, 48 Stat. 797, 797. Indeed, the statute that the First Congress enacted on this subject not only established that such children are U.S. citizens, but also expressly referred to them as "natural born citizens." Act of Mar. 26, 1790, ch. 3, § 1, 1 Stat. 103, 104.

Senator McCain's status as a "natural born" citizen by virtue of his birth to U.S. citizen parents is consistent with British statutes in force when the Constitution was drafted, which undoubtedly informed the Framers' understanding of the Natural Born Citizen Clause. Those statutes provided, for example, that children born abroad to parents who were "natural-born Subjects" were also "natural-born Subjects . . . to all Intents, Constructions and Purposes whatsoever." British Nationality Act, 1730, 4 Geo. 2, c. 21. The Framers substituted the word "citizen" for "subject" to reflect the shift from monarchy to democracy, but the Supreme Court has recognized that the two terms are otherwise identical. *See, e.g., Hennessy v. Richardson Drug Co.*, 189 U.S. 25, 34-35 (1903). Thus, the First Congress's statutory recognition that persons born abroad to U.S. citizens were "natural born" citizens fully conformed to British tradition, whereby citizenship conferred by statute based on the circumstances of one's *birth* made one *natural born*.

There is a second and independent basis for concluding that Senator McCain is a "natural born" citizen within the meaning of the Constitution. If the Panama Canal Zone was sovereign U.S. territory at the time of Senator McCain's birth, then that fact alone would make him a "natural born" citizen under the well-established principle that "natural born" citizenship includes birth within the territory and allegiance of the United States. *See, e.g., Wong Kim Ark*, 169 U.S. at 655-66. The Fourteenth Amendment expressly enshrines this connection between birthplace and citizenship in the text of the Constitution. U.S. Const. amend. XIV, § 1 ("All persons *born* or naturalized *in the United States*, and subject to the jurisdiction thereof, are

citizens of the United States . . . .") (emphases added). Premising "natural born" citizenship on the character of the territory in which one is born is rooted in the common-law understanding that persons born within the British kingdom and under loyalty to the British Crown—including most of the Framers themselves, who were born in the American colonies—were deemed "natural born subjects." *See, e.g.*, 1 William Blackstone, *Commentaries on the Laws of England* 354 (Legal Classics Library 1983) (1765) ("Natural-born subjects are such as are born within the dominions of the crown of England, that is, within the ligeance, or as it is generally called, the allegiance of the king . . . .").

There is substantial legal support for the proposition that the Panama Canal Zone was indeed sovereign U.S. territory when Senator McCain was born there in 1936. The U.S. Supreme Court has explained that, "[f]rom 1904 to 1979, the United States exercised sovereignty over the Panama Canal and the surrounding 10-mile-wide Panama Canal Zone." *O'Connor v. United States*, 479 U.S. 27, 28 (1986). Congress and the executive branch similarly suggested that the Canal Zone was subject to the sovereignty of the United States. *See, e.g.*, *The President—Government of the Canal Zone*, 26 Op. Att'y Gen. 113, 116 (1907) (recognizing that the 1904 treaty between the United States and Panama "imposed upon the United States the obligations as well as the powers of a sovereign within the [Canal Zone]"); Panama Canal Act of 1912, Pub. L. No. 62-337, § 1, 37 Stat. 560, 560 (recognizing that "the use, occupancy, or control" of the Canal Zone had been "granted to the United States by the treaty between the United States and the Republic of Panama"). Thus, although Senator McCain was not born within a State, there is a significant body of legal authority indicating that he was nevertheless born within the sovereign territory of the United States.

Historical practice confirms that birth on soil that is under the sovereignty of the United States, but not within a State, satisfies the Natural Born Citizen Clause. For example, Vice President Charles Curtis was born in the territory of Kansas on January 25, 1860—one year before Kansas became a State. Because the Twelfth Amendment requires that Vice Presidents possess the same qualifications as Presidents, the service of Vice President Curtis verifies that the phrase "natural born Citizen" includes birth outside of any State but within U.S. territory. Similarly, Senator Barry Goldwater was born in Arizona before its statehood, yet attained the Republican Party's presidential nomination in 1964. And Senator Barack Obama was born in Hawaii on August 4, 1961—not long after its admission to the Union on August 21, 1959. We find it inconceivable that Senator Obama would have been ineligible for the Presidency had he been born two years earlier.

Senator McCain's candidacy for the Presidency is consistent not only with the accepted meaning of "natural born Citizen," but also with the Framers' intentions when adopting that language. The Natural Born Citizen Clause was added to the Constitution shortly after John Jay sent a letter to George Washington expressing concern about "Foreigners" attaining the position of Commander in Chief. 3 Max Farrand, *The Records of the Federal Convention of 1787*, at 61 (1911). It goes without saying that the Framers did not intend to exclude a person from the office of the President simply because he or she was born to U.S. citizens serving in the U.S. military outside of the continental United States; Senator McCain is certainly not the hypothetical "Foreigner" who John Jay and George Washington were concerned might usurp the role of Commander in Chief.

2

Therefore, based on the original meaning of the Constitution, the Framers' intentions, and subsequent legal and historical precedent, Senator McCain's birth to parents who were U.S. citizens, serving on a U.S. military base in the Panama Canal Zone in 1936, makes him a "natural born Citizen" within the meaning of the Constitution.


Laurence H. Tribe


Theodore B. Olson

# Exhibit B

## DECLARATION OF MARKHAM ROBINSON

I, Markham Robinson, declare as follows

1.      I am the chairman elect of the American Independent Party.  I have also been elected by the American Independent Party as an elector in the November 2008 presidential election.

I declare under penalty of perjury that the foregoing is true and correct and based on my personal knowledge.  Executed August 12, 2008 in Solano County, California.

_____
Markham Robinson

# EXHIBIT 2

# DECLARATION IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

1  Gregory S. Walston, State Bar No. 196776
   Orestes Alexander Cross, State Bar No. 250471
2  WALSTON CROSS
   222 Columbus Avenue, Suite 420
3  San Francisco, California 94133
   Telephone: (415) 956-9200
4  Facsimile: (415) 956-9205
   Email: gwalston@walstonlaw.com
5
   ATTORNEYS FOR PLAINTIFF
6  MARKHAM ROBINSON

7

8                    UNITED STATES DISTRICT COURT

9                 NORTHERN DISTRICT OF CALIFORNIA

10                                          Case No. CV-08-3836 JL

11  MARKHAM ROBINSON,
                                            **DECLARATION OF GREGORY S.
12              Plaintiff                    WALSTON IN SUPPORT OF
                                             PLAINTIFF'S MOTION FOR
13       v.                                  SUMMARY JUDGMENT AND
                                             SUMMARY ADJUDICATION**
14  SECRETARY OF STATE DEBRA
    BOWEN, et al.

15              Defendants.

16

17

18       I,      Gregory S. Walston, declare as follows:

19       1.      I am an attorney licensed to practice before all California state courts, the United

20  States District Courts for the Northern and Eastern Districts of California, the United States Court

21  of Appeals for the Ninth Circuit, and the Supreme Court of the United States.  I am presently

22  employed as a partner in the Law Firm of Walston Cross, and, in that capacity, I represent the

23  plaintiff in this action.

24       2.      According to the California Secretary of State's website, the American Independent

25  Party is one of six political parties recognized the Secretary a "qualified political party."

26       3.      The aforementioned website can be found at the following internet address:

27  http://www.sos.ca.gov/elections/elections_f.htm.

28

4.      The five other "qualified" parties recognized by the Secretary are the Democratic Party, the Green Party, the Libertarian Party, the Peace and Freedom Party, and the Republican Party.

5.      Further, particular sections of the California Elections Code apply to the American Independent Party specifically.  See, Cal. Elections Code §§ 6500 *et seq*, 7500 *et seq.*

6.      Attached as Exhibit A is a true and correct copy of John McCain's birth certificate that was submitted to the District of New Hampshire in a *Hollander v. McCain*, listing Panama as Senator McCain's place of birth and 1936 as Senator McCain's year of birth.  Attached as Exhibit B is Senator McCain's motion to dismiss the complaint in *Hollander,* which acknowledged that Senator McCain was born in Panama (see, e.g., page 2 "Senator McCain was born in the Panama Canal Zone").  Attached as Exhibit C is the Court's opinion finding that Senator McCain was born in Panama in 1936 (See, top of page 3: "McCain was born, in 1936, at the Coco Solo Naval Air Station, a United States military installation in the PanamaCanal Zone").  Attached as Exhibit D is a true and correct copy of the McCain-for-President's summary of Senator McCain's birth, which states that Senator McCain was born in Panama in 1936.

I declare under penalty of perjury that the foregoing is true and correct and based on my personal knowledge.  Executed August 17, 2008 in San Francisco, California.

_____
Gregory S. Walston

WALSTON CROSS, ATTORNEYS
222 Columbus Avenue, Suite 420
San Francisco, California 94123
Telephone: (415) 956-9200
Facsimile: (415) 956-9205

*Robinson v. Secretary of State, et al.*

# Exhibit A



PANAMA CANAL COMMISSION
COMISION DEL CANAL DE PANAMA

CERTIFICATE OF LIVE BIRTH
CERTIFICADO DE NACIMIENTO VIVO

Name of child—Nombre del niño

John Sidney McCain III

Sex—Sexo    Birth Registration No.—Registro No.

Masc.    170027

Date of birth—Fecha de nacimiento

29 August 1936

Place of birth—Lugar de nacimiento

Colon, Panama

Father's name—Nombre del Padre

John McCain

Father's birthplace—Lugar de nacimiento del Padre

U S A

Mother's maiden name—Nombre de soltera de la Madre

Roberta Wright

Mother's birthplace—Lugar de nacimiento de la Madre

U S A

This is to certify that the above is a true copy of information recorded on the birth certificate on file in the records of the Panama Canal Commission at Balboa Heights, Republic of Panama. Certified copies must bear the raised impression of the seal of the Agency Records Officer, Panama Canal Commission.

Por el presente se certifica que lo anterior es copia fiel de la información que aparece en el certificado de nacimiento que se encuentra en los archivos de la Comisión del Canal de Panamá en Altos de Balboa, República de Panamá. Las copias certificadas deberán llevar la impresión en relieve del sello del Oficial de Archivos de la Agencia, de la Comisión del Canal de Panamá.

10 September 1936

(Date Registered—Fecha de Inscripción)

E. Durfee – 26 marzo 1980

(Registrar and Date Issued—Registrador y Fecha de Expedición)

WARNING: This certificate is printed on sensitized paper. Any alterations will nullify the certificate.

ADVERTENCIA: Este certificado está impreso en papel sensibilizado. Cualesquier alteraciones anularán el mismo.

# Exhibit B

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

---------------------------------------------------------------- x
                               :

FRED HOLLANDER,             :
                               :

        Plaintiff,       :
                               :

    v.                    :
                               :        Civ. No. 1:08-cv-00099-JL

SENATOR JOHN MCCAIN, and REPUBLICAN  :
NATIONAL COMMITTEE,       :
                               :

        Defendants.     :
                               :
                               :
                               :
                               :
                               :
---------------------------------------------------------------- x

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

      Defendants Senator John McCain and the Republican National Committee ("RNC") respectfully submit the following memorandum of law in support of their motion to dismiss Plaintiff's Corrected First Amended Complaint ("Complaint") pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

## INTRODUCTION

      Plaintiff alleges that Senator John McCain is not a "natural born Citizen" within the meaning of the United States Constitution and is therefore ineligible for the Presidency because he was born on a U.S. military base in the Panama Canal Zone to U.S. citizen parents, including one who was serving his country on active duty with the United States Navy. Plaintiff's claims suffer from an array of fatal jurisdictional flaws: They fail to allege a concrete and particularized injury in fact that would confer constitutional standing on Plaintiff, his claims are either moot or

not ripe for adjudication, and they may also raise a nonjusticiable political question.  Moreover, even if Plaintiff's Complaint did present an actual case or controversy, dismissal would still be required because it names as defendants only private persons engaged in political speech and association protected by the First Amendment and therefore fails to state a claim upon which relief can be granted.  Although these defects necessarily foreclose any possibility of reaching the substance of Plaintiff's allegations and the legal theories underlying them, those allegations are baseless in any event:  Senator McCain, indisputably, is a "natural born Citizen" eligible to serve as President of the United States.

It is generally accepted that the Framers included the Natural Born Citizen Clause in the Constitution in response to a 1787 letter from John Jay (then serving as the Continental Congress's Minister of Foreign Affairs) to George Washington (then presiding over the Constitutional Convention at Philadelphia) that suggested that the new Constitution prohibit "Foreigners" from attaining the position of Commander in Chief.  *See* Charles Gordon, *Who Can Be President of the United States: The Unresolved Enigma*, 28 Md. L. Rev. 1, 5 (1968).[1] Although he was born in the Panama Canal Zone, Senator McCain is hardly a "Foreigner[ ]."  He was born to two U.S. citizens, and Congress has recognized in successive federal statutes since the Nation's Founding that children born abroad to U.S. citizens are themselves U.S. citizens. 8 U.S.C. § 1401(c); *see also* Pub. L. No. 73-250, § 1, 48 Stat. 797, 797 (1934).  In fact, the

---

[1]  Jay wrote:

> Permit me to hint, whether it would not be wise & seasonable to provide a . . . strong check to the admission of Foreigners into the administration of our national Government; and to declare expresly that the Command in chief of the american army shall not be given to, nor devolve on, any but a natural *born* Citizen.

3 Max Farrand, *The Records of the Federal Convention of 1787*, at 61 (1911) (emphasis in original).

statute that the First Congress enacted on this subject in 1790 not only established that such children are U.S. citizens, *but also expressly referred to them as "natural born citizens."* 1 Stat. 103, 104 (1790) (emphasis added); *see also Bowsher v. Synar*, 478 U.S. 714, 723 (1986) (the views of the First Congress provide "contemporaneous and weighty evidence of the Constitution's meaning") (internal quotation marks omitted).  And the First Congress's statutory recognition that persons born abroad to U.S. citizens were "natural born citizens" itself was in accord with the British tradition that necessarily informed the Framers' understanding of the Natural Born Citizen Clause.  *See, e.g.*, British Nationality Act, 1730, 4 Geo. 2, c. 21 (children born abroad to parents who were "natural-born Subjects" were also "natural-born Subjects . . . to all Intents, Constructions, and Purposes whatsoever").

The fact that Senator McCain was born in 1936 rather than 1790 only strengthens his status as a "natural born Citizen" because both the U.S. Supreme Court and the other branches of the federal government have recognized that the Panama Canal Zone was sovereign U.S. territory when Senator McCain was born there.  *See, e.g.*, *O'Connor v. United States*, 479 U.S. 27, 28 (1986) ("[f]rom 1904 to 1979, the United States exercised sovereignty over the Panama Canal and the surrounding 10-mile-wide Panama Canal Zone"); *The President—Government of the Canal Zone*, 26 Op. Att'y Gen. 113, 116 (1907) (recognizing that the 1904 treaty between the United States and Panama "imposed upon the United States the obligations as well as the powers of a sovereign within the [Canal Zone]").  *But see Vermilya-Brown Co. v. Connell*, 335 U.S. 377, 381 (1948).  It is well-established that "natural born" citizenship includes birth within the territory and allegiance of the United States.  *See, e.g.*, *United States v. Wong Kim Ark*, 169 U.S. 649, 655-66 (1898); *see also* U.S. Const. amend. XIV, § 1.  Thus, although Senator McCain was not born within a State, he was nevertheless born within the sovereign territory of the United

States, which—even apart from his birth to U.S. citizen parents—provides an additional basis for his status as a "natural born Citizen."

It is inconceivable that the Framers intended to exclude a child born of two U.S. citizens from holding the Office of President simply because of the historical accident that he or she happened to be born in a place that was not a State of the Union.  And it is doubly inconceivable that the Framers intended to exclude such a child from holding the Office of President when he or she was born outside the continental United States only because the then-President dispatched his or her parents to that foreign location in the service of the United States.  Put another way:  Is there any reason to believe that Minister of Foreign Affairs Jay, who spent several years abroad in the service of his country and during those years welcomed into the world three of his six children, could have meant that another child born to him and his wife in Madrid or Paris should be ineligible to hold the Office of President?  Of course not.

But this Court need not—indeed, may not—reach the merits of Plaintiff's claims because Plaintiff's Complaint fails to articulate a justiciable case or controversy and, in any event, fails to state a claim upon which relief can be granted.  *See Nixon v. United States*, 506 U.S. 224, 226 (1993) ("[B]efore we reach the merits of . . . a claim, we must decide whether it is 'justiciable,' that is, whether it is a claim that may be resolved by the courts.").  While courts "should always be ready to meet any question confided to [them] by the Constitution, it is equally [their] duty not to pass beyond [their] appropriate sphere of action, and to take care not to involve [themselves] in discussions which properly belong to other forums."  *Luther v. Borden*, 48 U.S. (7 How.) 1, 47 (1849); *see also Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) ("The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case

4

may be disposed of.").  For the reasons set forth more fully below, Plaintiff's Complaint should

be dismissed in its entirety under Rules 12(b)(1) and 12(b)(6).

## ARGUMENT

**I.    Plaintiff's Claims Should Be Dismissed Because They Fail To Articulate A Justiciable Case Or Controversy.**

Plaintiff's claims are nonjusticiable—and therefore must be dismissed—for a host of

independent reasons.

### A.    Plaintiff Lacks Constitutional Standing Because His Complaint Does Not Allege That He Suffered Any Concrete And Particularized Injury In Fact.

To invoke this Court's jurisdiction, a plaintiff must allege, among other things, a

sufficient "injury in fact"—"an invasion of a legally protected interest" that is both "concrete and

particularized" and "actual or imminent, not conjectural or hypothetical."  *Lujan v. Defenders of

Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks omitted); *see also Sutliffe v. Epping

Sch. Dist.*, No. 06-cv-474-JL (D.N.H. Apr. 4, 2008).  The plaintiff "bears the burden of

establishing these elements" of standing.  *Lujan*, 504 U.S. at 561.  If construed charitably,

Plaintiff's Complaint can be read to allege four separate claims of injury:  (1) disenfranchisement

from the recent New Hampshire Republican primary election; (2) vote dilution in that New

Hampshire Republican primary election; (3) future disenfranchisement in the 2008 general

election for President; and (4) vote dilution in that general election for President.  *See* Compl.

¶¶ 1, 12, 13, 28.  Yet, none of these alleged injuries is sufficient to confer constitutional standing

on Plaintiff to raise the present claims.

Plaintiff's first three allegations of injury—disenfranchisement in the primary and general

elections, and vote dilution in the primary election—do not remotely allege that Plaintiff in fact

suffered, or is likely to suffer, a "concrete and particularized" injury that is an "invasion of a

legally protected interest" (*Lujan*, 504 U.S. at 560)—much less that these injuries were caused by the Defendants' conduct.[2]    Plaintiff's allegation of disenfranchisement from the New Hampshire Republican primary is refuted by his own Complaint, which states that he voted in that election.  *See* Compl. ¶ 7.  His claim of disenfranchisement from the general election is similarly defeated by his allegation that he plans to vote in that general election and the fact that the Complaint contains no allegation that the Defendants will somehow attempt to prevent him from casting a ballot in November.  *See id.* at ¶¶ 4, 7.

And Plaintiff's claim that Senator McCain's participation in the New Hampshire primary diluted the vote of every person who voted in that election is equally ineffectual.  Plaintiff contends that if a party's primary elections result in the nomination of a candidate who is ineligible to hold office, the votes cast in that party's primary "will count less than those . . . in other parties' primary elections."  Compl. ¶ 13.  Setting aside the question whether the purported "vote dilution" under this theory is caused by—or "'fairly traceable to'" (*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006))—the candidate's conduct or the *voters'*, Plaintiff's Complaint contains no allegation that votes cast in the New Hampshire Republican primary were less effective at selecting the Republicans' nominee than the votes cast in the State's Democratic primary.  Plaintiff seems to argue that, to the extent the Republicans nominate through their

---

 [2] Thus, in addition to failing to allege an "injury in fact," Plaintiff also does not meet the second element of standing, which requires "a causal connection between the injury and the conduct complained of."  *Lujan*, 504 U.S. at 560.  Plaintiff does not allege that Senator McCain or the RNC prevented him from voting in the primary election (or will prevent him from voting in the general election) or that any conduct undertaken by the Defendants caused his vote in the primary election to count less than the vote of other primary voters.  Moreover, Plaintiff is also unable to satisfy standing's redressability requirement (*id.* at 561) because the relief that he seeks—a court order prohibiting the RNC from nominating Senator McCain and compelling the Senator to end his candidacy—would violate the First Amendment rights of both the RNC and the Senator.  *See infra* Part II.A.

presidential primary a candidate who is ineligible to hold the Office of President, those primary votes will be less effective at selecting a President than the Democrats'.  But the purpose of the primary election is only to select the party's *nominee* for an office—not the officeholder himself.  And Plaintiff alleges no deficiency in the New Hampshire Republican primary in accomplishing *that* objective.

That leaves only Plaintiff's contention that the Republican Party's nomination of Senator McCain threatens to dilute the votes of Plaintiff "and an estimated 100 million additional voters who may otherwise cast their vote in the 2008 national election for a candidate who may later be declared ineligible to the Office of President."  Compl. ¶ 1.  Invoking an injury allegedly threatened to 100 million or more persons is an insufficient basis for standing, which requires, as an irreducible constitutional minimum, allegation of an injury that is "particularized" to the plaintiff.  *Lujan*, 504 U.S. at 561.  "[A] generally available grievance about government . . . seeking relief that no more directly and tangibly benefits [the plaintiff] than it does the public at large . . . does not state an Article III case or controversy."  *Id.* at 573-74; *see also Arizonans for Official English v. Arizona*, 520 U.S. 43, 64 (1997) ("An interest shared generally with the public at large in the proper application of the Constitution and laws will not do.").

Accordingly, both the Supreme Court and lower federal courts have consistently held that voters do not have standing to challenge the qualifications of candidates for elected federal office.  In *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208 (1974), for example, the Court held that the plaintiffs lacked standing to pursue a claim alleging that certain members of Congress were ineligible for office under the Constitution's Incompatibility Clause.  *Id.* at 220.  The Court explained that "standing to sue may not be predicated upon an interest . . . which is held in common by all members of the public" (*id.*) and that the standing requirement

carries "particular[ ]" weight in cases "seek[ing] an interpretation of a constitutional provision which has never before been construed by the federal courts." *Id.* at 221; *see also Ex Parte Levitt*, 302 U.S. 633, 634 (1937) (per curiam) (holding that the plaintiff lacked standing to challenge the eligibility of Hugo Black to serve on the U.S. Supreme Court because "it is not sufficient that [the plaintiff] has merely a general interest common to all members of the public").

Similarly, in *Jones v. Bush*, 122 F. Supp. 2d 713 (N.D. Tex. 2000), *aff'd without opinion*, 244 F.3d 134 (5th Cir. 2000), the court held that three Texas voters lacked standing to bring a suit alleging that George W. Bush and Richard B. Cheney were ineligible to receive Texas's electoral votes under the Twelfth Amendment. *Id.* at 715. The court explained that the alleged "violation of [the plaintiffs'] right to cast a 'meaningful vote'" (*id.* at 716) was insufficient to confer standing because their alleged injury was "undifferentiated and general" and the "plaintiffs [had] conspicuously fail[ed] to demonstrate how they, as opposed to the general voting population, will feel its effects." *Id.* at 717; *see also Froelich v. FEC*, 855 F. Supp. 868, 870 (E.D. Va. 1994) (holding that the plaintiffs lacked standing to bring a suit alleging that they were "denied a meaningful vote" by U.S. Senate candidates' acceptance of out-of-state campaign contributions because the plaintiffs' alleged injury was "hypothetical," "abstract," and "common to all Virginia voters"), *aff'd without opinion*, 57 F.3d 1066 (4th Cir. 1995).

Plaintiff's challenge to Senator McCain's status as a natural-born citizen is precisely the type of "generally available grievance" about a candidate's eligibility for office that is foreclosed by the Constitution's particularized injury requirement. *Lujan*, 504 U.S. at 573. Plaintiff's alleged injury—vote dilution in the general election—is no different than the injury purportedly suffered by *every* voter who intends to cast a ballot during the general election for the

Republican nominee for President.  In fact, by his own admission, Plaintiff's alleged injuries are shared by "an estimated 100 million . . . voters."  Compl. ¶¶ 1, 9, 23.  Because Plaintiff's claims present an "undifferentiated, generalized grievance" (*Lance v. Coffman*, 127 S. Ct. 1194, 1198 (2007) (per curiam)), they should be dismissed for lack of standing.

### B.    Plaintiff's Claims Directed To The New Hampshire Primary Are Moot, And Those Directed To The General Election Are Not Ripe.

Plaintiff's claims of disenfranchisement and vote dilution in the New Hampshire primary election are also nonjusticiable for the additional reason that they are moot, and his claims regarding the general election are not ripe.

Plaintiff's claims of disenfranchisement and vote dilution in the New Hampshire Republican primary are raised belatedly and are therefore moot because "events [have] ma[d]e it impossible to grant [Plaintiff] effective relief" on those claims.  *Pine Tree Med. Assocs. v. Sec'y of Health & Human Servs.*, 127 F.3d 118, 121 (1st Cir. 1997) (internal quotation marks omitted); *see also Gowen, Inc. v. F/V Quality One*, 244 F.3d 64, 66 (1st Cir. 2001) (a claim is moot where, due to the passage of time, there is no "reasonable chance of effective relief" being granted to the plaintiff).  The New Hampshire primary has already taken place, and Plaintiff's request that this Court prohibit the RNC from nominating Senator McCain and compel the Senator to end his candidacy would not remedy the disenfranchisement and vote dilution that Plaintiff allegedly suffered during the primary, which preceded the filing of this action.

Moreover, Plaintiff's claims directed to the general election are not ripe.  The ripeness doctrine "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements."  *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967).  Plaintiff's claims of disenfranchisement and vote dilution in the general election purport to protect the interest of voters that will "cast their vote in the 2008 national election for a candidate

who *may* later be declared ineligible to the Office of President."  Compl. ¶ 1 (emphasis added).

This formulation of the voters' alleged injury implicitly acknowledges that, if Senator McCain is

*not* elected to hold the Office of President, there will be no need for a court to address the

constitutional question of his eligibility.  The ripeness doctrine counsels "'avoidance of

premature adjudication'" of such disagreements while they remain abstract—and does so with

particular force where the "'abstract disagreements'" implicate constitutional questions.  *Doe v.

Bush*, 323 F.3d 133, 138 (1st Cir. 2003) (ripeness doctrine demands avoidance of "unnecessary

constitutional decisions").  Inasmuch as Senator McCain has not been elected President (and,

indeed, has not even been officially nominated as the Republican Party's candidate), it would be

"premature" as a constitutional matter for a court to address the issue.

### C.    Plaintiff's Claims May Also Present A Nonjusticiable Political Question.

Even if Plaintiff could find a way to manufacture standing and overcome the

jurisdictional hurdles posed by the mootness and ripeness doctrines, any complaint challenging

Senator McCain's eligibility to hold the Office of President would raise difficult issues under the

political question doctrine and, at least at this juncture, may well be nonjusticiable on that

ground.

The political question doctrine is "essentially a function of the separation of powers."

*Baker v. Carr*, 369 U.S. 186, 217 (1962).  It serves to "restrain the Judiciary from inappropriate

interference in the business of the other branches of Government" (*United States v. Munoz-

Flores*, 495 U.S. 385, 394 (1990)) by prohibiting the courts from deciding issues that properly

rest within the province of the political branches.  *See Marbury v. Madison*, 5 U.S. (1 Cranch)

137, 170 (1803).

The Constitution indicates that issues relating to a candidate's eligibility for the Office of President rest, in the first instance, with the voters and with the Electoral College, the constitutionally created body responsible for selecting the President of the United States.  *See* U.S. Const. art. II, § 1, cl. 2 ("Each State shall appoint, in such Manner as the Legislature thereof may direct," electors for the President and Vice President); *id.* amend. XXIII, § 1.  The Constitution's commitment to the Electoral College of the responsibility to select the President subsumes the authority to decide whether a presidential candidate is qualified for office because the examination of a candidate's qualifications is an integral component of the electors' decision-making process.  If a court were to sit in judgment of a candidate's qualifications *before* the Nation has voted, and *before* the Electoral College has cast its votes, such a judgment could "inappropriately interfer[e]" with the Electoral College's constitutional authority to elect the President and to evaluate the qualifications of the candidates seeking that office.  *Munoz-Flores*, 495 U.S. at 394.

The Constitution also provides that, after the Electoral College has voted, further review of a presidential candidate's eligibility for office, to the extent such review is required, rests with Congress.[3]  Where no candidate receives a majority of the electoral votes, the Constitution commits to the House of Representatives the authority to select the President and, in so doing, to evaluate the candidates' qualifications.  *See* U.S. Const. amend. XII.  Similarly, the Twentieth Amendment explicitly grants Congress the responsibility for selecting a President when a

---

[3]  Congress has already taken steps to express its view that Senator McCain is eligible for the Presidency.  Senator Claire McCaskill, together with Senators Hillary Clinton and Barack Obama, has introduced a resolution recognizing that Senator McCain is a "natural born Citizen" because he was born to U.S. citizen parents serving their country on a U.S. military base.  S. Res. 511, 110th Cong. (2008).

candidate elected by the Electoral College does not satisfy the Constitution's eligibility requirements. *See id.* amend. XX, § 3 ("the Congress may by law provide for the case wherein neither a President elect nor a Vice President elect shall have qualified, declaring who shall then act as President, or the manner in which one who is to act shall be selected, and such person shall act accordingly until a President or Vice President shall have qualified"). Both the House and Senate have standing committees with jurisdiction to decide questions relating to presidential elections. *See* S. R. 25.1.n(1)(5) (the Senate Committee on Rules and Administration has jurisdiction over "proposed legislation, messages, petitions, memorials, and other matters relating to . . . Federal elections generally, including the election of the President, Vice President, and Members of the Congress," as well as "Presidential succession"); *see also* H. R. 10(j)(12).

The Constitution therefore indicates that, in the first instance, the selection of the President—and the evaluation of a candidate's qualifications—should be made by politically accountable bodies without judicial participation. If a court were to pass upon the eligibility of a candidate to hold the Office of President before the Electoral College and Congress have acted, it may involve itself in political matters for which it is institutionally ill-suited and interfere with the constitutional authority of the Electoral College and Congress to evaluate the qualifications of presidential candidates. The political question doctrine suggests that courts should not preempt the judgments of those governmental bodies that the Constitution designates as the forums for determining a presidential candidate's eligibility to hold office. To permit them to do so could greatly aggrandize the power of the judicial branch and thereby seriously disrupt the Framers' carefully calibrated separation of powers—"the absolutely central guarantee of a just Government." *Munoz-Flores*, 495 U.S. at 394 (quoting *Morrison v. Olson*, 487 U.S. 654, 697 (1988) (Scalia, J., dissenting)); *see also Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579,

635 (1952) (Jackson, J., concurring) ("the Constitution diffuses power the better to secure liberty").

## II.    Plaintiff's Complaint Should Be Dismissed Because It Fails To State A Claim Upon Which Relief Can Be Granted.

To the extent that Plaintiff's claims of constitutional injury are justiciable—and, for the multiple reasons delineated above, they are not—this Court should still dismiss Plaintiff's Complaint under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. Plaintiff's Complaint alleges that Senator McCain's candidacy for President, and the possibility that the Republican Party will nominate Senator McCain as its candidate for that office, is inconsistent with the eligibility requirements set forth in Article II of the Constitution.  But neither Senator McCain nor the RNC is a state actor.  To the contrary, both Senator McCain and the RNC are private actors who, despite their political activity, retain their own rights under the Constitution, including their First Amendment rights of political association.  The relief sought by Plaintiff—an injunction compelling Senator McCain to end his candidacy for President and requiring the RNC to select a different person to be its nominee in the general election—would improperly trench upon those rights.

### A.    Plaintiff's Suit Infringes Upon The First Amendment Rights Of Senator McCain And The RNC.

Political candidates have "a constitutional right to run for office."  *Flinn v. Gordon*, 775 F.2d 1551, 1554 (11th Cir. 1985).  As the First Circuit has explained, the "right to run for public office touches on two fundamental freedoms:  freedom of individual expression and freedom of association."  *Mancuso v. Taft*, 476 F.2d 187, 195 (1st Cir. 1973); *see also Washington v. Finlay*, 664 F.2d 913, 927-28 (4th Cir. 1981) (noting the First Amendment's "protection of the freedom of association and of the rights to run for office, have one's name on the ballot, and present one's views to the electorate").  As to the former, "the individual's expressive activity has two

dimensions:  besides urging that his views be the views of the elected public official, he is also attempting to become a spokesman for a political party whose substantive program extends beyond the particular office in question."  *Mancuso*, 476 F.2d at 195-96.  As to the latter, a candidate's right to run for office implicates expressive association because "at some juncture his supporters and fellow party members may decide that he is the ideal person to carry the group's standard into the electoral fray."  *Id.* at 196.  Plaintiff's suit therefore challenges both Senator McCain's right to speak on behalf of the Republican Party's platform and his right to represent his party as a whole before the electorate.

The Supreme Court has also repeatedly observed that political parties and their members "enjoy a constitutionally protected right of political association."  *Cousins v. Wigoda*, 419 U.S. 477, 487 (1975).  Indeed, "[i]n no area is the political association's right [to free association] more important than in the process of selecting its nominee."  *Jones*, 530 U.S. at 575.  This process "often determines the party's positions on the most significant public policy issues of the day" and results in the nomination of a candidate "who becomes the party's ambassador to the general electorate in winning it over to the party's views."  *Id.*  Because the nomination process implicates core First Amendment freedoms, "a State, or a court, may not constitutionally substitute its own judgment for that of the Party."  *Democratic Party v. Wisconsin*, 450 U.S. 107, 123-24 (1981).  This is true even though a plaintiff may believe that his party's selection of a nominee was unwise or detrimental to the party's interests.  *See id.* at 124; *see also Tashjian v. Republican Party*, 479 U.S. 208, 224 (1986).

Plaintiff's requested remedy—a court order prohibiting Senator McCain from continuing his candidacy for President and requiring the RNC to select a new nominee—would profoundly intrude upon the First Amendment rights of both Senator McCain and the RNC.  If successful,

Plaintiff's suit would preemptively prevent Senator McCain from exercising his constitutional right to run for elected office and overturn the result of the constitutionally protected nominating process that will likely culminate in Senator McCain's selection as the Republican Party's nominee.  Indeed, if Plaintiff were granted the injunctive relief that he requests, the Republican Party would be compelled to select a new standard-bearer and would risk "being saddled with an unwanted . . . nominee." *Jones*, 530 U.S. at 579.  The First Amendment prohibits such judicial interference with the internal workings of a party's nominating process.

This is not to say, of course, that merely because a political party has a First Amendment right to select its nominee, the nominee has an unqualified right to hold elective office.  The First Amendment guarantees, however, that the choice of a nominee belongs to the political party and its members, *even if* the candidate ultimately proves "ineligible for office" or "unwilling to serve" (although that development is of no concern here given Senator McCain's irrefutable status as a "natural born Citizen").  *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 359 (1997).  In fact, history provides several examples of political parties that have advanced their political agendas by nominating candidates known to be ineligible at the time.  For example, in 1872, the Equal Rights Party nominated Victoria Woodhull, considered by many to be the first woman to run for President, despite the fact that she was not yet thirty-five years old and, as a woman, was then unable to vote.  *See* Kate Havelin, *Victoria Woodhull:  Fearless Feminist* 37 (2006).  Similarly, in 2004, the American Socialist Workers Party nominated a presidential candidate who was a Nicaraguan immigrant.  *See Third-Party Presidential Candidates*, USA Today, Oct. 23, 2004, *at* http://www.usatoday.com/news/politicselections/nation/president/2004-10-21-independent_x.htm.  As the First Amendment prevents courts from interfering with a political party's decision to nominate such a candidate, Plaintiff's claims must be dismissed.

### B.    Neither Senator McCain Nor The RNC Is A State Actor.

Moreover, the relief that Plaintiff seeks is unavailable for the additional reason that courts are powerless to issue the requested form of relief unless the defendants are state actors whose conduct is "dominate[d]" by the government "to such an extent that . . . [they] must be deemed to act with [its] authority." *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 620 (1991); *see also Kay v. N.H. Democratic Party*, 821 F.2d 31, 33 (1st Cir. 1987) ("the Constitution provides no redress when private parties abridge the free expression of others").

It is well-established that candidates for political office, like Senator McCain, are not state actors. In *Federer v. Gephardt*, 363 F.3d 754 (8th Cir. 2004), for example, the court dismissed a civil conspiracy suit against Representative Richard A. Gephardt arising out of his congressional reelection campaign in 2000. *Id.* at 758. The court concluded that Representative Gephardt was a "political candidate and private person," and that the plaintiff had therefore failed to allege the state action that is a prerequisite to a conspiracy cause of action under 42 U.S.C. § 1985. *See id.* at 759.

It is equally well-established that political parties generally are not state actors. *See O'Brien v. Brown*, 409 U.S. 1, 4-5 (1972) (per curiam) (staying court of appeals order that national party seat certain delegates at its convention and expressing "grave doubts" that a political party could be considered a state actor).[4] The First Circuit so held, for example, in *Kay*

---

[4]  In the "White Primary" cases, the Supreme Court recognized an exception to this general principle in the limited circumstance of a party's practice of denying primary ballot access based on race, which the Court held to constitute "state action within the meaning of the Fifteenth Amendment." *Smith v. Allwright*, 321 U.S. 649, 664 (1944). Because Plaintiff's Complaint does not raise a claim under the Fifteenth Amendment, he may not rely on the "White Primary" cases—which rest upon the unique constitutional concerns raised by race-based ballot access restrictions—to establish state action in this case.

*v. New Hampshire Democratic Party*, 821 F.2d 31, where it dismissed a suit against the New Hampshire Democratic Party and two party officials for allegedly violating the plaintiff's First Amendment right to speak at a presidential candidates' forum. *Id.* at 33. The court explained that the party was not engaged in state action and that the party officials therefore "had the authority, for constitutional purposes, to exclude [the plaintiff] from participation in their private meeting." *Id.* at 33 n.5; *see also Banchy v. Republican Party of Hamilton County*, 898 F.2d 1192, 1196 (6th Cir. 1990) ("Absent some credible allegation that ward chairmen engage in a governmental function, the Republican Party is not subject to suit under section 1983 for irregularities in its internal ward chairmen elections.").

Accordingly, neither Senator McCain—a private person running for political office—nor the RNC—a political committee—is a state actor. Plaintiff's suit seeking declaratory and injunctive relief against Senator McCain and the RNC based on their alleged violation of the Natural Born Citizen Clause therefore fails as a matter of law.

## CONCLUSION

For the foregoing reasons, Plaintiff's Complaint should be dismissed in its entirety for its failure to present justiciable claims to this Court.

Respectfully submitted.

Dated:  April 30, 2008

Matthew D. McGill
*pro hac vice admission pending*
Amir C. Tayrani
*pro hac vice admission pending*
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
mmcgill@gibsondunn.com
atayrani@gibsondunn.com

/s/ Charles G. Douglas, III
Charles G. Douglas, III  Bar # 669
Douglas, Leonard & Garvey, P.C.
6 Loudon Road, Suite 502
Concord, NH  03301
(603) 224-1988
mail@nhlawoffice.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing motion and supporting memorandum of law was served on the *pro se* plaintiff on April 30, 2008 by e-mail and overnight mail.


  /s/ Charles G. Douglas, III
Charles G. Douglas, III

# Exhibit C

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

<u>Fred Hollander</u>

    v.                Civil No. 08-cv-99-JL
                         Opinion No. 2008 DNH 129
<u>Senator John McCain</u>
<u>and the Republican</u>
<u>National Committee</u>

**O R D E R**

    Fred Hollander, proceeding pro se, brings this action challenging Senator John McCain's eligibility to serve as President of the United States.  Hollander claims that McCain, by virtue of his birth in the Panama Canal Zone--albeit to American parents--is not a "natural born Citizen" eligible to hold the office of President under Article II, § 1 of the Constitution.

    Though McCain and his co-defendant, the Republican National Committee ("RNC"), vigorously dispute this claim, they argue that this court cannot decide it in any event due to a number of jurisdictional defects:  lack of standing and ripeness, mootness, and nonjusticiability.  The defendants also argue that Hollander has failed to state a claim for relief because (1) they are not state actors, so Hollander cannot maintain any constitutional claim against them and (2) in any event, any remedy for it would necessarily violate their own First Amendment rights.

This court held a hearing on the defendants' motion to dismiss this action on those grounds on July 24, 2008.  Based on the arguments presented there, as well as in the parties' briefing, the court rules that Hollander lacks standing to bring this action.  The court does not reach the rest of the parties' arguments, including, most notably, the question of McCain's constitutional eligibility to be President.

**I.    Applicable Legal Standard**

A court faced with a challenge to standing at the pleading stage, as here, must "accept as true all material allegations of the complaint, and . . . construe the complaint in favor of the complaining party." Warth v. Seldin, 422 U.S. 490, 501 (1975). Hollander's pro se complaint, furthermore, must be construed liberally, "held to less stringent standards than formal pleadings drafted by lawyers." Estelle v. Gamble, 429 U.S. 97, 106 (internal quotation marks omitted).  Yet even these standards do not require the court to credit "[e]mpirically unverifiable conclusions, not logically compelled, or at least supported, by the stated facts" in the complaint.  Sea Shore Corp. v. Sullivan, 158 F.3d 51, 54 (1st Cir. 1998) (internal quotation marks omitted); Ahmed v. Rosenblatt, 118 F.3d 886, 890 (1st Cir. 1997).

## II.  __Background__

McCain was born, in 1936, at the Coco Solo Naval Air
Station, a United States military installation in the Panama
Canal Zone.[1]  At the time, McCain's father--who, like McCain's
mother, was an American citizen--was stationed there on active
duty with the United States Navy.  McCain, by virtue of his
American parentage, is unquestionably an American citizen.  <u>See</u>
Act of May 24, 1934, Pub. L. No. 73-250, § 1, 48 Stat. 797
(amended 1952) ("Any child hereafter born out of the limits and
jurisdiction of the United States, whose father or mother or both
at the time of the birth of such child is a citizen of the United
States, is declared to be a citizen of the United States")[2]; <u>see
also</u> Act of Aug. 4, 1937, Pub. L. No. 75-243, 50 Stat. 558
(codified as amended at 8 U.S.C. § 1403(b)) (conferring
citizenship on children born in the Canal Zone to one American
parent on or after February 26, 1904, and born to one American

---

[1]Though Hollander makes this allegation in his complaint, in
his objection he states, "[s]ince the hospital at the Coco Solo
Naval Air Station did not even exist until 1941 . . . , it is
reasonable to assume that [McCain] was born in the city of Colón
in the Republic of Panama."  Hollander has also provided a copy
of McCain's birth certificate, which lists his place of birth as
Colón.  The defendants dispute this theory, but it is irrelevant
to the present motion in any event.

[2]The law is the same today.  <u>See</u> 8 U.S.C. § 1401(c) (2005).

3

parent anywhere in Panama after that date so long as the parent was employed there by the United States at the child's birth).

Yet the Constitution provides that "No person except a natural born Citizen, or a Citizen of the United States, at the time of the Adoption of this Constitution, shall be eligible to the Office of President."  U.S. Const., art. II, § 1, cl. 4 (emphasis added).  The phrase "natural born Citizen" is not defined in the Constitution, see Minor v. Happersett, 88 U.S. 162, 167 (1875), nor does it appear anywhere else in the document, see Charles Gordon, Who Can Be President of the United States:  An Unresolved Enigma, 28 Md. L. Rev. 1, 5 (1968).  The phrase has thus spawned a largely academic controversy over whether it excludes those citizens who acquired that status via birth to American parents abroad.  Compare, e.g., Jill A. Pryor, The Natural-Born Citizen Clause and Presidential Eligibility:  An Approach for Resolving Two Hundred Years of Uncertainty, 97 Yale L.J. 881, 899 (1988) (concluding that those citizens are eligible) with, e.g., Gabriel J. Chin, Why Senator John McCain Cannot Be President 17-18 (July 2008) (unpublished manuscript), available at http://www.law.arizona.edu/FacultyPubs/Documents/Chin/ALS08-14.pdf (concluding they are not).[3]

---

[3]Though the weight of the commentary falls heavily on the side of eligibility, see, e.g., Sarah Helene Duggin & Mary Beth

The question has taken on a real-world dimension, however, during the occasional presidential candidacies of politicians born abroad:  Franklin D. Roosevelt, Jr., who was born to American parents in Canada, see Warren Freedman, Presidential Timber:  Foreign Born Children of American Parents, 35 Cornell L.Q. 357 n. 2 (1950); George Romney (father to McCain's one-time opponent in the recent Republican presidential primary, Mitt Romney), who was born to American parents in Mexico, see Gordon, supra, at 1; and, now, McCain, see, e.g., Chin, supra, at 3-4. In McCain's case, the question also takes on an additional layer of complication due to his birth in the Panama Canal Zone.

Those born "in the United States, and subject to the jurisdiction thereof," U.S. Const., amend. XIV, have been considered American citizens under American law in effect since the time of the founding, United States v. Wong Kim Ark, 169 U.S. 649, 674-75 (1898), and thus eligible for the presidency, see, e.g., Schneider v. Rusk, 377 U.S. 163, 165 (1964) (dicta).  So

---

Collins, "Natural Born" in the USA:  The Striking Unfairness and Dangerous Ambiguity of the Constitution's Presidential Qualifications Clause and Why We Need to Fix It, 85 B.U. L. Rev. 53, 82-83 (2005) (surveying authority), many of these commentators acknowledge that the question is not completely free from doubt, see, e.g., Lawrence Friedman, An Idea Whose Time Has Come--The Curious History, Uncertain Effect, and Need for Amendment of the "Natural Born Citizen" Requirement for the Presidency, 52 St. Louis U. L.J. 137, 143 (2007).

the defendants say that, apart from McCain's citizenship by parentage, he can be President because "he was born within the sovereign territory of the United States," namely, the Canal Zone, over which they argue the United States was exercising the powers of a sovereign at the time of McCain's birth, under the Hay-Bunau-Varilla Convention.  See Convention between the United States and the Republic of Panama for the Construction of a Ship Canal to Connect the Waters of the Atlantic and Pacific Oceans, U.S.-Pan., art. III, Nov. 18, 1903, 33 Stat. 2234, 2235.  The Supreme Court, however, has made contradictory comments in dicta on the status of the Canal Zone.  Compare O'Connor v. United States, 479 U.S. 27, 28 (1986) (observing that the United States exercised sovereignty over the Canal Zone under the Convention) with Vermilya-Brown Co. v. Connell, 335 U.S. 377, 381 (1948) (observing that the United States has no sovereignty there).

Hollander claims, due to what he calls McCain's "unequivocal ineligibil[ity]" for the Presidency, that the RNC "should not be permitted to nominate him . . . .  This would lead to the disenfranchisement of [Hollander] and 100 million additional voters" in the general presidential election.  Hollander, in fact, claims that he has already suffered disenfranchisement in the 2008 New Hampshire Republican primary, because it resulted in

the allocation of delegates to the Republican National Convention on McCain's behalf, despite his alleged ineligibility.[4]

As a result, Hollander says, his vote in the New Hampshire primary, and those of others participating in primary elections in which McCain appeared on the ballot, "will count less than [the votes of] those who voted in other parties' primary elections," which led to the allocation of votes to a constitutionally eligible Presidential candidate.  Hollander adds that the defendants are responsible for this disenfranchisement because McCain ran in the New Hampshire primary "under false pretenses" to his eligibility for the Presidency, while the RNC "authorized" him to do so.  To remedy his claimed disenfranchisement in the New Hampshire Republican primary, and to prevent his further claimed disenfranchisement in the general election, Hollander requests:  (1) a declaratory judgment that McCain is ineligible for the Presidency, (2) an injunction requiring McCain to withdraw his candidacy, and (3) an injunction requiring the RNC to reallocate the delegates awarded to McCain as the result of the New Hampshire primary and others, and to nominate another candidate.

---

[4]McCain received about 37 percent of the vote in the primary, resulting in the allocation of seven delegates to him and five to other candidates.

III. **Analysis**

As previously mentioned, the defendants argue that Hollander lacks standing to maintain this lawsuit.  "Article III of the Constitution limits the 'judicial power' of the United States to the resolution of 'cases' and 'controversies'. . . .  As an incident to the elaboration of this bedrock requirement, [the Supreme] Court has always required that a litigant have 'standing' to challenge the action sought to be adjudicated in the lawsuit."  Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc., 454 U.S. 464, 471 (1982).  So-called "Article III standing" has three requirements:  (1) the plaintiff has suffered "an injury in fact," (2) that injury bears a causal connection to the defendant's challenged conduct, and (3) a favorable judicial decision will likely provide the plaintiff with redress from that injury.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).  The party bringing the claim--Hollander here--bears the burden to show his or her standing to bring it.  Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 12 (2004).

Based on these principles, the Supreme Court has "consistently held that a plaintiff raising only a generally available grievance about government--claiming only harm to his and every citizen's interest in proper application of the

Constitution and laws, and seeking relief that no more directly
and tangibly benefits him than it does the public at large--does
not state an Article III case or controversy." <u>Lujan</u>, 504 U.S.
at 573-74.  These holdings include <u>Schlesinger v. Reservists</u>
<u>Committee to Stop the War</u>, 418 U.S. 208 (1974), where the Court
ruled that a group of citizens lacked standing to litigate the
eligibility, under the Incompatibility Clause,[5] of members of
Congress to serve simultaneously in the military reserves.

Alleging injury "because Members of Congress holding a
Reserve position in the Executive Branch were said to be subject
to the possibility of undue influence by the Executive Branch, in
violation of the concept of the independence of Congress"
embodied in the Clause, the plaintiffs sought an injunction
against the service of congressmen in the reserves as well as "a
declaration that membership in the Reserves is an office under
the United States prohibited to Members of Congress by Art. I, §
6, cl. 2." <u>Schlesinger</u>, 418 U.S. at 211-12 (footnote omitted).
But the Court called it

---

[5]Together with the Ineligibility Clause, this provision
states, "No Senator or Representative shall, during the Time for
which he was elected, be appointed to any civil Office under the
Authority of the United States, which shall have been created, or
the Emoluments whereof shall have been encreased during such
time; and no Person holding any Office under the United States,
shall be a Member of either House during his Continuance in
Office."  U.S. Const., art. I, § 6, cl. 2.

> nothing more than a matter of speculation whether the claimed nonobservance of that Clause deprives citizens of the faithful discharge of the legislative duties of reservist members of Congress. And that claimed nonobservance, standing alone, would adversely affect only the generalized interest of all citizens in constitutional governance, and that is an abstract injury.

Id. at 217 (footnote omitted). The Court went on to hold "that standing to sue may not be predicated upon an interest of the kind alleged here which is held in common by all members of the public, because of the necessarily abstract nature of the injury all citizens share." Id. at 229.

Schlesinger makes clear, then, that Hollander does not have standing based on the harm he would suffer should McCain be elected President despite his alleged lack of eligibility under Art. II, § 1, cl. 4. That harm, "standing alone, would adversely affect only the generalized interest of all citizens in constitutional governance." 418 U.S. at 217; see also Ex parte Lévitt, 302 U.S. 633, 634 (1937) (ruling that citizen lacked standing to challenge appointment of Hugo Black to the Court under the Ineligibility Clause based on his membership in Congress when it enacted a new judicial pension plan).

Hollander, however, argues that the harm to him from McCain's candidacy transcends simply the right to be governed by a constitutionally qualified President; Hollander claims it also

10

impacts his right to vote, both in the New Hampshire Republican
Primary and the general election.  This is a difficult theory to
understand, but it appears to rest on the premise that McCain's
mere status as a presidential candidate or party nominee somehow
interferes with the electoral franchise of voters like Hollander
who consider McCain ineligible for the office.  Presumably, those
voters are empowered to address that concern on their own by
voting for a different presidential candidate, whose eligibility
is unimpeachable.  The presence of some allegedly ineligible
candidate on the ballot would not seem to impair that right in
the least, no matter how that candidate performs in the election.

　　　To be sure, courts have held that a candidate or his
political party has standing to challenge the inclusion of an
allegedly ineligible rival on the ballot, on the theory that
doing so hurts the candidate's or party's own chances of
prevailing in the election.  See, e.g., Tex. Dem. Party v.
Benkiser, 459 F.3d 582, 586-87 & n.4 (5th Cir. 2006); Schulz v.
Williams, 44 F.3d 48, 53 (2d Cir. 1994); Fulani v. Hogsett, 917
F.2d 1028, 1030 (7th Cir. 1990).  But that notion of "competitive
standing" has never been extended to voters challenging the
eligibility of a particular candidate.  See Gottlieb v. Fed.
Elec. Comm'n, 143 F.3d 618, 622 (D.C. Cir. 1998).

11

In Gottlieb, the court drew a distinction between voters' claims over the allegedly illegal exclusion of their preferred candidate and the allegedly illegal inclusion of a rival candidate. Id. While the exclusion "directly imping[es] on the voters' ability to support" their chosen candidate--after all, they cannot vote for somebody who is not on the ballot--the mere inclusion of a rival does "not impede the voters from supporting the candidate of their choice" and thus does not cause the legally cognizable harm necessary for standing. Id. (citing Buckley v. Valeo, 424 U.S. 1, 94 (1976)). So voters have no standing to complain about the participation of an ineligible candidate in an election, even if it results in the siphoning of votes away from an eligible candidate they prefer. See id. As Gottlieb reasons, only the eligible candidate, or his or her political party, can claim standing based on that injury.

In addition to Gottlieb, "[s]everal other Circuit Courts have also concluded that a voter fails to present an injury-in-fact when the alleged harm . . . is only derivative of a harm experienced by a candidate." Crist v. Comm'n on Pres. Debates, 262 F.3d 193, 195 (2d Cir. 2001) (per curiam). One of those courts was the First Circuit in Becker v. Federal Election Commission, 230 F.3d 381 (1st Cir. 2000). There, both presidential candidate Ralph Nader and a group of voters

12

challenged the corporate sponsorship of presidential debates.
Id. at 383-84.  Nader alleged that, in light of "his principled
stand against accepting corporate contributions," he could not
participate in these debates, placing him at a competitive
disadvantage to his campaign rivals, who harbored no such qualms.
Id. at 386.  The court of appeals ruled that this conferred
standing on Nader, but not on the voters.  Id. at 389-90.

> In rejecting the voters' standing, the court reasoned:
>
>> Regardless of Nader's injury, his supporters remain
>> fully able to advocate for his candidacy and to cast
>> their votes in his favor.  The only derivative harm
>> Nader's supporters can possibly assert is that their
>> preferred candidate now has less chance of being
>> elected.  Such 'harm,' however, is hardly a restriction
>> on voters' rights and by itself is not a legally
>> cognizable injury sufficient for standing.

Id. at 390 (citations omitted).  That reasoning applies with
equal force here.  McCain's candidacy for the presidency,
whatever his eligibility, is "hardly a restriction on voters'
rights" because it in no way prevents them from voting for
somebody else.  In fact, Hollander alleges that he did just that
in the New Hampshire Republican primary.

That Hollander's chosen candidate lost despite McCain's
alleged ineligibility does not, as Hollander asserts, mean that
his vote "count[ed] less" than, say, those cast in the New
Hampshire Democratic primary, which presumably gave voters a

13

choice among constitutionally qualified candidates only.[6]  So far
as the complaint discloses, the New Hampshire Secretary of State
duly counted the votes in each party's primary and apportioned
the delegates to the candidates accordingly under New Hampshire
law.  See N.H. Rev. Stat. Ann. § 659:94.  The apportionment of a
majority of the Republican delegates to McCain, who won his
party's primary here, did not injure Hollander any more than the
constructive exclusion of Nader from the presidential debates
injured his supporters; in each case, the practice simply made it
less likely that the plaintiff's preferred candidate would
ultimately be elected, which, as the First Circuit held in
Becker, does not amount to a judicially cognizable injury.

Hollander also argues that he "would again be
disenfranchised should he vote for McCain in the general election
and then McCain should be subsequently removed due to his lack of
eligibility."  Unlike Hollander's other "disenfranchisement"

_____

    [6]It is hard to say for sure, since there were some twenty-
one presidential candidates in the New Hampshire Democratic
primary, many of whom are hardly household names.  N.H. Sec'y of
State, Candidates for Upcoming Presidential Primary Election,
http://www.sos.nh.gov/presprim2008/candidatesfiled.htm (last
visited July 24, 2008).  There were the same number of
presidential candidates on the Republican side.  Id.  This
underscores the difficulty with Hollander's theory that the
simple presence of an ineligible candidate on a ballot
necessarily disenfranchises all voters who support eligible
candidates in that election.

theory, this one does not depend on the failure of his chosen candidate __because of__ McCain's alleged ineligibility, but on the success of Hollander's chosen candidate--who is McCain in this scenario--__despite__ his alleged ineligibility.  On this theory, however, Hollander's alleged "disenfranchisement" flows not from the actions he has challenged here, __i.e.__, McCain's presidential campaign or the RNC's likely selection of him as its nominee, but from his subsequent removal from office at the hands of someone else (presumably one of the co-equal branches of government), resulting (presumably, yet again) in a President different from the one Hollander helped to elect.

This theory presents a number of serious problems, not the least of which are whether the removal of an elected official by non-electoral means amounts to "disenfranchisement" of the voters who put him there, __cf.__ __Powell v. McCormack__, 395 U.S. 486, 547 (1969), and whether the claim is "contingent on events that may not occur as anticipated or may not occur at all," __Lincoln House, Inc. v. Dupre__, 903 F.2d 845, 847 (1st Cir. 1990), namely, McCain's election to, then removal from, the office of President.[7]  Putting those considerations aside, however, the

_____

[7]There is also the question of whether "disenfranchisement" resulting from a vote for an ineligible candidate is the sort of "self-inflicted" harm caused by the voter, rather than any state actor, which therefore does not amount to an infringement of the

15

theory does not establish Hollander's standing because it does not "allege personal injury fairly traceable to the defendant's allegedly unlawful conduct," <u>Allen v. Wright</u>, 468 U.S. 737, 751 (1984), but to the conduct of those--whoever they might turn out to be--responsible for ultimately ousting McCain from office. Indeed, McCain and the RNC are trying to achieve the opposite.

Hollander's real complaint seems to be that, in the general election, he will face the Hobson's choice of having to vote for his party's nominee, who is allegedly ineligible, or against his party's nominee, though he is a registered Republican.  But a political party retains considerable, if not unlimited, discretion over the selection of its nominees, <u>see</u> 1 Tribe, <u>supra</u>, §§ 13-23--13-25, at 1118-1129, and these limitations have never been understood to incorporate the "right" of registered party members to a constitutionally eligible nominee.[8]  Moreover,

_____

franchise right.  <u>See</u> 1 Lawrence H. Tribe, <u>American Constitutional Law</u> § 13-24, at 1122-23 (2d ed. 1988) (reasoning that, where voters disqualify themselves from voting in one party's primary under state law by voting in another's, it is the voters' own behavior, "rather than the operation of state law, that should be blamed for their inability to cast a ballot," discussing <u>Rosario v. Rockefeller</u>, 410 U.S. 752 (1973)).

[8]The Supreme Court has upheld state laws prohibiting certain candidates from appearing on the ballot--including those "ineligible for office, unwilling to serve, or [running as] another party's candidate"--against challenges founded on the associational rights of the party who wishes to nominate such a candidate.  <u>Timmons v. Twin Cities Area New Party</u>, 520 U.S. 351,

Hollander remains free to cast his vote for any candidate he considers eligible, including by writing in whichever Republican candidate he believes should be nominated instead of McCain, and to have that vote counted just as much as those cast for the party's official nominee, so his right to the franchise remains intact. See Reynolds v. Sims, 377 U.S. 533, 555 (1964) (defining right as "to vote freely for the candidate of one's choice" without "debasement or dilution of the weight of a citizen's vote"). Difficult choices on Election Day do not translate into judicially cognizable injuries.

This is not to demean the sincerity of Hollander's challenge to McCain's eligibility for the presidency; as discussed supra Part II, that challenge has yet to be definitively settled, and, as a number of commentators have concluded, arguably cannot be without a constitutional amendment. What is settled, however, is that an individual voter like Hollander lacks standing to raise

_____

359 (1997) (footnote omitted); see also Socialist Workers Party of Ill. v. Ogilvie, 357 F. Supp. 109, 113 (N.D. Ill. 1972) (rejecting party's First Amendment challenge to exclusion from ballot of presidential candidate who did not meet constitutional age requirement). But again, Hollander's claim is not a political party's challenge to the exclusion of its candidate from, or the inclusion of a rival candidate on, the ballot; it is a voter's challenge to the inclusion of an allegedly ineligible candidate on the ballot. So this case raises no question as to the constitutionality of a state-law prohibition on ineligible candidates; Hollander's claim is not that McCain was or will be kept from the ballot, but that he should have been or should be.

that challenge in the federal courts.  See Dugan & Collins,
supra, at 115 (recognizing debates over meaning of Art. II, § 1,
cl. 4, but concluding that voters lack standing to raise that
issue judicially).  Indeed, "[t]he purest reason to deny standing
is that the plaintiff is not able to show an injury to the voter
interest, however much the plaintiff may feel offended by the
challenged practice."  13 Charles Alan Wright et al., Federal
Practice & Procedure § 3531.4 (2d ed. 1984 & 2007 supp.)
(footnote omitted).  Because Hollander can show no such injury,
this court lacks jurisdiction over his attempt to resolve the
question of McCain's eligibility under Art. II, § 1, cl. 4.
Whatever the contours of that constitutional provision, Article
III has been definitively read by the courts to confer no
jurisdiction over this kind of action.

## IV.  **Conclusion**

For the foregoing reasons, the defendants' motion to dismiss
is granted on the ground that Hollander lacks standing.  All
other pending motions are denied as moot.  The clerk shall enter
judgment accordingly and close the case.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  July 24, 2008

cc:  Fred Hollander, pro se
     Charles G. Douglas, III, Esq.
     Matthew D. McGill, Esq.
     Amir C. Tayrani, Esq.
     Seth R. Aframe, Esq.

19

# Exhibit D



### McCAIN

**Picture #1**

**Preview**

<< PLAY

**Media**

Picture #1
Picture #2

**John Sidney McCain, III, is born, August 29, 1936, in the Panama Canal Zone.**
On August 29, 1936, John Sidney McCain, III, was born at the Coco Solo Air Base hospital in the Panama Canal Zone. His father was serving as an Executive Officer aboard a Naval submarine in Panama. In an improbable coincidence, John's grandfather Slew McCain arrived just days later to command the Coco Solo Naval Air Station. All three

**Web Links and PDFs**

TIME SHUTTLE

Paid for by John McCain 2008
Back to www.JohnMcCain.com >